# EXHIBIT A

## PRE-JUDGMENT PLAINTIFFS

| "Me Too" Pari Passu Case (Plaintiff(s)) | Docket # | Date of Complaint | Amount of Pre-Judgment Principal Claimed - 1994 FAA Bonds |
|---|---|---|---|
| *NML Capital, Ltd. v.* *Republic of Argentina* (NML Capital, Ltd.) | 14 Civ. 8988 | 11/25/2014 (amended) | $2,694,745 |
| *Foglia, et al. v.* *Republic of Argentina* (Virgiolio Luis Foglia; Maria Cristina Argentina Barna and Ricardo Aurelio Triay) | 14 Civ. 8243 | 10/15/2014 | $297,000 |
| *Pons, et al. v.* *Republic of Argentina* (Ricardo Pons and Ofelia Nelida Garcia; NW Global Strategy) | 13 Civ. 8887 | 12/16/2013 | $211,000 |
| *Guibelalde, et al. v.* *Republic of Argentina* (Horacio Guibelalde and Marta Mabel Folgado) | 11 Civ. 4908 | 2/23/2014 (motion for leave to amend) | $115,000 |
| *Dorra, et al. v.* *Republic of Argentina* (Maximo Dorra and Olga Dorra de Dorra; Raul Rennella and Sandra Elizabeth Schuler; Angel Emilio Molinos) | 14 Civ. 10141 | 12/29/2014 | $574,585 |
| *Beloqui, et al. v.* *Republic of Argentina* (Miguel Angel Beloqui and Ana Josefa Zemborain) | 14 Civ. 5963 | 7/31/2014 | $114,000 |
| *Tortus Capital Master Fund, LP v.* *Republic of Argentina ("Tortus II")* (Tortus Capital Master Fund, LP) | 14 Civ. 1109 | 2/21/2014 | $210,000 |
| *Tortus Capital Master Fund, LP v.* *Republic of Argentina ("Tortus III")* (Tortus Capital Master Fund, LP) | 14 Civ. 3127 | 5/23/2014 (amended) | $77,000 |
| *Trinity Investments Limited  v.* *Republic of Argentina* (Trinity Investments Limited) | 14 Civ. 10016 | 12/18/2014 | $6,338,000 |

## PRE-JUDGMENT PLAINTIFFS

| "Me Too" Pari Passu Case (Plaintiff(s)) | Docket # | Date of Complaint | Amount of Pre-Judgment Principal Claimed - 1994 FAA Bonds |
|---|---|---|---|
| *MCHA Holdings, LLC  v.* <br> *Republic of Argentina* <br> (MCHA Holdings, LLC) | 14 Civ. 7637 | 9/19/2014 | $6,819,000 |
| *MCHA Holdings, LLC  v.* <br> *Republic of Argentina* <br> (MCHA Holdings, LLC) | 14 Civ. 10064 | 12/22/2014 | $15,657,000 |
| *ARAG-A Limited, et al. v.* <br> *Republic of Argentina* <br> (ARAG-A Limited; ARAG-O Limited; ARAG-T Limited; ARAG-V Limited) | 14 Civ. 9855 | 12/12/2014 | $1,449,000 |
| *Attestor Master Value Fund LP v.* <br> *Republic of Argentina* <br> (Attestor Master Value Fund) | 14 Civ. 5849 | 8/19/2014 (amended) | $25,595,696 |
| *Claridae Ltd, et al. v.* <br> *Republic of Argentina* <br> (Claridae, Ltd.; Maria del Pilar de Wenetz Ferrer) | 14 Civ. 10201 | 12/30/2014 | $214,705 + €491,000 |
| *Lambertini, et al. v.* <br> *Republic of Argentina* <br> (Egar Ramon Lambertini; Ana Doratelli and Juana Bonaiuti; Tito Siena; Scoggin Capital Management II LLC; Scoggin International Fund Ltd.; Scoggin Worldwide Fund Ltd.) | 15 Civ. 1471 | 2/27/2015 | $3,992,000 |

# EXHIBIT B

**POST-JUDGMENT PLAINTIFFS**

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Allan Applestein TTEE FBO D.C.A. Grantor Trust | *Allan Applestein TTEE FBO D.C.A. Grantor Trust, et al.* , 02 Civ. 4124 | 5/31/2002 | 12/30/2003 | $285,981 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Carla Marini Arcangeli de Felicis | *Bettoni, et al.* , 05 Civ. 4299 | 4/28/2005 | 1/17/2007 | $1,378,736 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Pier Luigi Lucibello Piani;  Franco Trentin and Stefania Trentin | *Beyer, et al.* , 07 Civ. 0098 | 1/5/2007 | 12/26/2007 | $374,615 € 113,826 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Marco Borgra; Sergio Borgra; Donatella Fragonara Zanotti | *Borgra, et al.* , 07 Civ. 5807 | 6/19/2007 | 4/8/2008 | $223,315 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Alberto Baciucco; Otello Baciucco; Emanuele Botti | *Botti, et al.* , 05 Civ. 8687 | 10/11/2005 | 1/19/2007 | $764,335 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Renata Boscariol; Giampaolo Montino; Maurizio Sergi; Simona Staccioli | *Cilli, et al.* ,  04 Civ. 6594 | 8/13/2004 | 8/23/2006 | $239,930 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Agostino Consolini; Cesarino Consolini; Mario Giacometti; Verna Guialandi; Hilda Rupprecht | *Consolini, et al.* , 05 Civ. 0177 | 1/7/2005 | 4/2/2007 | $596,047 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Carifin S.A.; Diego Castagna and Eufrosina De Stefano | *Fedecostante, et al.* , 05 Civ. 4466 | 5/6/2005 | 1/11/2007 | $1,957,584 |

**POST-JUDGMENT PLAINTIFFS**

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Gianfranco Agostini; Sara Bartolozzi; Roberto Berardocco; Carlo Bretti; Susanna Bretti; Maria Robbiati; Anna Ferri; Giovanni Giardina and Vincenza Sabatelli; Franco Pezze | *Ferri, et al.* , 05 Civ. 2943 | 3/17/2005 | 1/25/2007 | $1,027,020 € 15,010 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Carlotta Giovanni; Raimondo Iallonardo | *Franceschi, et al.* , 03 Civ. 4693 | 6/25/2003 | 1/11/2007 | $738,780 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Adriano Bettinelli; Ruggero Rossini and Antonietta Giuseppina Brioschi | *Klein, et al.* , 05 Civ. 6599 | 7/18/2005 | 6/1/2007 | $1,816,510 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Graziano Adami; Monica Crozzoletto; Celestino Goglia; Paolo Lisi; Elide Margnelli; Amato Mori | *Lisi, et al.* , 05 Civ. 6002 | 6/27/2005 | 1/19/2007 | $545,236 € 39,189 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Sergio Lovati | *Lovati* , 05 Civ. 8195 | 9/20/2005 | 1/11/2007 | $40,058,222 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Valerio Piacenza | *Mazzini, et al.* , 03 Civ. 8120 | 10/14/2003 | 5/22/2006 | $100,251 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Graziella Bonadiman; Italia Camato; Giovanna Ferro; Salvatore Melchionda; Tiziano Sasselli | *Moldes, et al.* , 04 Civ. 6137 | 8/6/2004 | 8/18/2006 | $1,294,042 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Milena Ampalla; Antonella Bacchiocchi; and 65 additional plaintiffs | *Morata, et al.* , 04 Civ. 3314 | 4/27/2004 | 1/18/2007 | $31,803,222 |

## POST-JUDGMENT PLAINTIFFS

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Serenella Belleggia and Carlo Farioli | *Pasquali,  et al.* , 05 Civ. 10636 | 12/19/2005 | 1/18/2007 | $41,880 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Angelo Cottoni; Bruna Mattioli; Allessandra Regoli; Silvia Regoli; Ines Rota; Vito Zancaner; Matteo Zanichelli; Giovanni Zanichelli | *Rigueiro, et al.* , 05 Civ. 3089 | 3/18/2005 | 1/17/2007 | $10,026,667 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Augusto Arcangeli De Felicis; Alberto Compare; and 10 additional plaintiffs | *Rosa, et al.* , 04 Civ. 7504 | 9/22/2004 | 5/29/2007 | $2,418,845 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Ruggero Rossini; Antonietta Giuseppina Brioschi; Raffaele Rossini; Simonetta Montanari; Claudio Mori; Alfredo Pelli; Graziella Berchi; Giuseppe Silvio Rossinni; Marinella Scalvi | *Rossini, et al.* , 05 Civ. 6200 | 6/30/2005 | 1/19/2007 | $1,891,725 € 154,537 |
| *Andrarex Ltd. v. Republic of Argentina* , 14 Civ. 9093 (11/14/2014) | Andrarex, Ltd. | *Andrarex, Ltd.* , 07 Civ. 5593 | 6/12/2007 | 10/2/2008 | $5,276,390 |
| *Angulo, Jose Pedro et al v. Republic of Argentina* , 15 Civ. 1470 (2/27/2015) | Jose Perdro Angulo; Pedro Timoteo Angulo | *Angulo, et al.* , 06 Civ. 1590 | 2/28/2006 | 12/26/2007 | $680,352 |
| *Angulo, Jose Pedro et al v. Republic of Argentina* , 15 Civ. 1470 (2/27/2015) | Claren Corp. | *Claren Corp.* , 06 Civ. 13675 | 12/1/2006 | 12/13/2007 | $7,507,089 |
| *Angulo, Jose Pedro et al v. Republic of Argentina* , 15 Civ. 1470 (2/27/2015) | Fernando Crostelli; Juan Carlos Crostelli; Martina Crostelli; Viviana Crostelli | *Crostelli, et al.* , 06 Civ. 15300 | 12/19/2006 | 11/19/2007 | $10,636,731 |

## POST-JUDGMENT PLAINTIFFS

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Angulo, Jose Pedro et al v. Republic of Argentina*, 15 Civ. 1470  (2/27/2015) | Patricio Hansen | *Hansen*, 06 Civ. 15293 | 12/19/2006 | 8/10/2009 | $510,262 |
| *Aurelius Capital Partners, LP, et al. v. Republic of Argentina*, 14 Civ. 8946 (11/10/2014) | Aurelius Capital Partners, LP; Aurelius Capital Master, Ltd | *Aurelius Capital Partners, LP, et al.*, 07 Civ. 2715 | 4/3/2007 | 4/29/2008 | $195,794,206 |
| *Aurelius Capital Partners, LP, et al. v. Republic of Argentina*, 14 Civ. 8946 (11/10/2014) | Aurelius Capital Partners, LP; Aurelius Capital Master, Ltd | *Aurelius Capital Partners, LP, et al.*, 07 Civ. 11327 | 12/17/2007 | 6/13/2008 | $128,540,595 |
| *Banca Arner, S.A., et al. v. Republic of Argentina*, 15 Civ. 1508  (3/2/2015) | Banca Arner, S.A. | *Banca Arner, S.A.*, 05 Civ. 277 | 1/12/2005 | 1/11/2007 | $37,371,622 |
| *Banca Arner S.A., et al. v. Republic of Argentina*, 15 Civ. 1508  (3/2/2015) | Brantford Holding S.A. | *Beltramo, et al.*, 06 Civ. 7151 | 9/18/2006 | 1/14/2014 | $7,266,560 |
| *Blue Angel Capital I LLC v. Republic of Argentina*, 14 Civ. 8947 (11/20/2014) | Blue Angel Capital I LLC | *Blue Angel Capital I LLC*, 07 Civ. 2693 | 4/2/2007 | 4/28/2008 | $229,654,415 |
| *Capital Markets Financial Services Inc., et al. v. Republic of Argentina*, 15 Civ. 710 (1/30/2014) | Clarex Ltd. | *Capital Markets Financial Services Inc., et al.*, 06 Civ. 15301 | 12/19/2006 | 11/9/2010 | $136,623,446 |
| *Capital Ventures International v. Republic of Argentina*, 14 Civ. 7258 (9/8/2014) | Capital Ventures International | *Capital Ventures International*, 05 Civ. 4085 | 4/25/2005 | 3/16/2007 | $52,116,640 |
| *Capital Ventures International v. Republic of Argentina*, 14 Civ. 7258 (9/8/2014) | Capital Ventures International | *Capital Ventures International*, 06 Civ. 207 | 1/11/2006 | 6/8/2007 | $104,450,284 €4,435,589 |

**POST-JUDGMENT PLAINTIFFS**

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Cordoba Capital v. Republic of Argentina* , 14 Civ. 7164 (9/5/2014) | Cordoba Capital | *Cordoba Capital* , 06 Civ. 5887 | 8/3/2006 | 6/1/2009 | $100,033,967 |
| *EM Ltd. v. Republic of Argentina* , 14 Civ. 8303 (10/16/2014) | EM Ltd. | *EM Ltd.* , 03 Civ. 2507 | 4/10/2003 | 10/27/2003 | $724,801,663 |
| *FFI Fund, Ltd. and FYI Ltd. v. Republic of Argentina* , 14 Civ. 8630 (10/29/2014) | FFI Fund Ltd. | *FFI Fund Ltd., et al.* , 05 Civ. 3328 | 3/29/2005 | 5/28/2009 | $673,669,080 |
| *FFI Fund, Ltd. and FYI Ltd. v. Republic of Argentina* , 14 Civ. 8630 (10/29/2014) | FYI Ltd. | *FFI Fund Ltd., et al.* , 05 Civ. 3328 | 3/29/2005 | 1/27/2010 | $448,302,340 |
| *GMO Emerging Country Debt Fund v. Republic of Argentina* , 14 Civ. 8667 (10/30/2014) | GMO Emerging Country Debt Fund | *GMO Emerging Country Debt Fund* , 05 Civ. 10383 | 12/12/2005 | 8/19/2010 | $57,388,918 |
| *GMO Emerging Country Debt Investment Fund PLC v. Republic of Argentina* , 14 Civ. 8666 (10/30/2014) | GMO Emerging Country Debt Investment Fund | *GMO Emerging Country Debt Investment Fund* , 05 Civ. 10382 | 12/12/2005 | 8/19/2010 | $6,711,013 |
| *GMO Emerging Country Debt L.P. v. Republic of Argentina* , 14 Civ. 8665 (10/30/2014) | GMO Emerging Country Debt L.P. | *GMO Emerging Country Debt L.P.* , 05 Civ. 10380 | 12/12/2005 | 8/19/2010 | $33,635,078 |
| *Lightwater Corp. Ltd. v. Republic of Argentina* , 14 Civ. 4092 (9/30/2014 - amended) | Lightwater Corp. Ltd. | *Lightwater Corp. Ltd.* , 02 Civ. 3804 | 5/17/2002 | 5/27/2003 | $8,353,625 |

**POST-JUDGMENT PLAINTIFFS**

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Los Angeles Capital v. Republic of Argentina*, 14 Civ. 7169 (9/5/2014) | Los Angeles Capital | *Los Angeles Capital*, 05 Civ. 10201 | 12/5/2005 | 6/1/2009 | $82,160,690 |
| *Los Angeles Capital v. Republic of Argentina*, 14 Civ. 7169 (9/5/2014) | Los Angeles Capital | *Los Angeles Capital*, 07 Civ. 2349 | 3/21/2007 | 6/1/2009 | $75,139,739 |
| *Montreux Partners, L.P. v. Republic of Argentina*, 14 Civ. 7171 (9/5/2014) | Montreux Partners, L.P. | *Montreux Partners, L.P.*, 05 Civ. 4239 | 4/28/2005 | 6/1/2009 | $48,621,544 |
| *NML Capital, Ltd. v. Republic of Argentina*, 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.*, 03 Civ. 8845 | 11/7/2003 | 12/18/2006 | $284,184,632 |
| *NML Capital, Ltd. v. Republic of Argentina*, 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.*, 05 Civ. 2434 | 2/28/2005 | 6/16/2009 | $311,177,898 |
| *NML Capital, Ltd. v. Republic of Argentina*, 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital Ltd.*, 06 Civ. 6466 | 8/25/2006 | 6/16/2009 | $533,378,361 |
| *NML Capital, Ltd. v. Republic of Argentina*, 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.*, 07 Civ. 1910 | 3/5/2007 | 4/10/2008 (date of summary judgment order) | $71,598,000 (principal only) |
| *NML Capital, Ltd. v. Republic of Argentina*, 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.*, 07 Civ. 2690 | 4/2/2007 | 6/16/2009 | $148,781,936 |

## POST-JUDGMENT PLAINTIFFS

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *NML Capital, Ltd. v. Republic of Argentina* , 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.* , 07 Civ. 6563 | 7/20/2007 | 4/10/2008 (date of summary judgment order) | $300,000 (principal only) |
| *NML Capital, Ltd. v. Republic of Argentina* , 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.* , 08 Civ. 2541 | 3/13/2008 | 3/4/2009 (date of summary judgment order) | $16,719,628 (principal only) |
| *NML Capital, Ltd. v. Republic of Argentina* , 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.* , 08 Civ. 3302 | 4/2/2008 | 6/16/2009 | $290,270,631 |
| *Old Castle Holdings, Ltd. v. Republic of Argentina* , 14 Civ. 4091 (9/30/2014 - amended) | Old Castle Holdings, Ltd. | *Old Castle Holdings, Ltd.* , 02 Civ. 3808 | 5/17/2002 | 5/30/2003 | $835,363 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Roberto Claudio Pitronaci; Alberto Guillermo Hillcoat; Enrique Sebastian Palacio Minetti; Casimiro Kornas; Miguel Alberto Balestrini; Lidia Florinda Pioli | *Heeb, et al.* , 07 Civ. 10656 | 11/28/2007 | 2/7/2009 | $2,491,144 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Pedro Kalbermann | *Allan Applestein TTEE FBO D.C.A. Grantor Trust, et al.* , 02 Civ. 4124 | 5/30/2003 | 05/12/2004 | $1,396,976 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Consultora Kilser S.A. | *Amber Reed Corp., et al.* , 08 Civ. 440 | 1/17/2008 | 10/16/2008 | $1,781,728 |

**POST-JUDGMENT PLAINTIFFS**

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Andrea Paleari; Gamatown Corp.; Abel Amoroso; Norfolk Investment Trade Co.; Eduardo Raul Garrido | *Amoroso, et al.* , 06 Civ. 3197 | 4/25/2006 | 6/26/2007 | $1,552,690 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Roberto Bautista Franco Baccanelli | *Baccanelli* , 07 Civ. 2788 | 4/6/2007 | 4/22/2008 | $10,200,678 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Ramon Eduardo Nebhen; Bruno Italia; Angela Busi; Maria Lucrecia Quiroga; Nicolas Carlos Amador Farinola; Nicolas Carlos Amador Farinola; Renate Arnold; Irma Haydee Redondo de Negri | *Bettoni, et al.* , 05 Civ. 4299 | 5/2/2005 | 1/17/2007 | $3,207,003 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Antonio Juan Pauletich; Franco Peruz; Norberto Dario Casella; Guido Scanavino; Giancarlo Grassi; Hendrik Beyer; Edgardo Gerardo A. Sclafani; Lucia Rafaela Tasso; Alexia Brandes | *Beyer, et al.* , 07 Civ. 98 | 1/30/2007 | 12/26/2007 | $5,012,061 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Bliway International S.A. | *Bliway International S.A.* , 06 Civ. 3198 | 4/25/2006 | 6/26/2007 | $2,348,974 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Hartmut Peters; Wolfgang Bolland; Wege Zu Mozart Veranstaltungsgesellschaft m.b.H. | *Bolland, et al.* , 06 Civ. 3196 | 4/25/2006 | 4/2/2007 | $4,992,843 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Alfredo Carlos Alzaga; Miguel Alberto Balestrini; Mariana Noemi Tauss; Atilio Luis Pocosgnich; Beatriz Marti Reta | *Borgra, et al.* , 07 Civ. 5807 | 6/19/2007 | 4/8/2008 | $1,042,429 |

## POST-JUDGMENT PLAINTIFFS

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina*, 14 Civ. 8242 (10/15/2014) | Silvio Eduardo Schuster; Miguel Kaufmann; Edgardo A. Ramos; Elena Pasquali; Portico Capital Inc.; Corleis Sociedad Anonima; Graciela Candida Saenz; Jorg Zahn | *Botti, et al.*, 05 Civ. 8687 | 10/12/2005 | 1/19/2007 | $4,834,121 |
| *Perez, et al. v. Republic of Argentina*, 14 Civ. 8242 (10/15/2014) | Crista Irene Brandes | *Brandes, et al.*, 08 Civ. 6625 | 7/25/2008 | 2/7/2009 | $4,785,792 |
| *Perez, et al. v. Republic of Argentina*, 14 Civ. 8242 (10/15/2014) | Delfin A. Rabinovich; Oscar Secco; Alejandro Fernandez Barbeito; Elvira Dagmar Buzcat; Mercedes Calvo | *Buczat, et al.*, 04 Civ. 7056 | 9/2/2004 | 9/19/2006 | $2,065,067 |
| *Perez, et al. v. Republic of Argentina*, 14 Civ. 8242 (10/15/2014) | Oscar Reinaldo Carabajal; Rosa Delfina Castro; Gamatown Corporation S.A. | *Carabajal, et al.*, 09 Civ. 8257 | 9/29/2009 | 2/25/2011 | $2,084,294 |
| *Perez, et al. v. Republic of Argentina*, 14 Civ. 8242 (10/15/2014) | Colombo Masi; Luis Pedro Bivort; Maria Fausta Cilli; Fiorenzo Faccioni; Leonardo Hilario Simone; Carlos Arturo Jose Ulla; Decio Carlos Francisco Ulla | *Cilli, et al.*, 04 Civ. 6594 | 8/13/2004 | 8/23/2006 | $2,777,303 |
| *Perez, et al. v. Republic of Argentina*, 14 Civ. 8242 (10/15/2014) | Michelle Colella | *Colella, et al.*, 04 Civ. 2710 | 4/9/2004 | 6/1/2006 | $6,787,965 |
| *Perez, et al. v. Republic of Argentin*a, 14 Civ. 8242 (10/15/2014) | Fiseico - Financing Services International Corporation; Edith Elvira Nicolas; Lerinerco S.A.; Lorenzo Bianchi | *Consolini, et al.*, 05 Civ. 177 | 1/7/2005 | 4/2/2007 | $895,390 |

## POST-JUDGMENT PLAINTIFFS

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Carlo Cigolini; Juan Eduardo Colombo; Carla Nanni; Maurizio Petroni; Roberto Akman; Gabriele Dolcetti; Gabriele Dolcetti; Marcella Dolcetti; Luca Mulazzani | *Dolcetti, et al.* , 07 Civ. 2607 | 3/29/2007 | 1/31/2009 | $4,120,232 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | HWB Alexandra Strategies Portfolio; HWB Dachfonds - Venividivici; HWB Gold & Silber Plus; Victoria Strategies Portfolio Ltd.; Drawrah Limited | *Drawrah, et al.* , 09 Civ. 8299 | 9/30/2009 | 2/25/2011 | $48,443,925 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Cesare de Juliis; Rudolf Erb; Silvia Beatriz Ovejero; Jose L. Peluso | *Erb, et al.* , 07 Civ. 11495 | 12/21/2007 | 9/26/2008 | $2,193,608 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Alejandro Alberto Etcheto | *Etcheto, et al.* , 08 Civ. 4902 | 5/28/2008 | 2/7/2009 | $360,550 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Hector Perez; Marland International S.A.; Lis Carina Medina; and 10 additional plaintiffs | *Etevob, et al.* , 03 Civ. 1680 | 3/11/2003 | 1/16/2007 | $7,645,902 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Vanina Andrea Exposito | *Exposito* , 04 Civ. 3639 | 5/12/2004 | 7/13/2007 | $198,222 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Massimo Baldari; Alberto Ancieto Gonzalez; Roberto Fedecostante; Brigida Elvira Denis; Nelida Amelia Giusti de Behar; Alexander Stern; Maria Marta de Luca | *Fedecostante, et al.* , 05 Civ. 4466 | 5/6/2005 | 01/11/2007 | $1,847,043 |

## POST-JUDGMENT PLAINTIFFS

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Eduardo Argentieri; Carlos Adolfo Escati; Armando Eduardo Valerio; Mirta Antonia Portela; Gabriel Federico Leimgruber; Laura Victoria Demidovich | *Ferri, et al.* , 05 Civ. 2943 | 3/17/2005 | 1/25/2007 | $1,011,406 |
| *Perez, et al. v. Republic of Argentin* a, 14 Civ. 8242 (10/15/2014) | Livio Mazzola; Bradford Promotions S.A.; Hamburg Consulting Inc.; Pierino Garrafa; Carlos Jesus Sendin; and 10 additional plaintiffs | *Franceschi, et al.* , 03 Civ. 4693 | 6/25/2003 | 1/11/2007 | $5,373,301 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Helmut Hagemann | *Hagemann* , 08 Civ. 5436 | 6/16/2008 | 4/3/2009 | € 954,390 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | HWB Renten Portfolio Plus; HWB Alexandra Strategies Portfolio; Victoria Strategies Porfolio Ltd.; HWB Victoria Strategies Portfolio; HWB Portfolio Plus | *HWB Securities II, et al.* , 07 Civ. 11382 | 12/19/2007 | 2/7/2009 | $12,374,663 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Gunther Braun; HWB Renten Portfolio Plus; HWB Alexandra Strategies Portfolio; NW Global Strategy; Victoria Strategies Portfolio Ltd.; HWB Victoria Strategies Portfolio; HWB Portfolio Plus | *HWB Victoria, et al.* , 07 Civ. 10657 | 11/28/2007 | 2/7/2009 | $115,950,470 |
| *Perez, et al. v. Republic of Argentin* a, 14 Civ. 8242 (10/15/2014) | Fersimar Corp., S.A.; Carlos A. Rial Coto; Diana Klein; Ghibli Investments Ltd.; County Bay Investments Ltd. | *Klein, et al.* , 05 Civ. 6599 | 7/21/2005 | 6/1/2007 | $5,970,827 |

## POST-JUDGMENT PLAINTIFFS

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Giordano Allievi; Ambrogio Stucchi; Moreno Legnaro; Mario Dal Toe; Davide Ciallella; Bramante Dal Toe; Aldo Naj Oleari; Ada Dal Trozzo; Luis Garcia Tobio | *Legnaro, et al.* , 05 Civ. 178 | 1/13/2005 | 1/19/2007 | $809,020 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Sergio Rodolfo Berri; Malcolm Gerald Berri; Franco Maria Conte; Francesco Massoletti | *Lisi, et al.* , 05 Civ. 6002 | 6/28/2005 | 1/19/2007 | $1,473,539 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Luigi Giacomazzi; Agostino Scocchera; Kazimierz Kornas; Nora Raquel Lopez; Marcos Vanni; Carlos Alberto Martinez; Sidney Sutter | *Martinez, et al.* , 05 Civ. 2521 | 3/3/2005 | 1/11/2007 | $3,361,182 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Mazoral S.A. | *Mazoral S.A.* , 04 Civ. 3313 | 4/30/2004 | 8/16/2006 | $10,800,595 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Jorge Marcelo Mazzini; Compania Calitecno S.A.; Ana Valeria Baravalle; Jose Alberto Landi; Hernan Taboada; Susana Frasca de Lauria; and 15 additional plaintiffs | *Mazzini, et al.* , 03 Civ. 8120 | 3/25/2004 | 5/22/2006 | $9,821,523 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Luciana Ceredi; Alesia Milanesi; Peng Zeying; Raul Alejandro Gonzalez Martin; Gustavo Carlos Ferreira; Jose Emilio Cartana; Raul Horacio Mendez | *Milanesi, et al* ., 07 Civ. 7248 | 8/14/2007 | 9/25/2008 | $2,857,971 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Nelson Dante Luciano; Oscar Raul Clavijo; Carlos Alberto Bruzzone; Pedro Kalbermann | *Moldes, et al.* , 04 Civ. 6137 | 8/9/2004 | 8/18/2006 | $2,836,189 |

## POST-JUDGMENT PLAINTIFFS

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Ansgar Neuenhofer; First City S.A.; Alberto Silvio Bursztyn; Claudio Oscar Mazza; Lydia Haydee Gigaglia; Rodolfo Burul; and 20 additional plaintiffs | *Morata, et al.* , 04 Civ. 3314 | 12/9/2004 | 1/18/2007 | $5,076,540 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (NW Global Strategy, et al.) (10/15/2014) | Gamatown Corporation S.A.; HWB Gold & Silber Plus; NW Global Strategy | *NW Global Strategy, et al.* , 10 Civ. 4656 | 6/15/2010 | 4/1/2011 | $8,836,012 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Mara Cavana; Maurizio Dalla; and 10 additional plaintiffs | *Palladini, et al.* , 07 Civ. 689 | 1/29/2007 | 12/26/2007 | $10,705,217 |
| *Perez, et al. v. Republic of Argentin*a, 14 Civ. 8242 (10/15/2014) | Ricardo Kaufmann; Miguel Angel Bitto; Eugenio Quatrini; Pedro Marcelo Sexe; Telincor S.A.; Socrate Pasquali | *Pasquali, et al.* , 05 Civ. 10636 | 12/19/2005 | 1/18/2007 | $4,752,422 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Diego Pedro Peluffo; Juan Omar Giovachini; Guillermo Almanza; Graciela Adriana Gamito; and 30 additional plaintiffs | *Prima, et al.* , 04 Civ. 1077 | 2/10/2004 | 8/17/2006 | $59,860,601 € 105,380 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Marcelo Ruben Rigueiro; Alfredo Enrique Zucchini; Nestor de Nicola; Santiago Rocca; Dussault in Colella, Denise Marie Laurette; Josef Schwald; Susana Leonor Gatti | *Rigueiro, et al.* , 05 Civ. 3089 | 3/22/2005 | 1/17/2007 | $3,827,276 |

**POST-JUDGMENT PLAINTIFFS**

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Manuel Calvo; Alcira Noemi Arditi; Fernando Barbeito Fernandez; Sandro Concettini; Maria Asuncion Inmaculada Castelli; Roberto Carlos Parada; Alicia G. de Sondermann | *Rosa, et al.* , 04 Civ. 7504 | 8/16/2005 | 5/29/2007 | $1,830,341 €105,974 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Ines Delia Eidelman; Modern Group S.A.; Lucabras S.A.; Cesar Civetta | *Rossini, et al.* , 05 Civ. 6200 | 7/5/2005 | 1/19/2007 | $603,141 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Anye Salinovich | *Salinovich, et al.* , 11 Civ. 4223 | 6/21/2011 | 6/7/2012 | $47,448 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Griselda Teresa Dulevich; Maria Augustina Sauco | *Sauco, et al.* , 05 Civ. 3955 | 4/19/2005 | 8/18/2006 | $2,256,961 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Sabine Zahn; Josef Schwald; Stefano Spanicciati; Nestor Alberto Rubin; Andreas Wilfried Schwald | *Schwald, et al.* , 06 Civ. 6032 | 8/8/2006 | 5/2/2007 | $1,675,345 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | U.V.A. Vaduz; Klaus Bohrer | *U.V.A. Vaduz, et al.* , 07 Civ. 11497 | 8/13/2008 | 10/22/2008 | $5,580,919 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Zylberberg Fein LLC | *Zylberberg Fein LLC* , 07 Civ. 11496 | 12/21/2007 | 9/23/2008 | $7,891,737 |
| *Settin v. Republic of Argentina* , 14 Civ. 8739 (10/31/2014) | Rafael Settin | *Settin, et al.* , 06 Civ. 3068 | 4/21/2006 | 2/21/2008 | $3,936,228 |
| *Wilton Capital, Ltd. v. Republic of Argentina* , 14 Civ. 7166 (9/5/2014) | Wilton Capital, Ltd. | *Wilton Capital, Ltd.* , 07 Civ. 1797 | 3/1/2007 | 6/1/2009 | $39,869,672 |

## POST-JUDGMENT PLAINTIFFS

| "Me Too" Pari Passu Cases | Plaintiffs in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Wilton Capital, Ltd. v. Republic of Argentina* , 14 Civ. 7166 (9/5/2014) | Wilton Capital, Ltd. | Wilton Capital, Ltd., 09 Civ. 401 | 1/14/2009 | 6/26/2009 | $66,125,303 |

# EXHIBIT C

United Nations

**A**/RES/68/304



**General Assembly**

Distr.: General
17 September 2014

**Sixty-eighth session**
Agenda item 14

# Resolution adopted by the General Assembly on 9 September 2014

[*without reference to a Main Committee (A/68/L.57/Rev.1)*]

### 68/304. Towards the establishment of a multilateral legal framework for sovereign debt restructuring processes

*The General Assembly*,

*Recalling* the United Nations Millennium Declaration, adopted on 8 September 2000,[1] and the high-level plenary meeting of the General Assembly on the Millennium Development Goals and its outcome document,[2]

*Recalling also* the 2005 World Summit Outcome[3] and the follow-up to the development outcome of the 2005 World Summit, including the Millennium Development Goals and the other internationally agreed development goals,[4]

*Recalling further* the International Conference on Financing for Development and its outcome document,[5] in which sustainable debt financing is recognized as an important element for mobilizing resources for public and private investment, and the Follow-up International Conference on Financing for Development to Review the Implementation of the Monterrey Consensus and its outcome document, the Doha Declaration on Financing for Development,[6] as well as General Assembly resolution 68/204 of 20 December 2013,

*Recalling* its resolution 68/279 of 30 June 2014 on the convening of the third International Conference on Financing for Development to assess the progress made in the implementation of the Monterrey Consensus and the Doha Declaration, reinvigorate and strengthen the financing for development follow-up process, identify obstacles and constraints encountered in the achievement of the goals and objectives agreed therein, as well as actions and initiatives to overcome these constraints, and address new and emerging issues, including in the context of the recent multilateral efforts to promote international development cooperation, taking into account the current evolving development cooperation landscape, the

---

[1] Resolution 55/2.

[2] Resolution 65/1.

[3] Resolution 60/1.

[4] Resolution 60/265.

[5] *Report of the International Conference on Financing for Development, Monterrey, Mexico, 18–22 March 2002* (United Nations publication, Sales No. E.02.II.A.7), chap. I, resolution 1, annex.

[6] Resolution 63/239, annex.




**Please recycle**



interrelationship of all sources of development finance and the synergies among financing objectives across the three dimensions of sustainable development, as well as the need to support the United Nations development agenda beyond 2015,

*Recalling also* the United Nations Conference on Sustainable Development, held in Rio de Janeiro, Brazil, from 20 to 22 June 2012, and its outcome document, entitled "The future we want",[7]

*Recalling further* its resolution 63/303 of 9 July 2009, in which it endorsed the Outcome of the Conference on the World Financial and Economic Crisis and Its Impact on Development, held in New York from 24 to 30 June 2009,

*Stressing* the need to reinforce coherence and coordination and to avoid duplication of efforts with regard to the financing for development process,

*Taking note* of the report of the Commission of Experts on Reform of the International Monetary and Financial System, convened by the President of the General Assembly at its sixty-third session,[8]

*Recalling* its resolutions 58/203 of 23 December 2003, 59/223 of 22 December 2004, 60/187 of 22 December 2005, 61/188 of 20 December 2006, 62/186 of 19 December 2007, 63/206 of 19 December 2008, 64/191 of 21 December 2009, 65/144 of 20 December 2010, 66/189 of 22 December 2011, 67/198 of 21 December 2012 and 68/202 of 20 December 2013,

*Noting* that sovereign debt crises are a recurring problem that involves very serious political, economic and social consequences and that the restructuring processes of sovereign debt are a frequent phenomenon in the international financial system,

*Noting with concern* that there remain a number of low- and middle-income developing countries that are still facing difficulties in finding a durable solution to their external debt problems, which could adversely affect their sustainable development,

*Recognizing* that addressing the sovereign debt problems of developing countries is an important part of international cooperation,

*Stressing* the importance for developing countries, on a case-by-case basis, of debt relief, including debt cancellation, as appropriate, and debt restructuring as debt crisis prevention and management tools,

*Stressing also* the need to work towards the establishment of responsible and preventive financial crisis policies to enhance transparent and sustainable national financial systems,

*Recognizing* the sovereign right of any State to restructure its sovereign debt, which should not be frustrated or impeded by any measure emanating from another State,

*Recognizing also* that the efforts of a State to restructure its sovereign debt should not be frustrated or impeded by commercial creditors, including specialized investor funds such as hedge funds, which seek to undertake speculative purchases

---

[7] Resolution 66/288, annex.
[8] A/63/838.

of its distressed debt at deeply discounted rates on secondary markets in order to pursue full payment via litigation,

*Noting* that private creditors of sovereign debt are increasingly numerous, anonymous and difficult to coordinate and that there are a variety of debt instruments and a wide range of jurisdictions in which debt is issued, thus complicating the restructuring of sovereign debt,

*Noting also* the concern expressed in the declaration of the Summit of Heads of State and Government of the Group of 77 and China on the theme "For a New World Order for Living Well", held in Santa Cruz de la Sierra, Plurinational State of Bolivia, on 14 and 15 June 2014,[9] concerning the so-called "vulture funds" and their actions of a highly speculative nature, which pose a risk to all future debt restructuring processes, for both developing and developed countries,

*Taking into account* the initiatives studied in the framework of the International Development Association of the World Bank and the International Monetary Fund to address the activities of the so-called "vulture funds", with the objective of, inter alia, preventing such funds from benefiting from litigation initiated against indebted countries, which are forced to divert many of their resources to handle such litigation, thereby undermining the purpose of the debt restructuring processes,

*Recalling*, among other things, the work carried out by the International Monetary Fund in 2003, with the support of the International Monetary and Financial Committee, to formulate a proposal for a sovereign debt restructuring mechanism,

*Stressing* the importance of the Principles on Promoting Responsible Sovereign Lending and Borrowing issued by the United Nations Conference on Trade and Development on 4 May 2011, which aim to reduce the prevalence of sovereign debt crises, prevent unsustainable debt situations, maintain steady economic growth and help achieve the Millennium Development Goals, encouraging to that end responsible sovereign borrowing,

*Stressing also* the need to continue to address systemic fragilities and imbalances and the need for continuing efforts to reform and strengthen the international financial system,

*Noting with concern* that the international financial system does not have a sound legal framework for the orderly and predictable restructuring of sovereign debt, which further increases the cost of non-compliance,

*Recognizing* the need to create a legal framework that facilitates the orderly restructuring of sovereign debts, allows the re-establishment of viability and growth without creating incentives that inadvertently increase the risk of non-compliance and acts as a deterrent to disruptive litigation that creditors could engage in during negotiations to restructure sovereign debts,

*Stressing*, in this context, the importance of establishing a clear set of principles for the management and resolution of financial crises that take into account the obligation of sovereign creditors to act in good faith and with a cooperative spirit to reach a consensual rearrangement of the debt of sovereign States,

---

[9] A/68/948, annex.

*Recognizing* that debt-restructuring processes should have as their core element a determination of real payment capacity so that they do not adversely affect economic growth and the fulfilment of the unfinished business of the Millennium Development Goals, the sustainable development goals and the post-2015 development agenda,

*Stressing* that, in the restructuring of sovereign debt, the progressive development and codification of international law are necessary in order to make it a more effective means to implement the purposes and principles of the Charter of the United Nations and to give greater importance to its role in the relations among States,

1.    *Emphasizes* the special importance of a timely, effective, comprehensive and durable solution to the debt problems of developing countries in order to promote their inclusive economic growth and development;

2.    *Calls for* the intensification of efforts to prevent debt crises by enhancing international financial mechanisms for crisis prevention and resolution, in cooperation with the private sector, with a view to finding solutions acceptable to all;

3.    *Calls upon* all Member States and the United Nations system, and invites the Bretton Woods institutions and the private sector, to take appropriate measures and actions for the implementation of the commitments, agreements and decisions of the major United Nations conferences and summits, in particular those related to the question of the external debt sustainability of developing countries;

4.    *Recognizes* the roles of the United Nations and the international financial institutions in accordance with their respective mandates, and encourages them to continue to support global efforts towards sustainable development and a durable solution to the problem of the debt of developing countries;

5.    *Decides* to elaborate and adopt through a process of intergovernmental negotiations, as a matter of priority during its sixty-ninth session, a multilateral legal framework for sovereign debt restructuring processes with a view, inter alia, to increasing the efficiency, stability and predictability of the international financial system and achieving sustained, inclusive and equitable economic growth and sustainable development, in accordance with national circumstances and priorities;

6.    *Also decides* to define the modalities for the intergovernmental negotiations and the adoption of the text of the multilateral legal framework at the main part of its sixty-ninth session, before the end of 2014.

*107th plenary meeting*
*9 September 2014*

———————

# EXHIBIT D

No. 13-990

IN THE

# Supreme Court of the United States

❖❖

REPUBLIC OF ARGENTINA,

*Petitioner,*

—v.—

NML CAPITAL, LTD., ET AL.,

*Respondents.*

_____

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT

**BRIEF FOR THE REPUBLIC OF FRANCE AS**
***AMICUS CURIAE* IN SUPPORT OF THE REPUBLIC OF
ARGENTINA'S PETITION FOR A WRIT OF CERTIORARI**

DIANA BILLIK
ALLEN & OVERY LLP
52 Avenue Hoche
75379 Paris Cedex 08
France

ANDREW RHYS DAVIES
   (*Counsel of Record*)
MICHAEL F. WESTFAL
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 610-6300
andrew.rhys.davies@allenovery.com

*Counsel for Amicus Curiae*

March 24, 2014

i

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES........................................ ii

INTEREST OF THE *AMICUS CURIAE*.................. 1

SUMMARY OF THE ARGUMENT........................... 4

ARGUMENT................................................. 6

I.  THE RATABLE PAYMENT INJUNCTION
    AFFIRMED BY THE COURT OF APPEALS
    UPSETS WELL-SETTLED MARKET
    UNDERSTANDING................................... 6

II. THE DECISION OF THE COURT OF APPEALS
    THREATENS WIDER PUBLIC AND PRIVATE
    INTERESTS........................................ 10

    A.  The Court Of Appeals' Decision Will Have
        A Global Impact................................ 11

    B.  The Court Of Appeals' Decision Jeopardizes
        The Ability Of Sovereign Debtors To Achieve
        Orderly And Negotiated Restructurings
        Of Their External Debt.................... 14

    C.  The Court Of Appeals' Decision Also
        Threatens Sovereign Lending, Particularly
        Development Aid In The Form Of Loans
        To Developing Countries................. 19

    D.  Contrary To The Court Of Appeals' View,
        Collective Action Clauses Do Not Resolve
        The Problems Created By Its Ruling............ 21

CONCLUSION........................................ 24

ii

# TABLE OF AUTHORITIES

### CASES                PAGE

*Export-Import Bank of the Republic of China v. Grenada*, No. 13 Civ. 1450 (HB), 2013 WL 4414875 (S.D.N.Y. Aug. 19, 2013) ......................18

*NML Capital, Ltd., v. Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012) ..........................passim

*NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230 (2d Cir. 2013) ......................12, 13, 22

### RULES

Sup. Ct. R. 37.2 ............................................................ 1

Sup. Ct. R. 37.6 ............................................................ 1

### OTHER AUTHORITIES

Georges Affaki, *Du Sens des mots et du bon sens: de la bonne interprétation de la clause pari passu* [*Of the meaning of words: of the proper interpretation of the pari passu clause*], Mélanges Le Tourneau, Dalloz (2008) ..................8

Georges Affaki & Jean Stoufflet, *Chronique de Droit Bancaire International*, 101 Banque et droit 81 (2005) ..........................................................8

Michael Bradley & Mitu Gulati, *Collective Action Clauses for the Eurozone*, Review of Finance (2013) ..................................................................12

Brief of the United States of America as *Amicus Curiae* in Support of Reversal¸ *NML Capital,* (2d Cir. 2012) (No. 12-105) ......................................7

iii

Jean-Pierre Buyle & Martine Delierneux, *Contrats de crédit internationaux: clauses "pari passu" et égalité des créanciers* [*International credit agreements: pari passu clauses and equal treatment of creditors*] *under Arrêt de la cour d'appel de Bruxelles du 19 mars 2004*, T.B.H.-R.D.C. 99 (2006) ........................................................................9

Udaibir S. Das et al., *Sovereign Debt Restructurings 1950-2010: Literature Survey, Data, and Stylized Facts*, International Monetary Fund Working Paper No. 12/203 (August 2012)...................passim

Financial Markets Law Committee, *Analysis of the role, use and meaning of pari passu clauses in sovereign loan obligations as a matter of English law* (Mar. 1, 2005) ....................................................8

Anna Gelpern, Peterson Institute for International Economics, *Sovereign Damage Control,* Policy Brief Number PB13-12 (2013)..............................21

G. Mitu Gulati & Kenneth N. Klee, *Sovereign Piracy*, 56 Bus. Law. 635 (2001) ...................passim

International Monetary Fund, *Eligibility To Use The Fund's Facilities For Concessional Financing* (Mar. 15, 2013) .....................................19

International Monetary Fund, *Sovereign Debt Restructuring–Recent Developments and Implications for the Fund's Legal and Policy Framework* (Apr. 26, 2013) ...........................passim

Joint Response Brief of Plaintiffs-Appellees NML Capital, Ltd. and Olifant Fund, Ltd., *NML Capital* (2d Cir. 2013) (No.12-105) .......................23

iv

Christoph Keller, *Umschuldung von Staatsanleihen unter Berücksichtigung der Problematik einer Aggregation aller Anleihegläubiger* [*Restructuring of sovereign bonds in particular in light of aggregation clauses affecting all bondholders*], Die Reform des Schuldverschreibungsrechts [The reform of the German debt securities law] (2004) ................................9

Mauro Megliani*, Debitori sovrani e obbligazionisti sovrani,* [*Sovereign debt and sovereign bondholders*], 02 Diritto commerciale internazionale 259 (2010) ................................................9

Dr. Otto Palandt & Dr. Christian Grünberg, *Bürgerliches Gesetzbuch (German Civil Code)* § 275, Note 3 (69th ed. 2010).....................9

Dr. Christoph G. Paulus, *Jüngste Entwicklungen im Resolvenzrecht* [*Recent developments in the law of resolvency*], Wertpapiermitteilungen 489 (2013) .....9

Prof. Dr. Otto Sandrock, *Griechenland und Zypern in der Finanzkrise: die Rechtsstellung ihrer privaten Finanzinvestoren*, Recht der Internationalen Wirtschaft 16 (2014) ...................9

Julian Schumacher et al., *Sovereign Defaults in Court: The Rise of Creditor Litigation 1976-2010* (2013) ...................................................16

Alexander Szodruch, *Staateninsolvenz und private Gläubiger* [*State insolvency and private investors*], Rechtsprobleme des Private Sector Involvement bei staatlichen Finanzkrisen im 21. Jahrhundert 181 (2008) .............................................9

Trésor Direction Générale, *Encours des créances de la France sur les États étrangers au 31 décembre 2011*.................................................20

v

Horatia Muir Watt, *Private International Law Beyond the Schism*, 2(3) Transnational Legal Theory 347 (2011).................................................17

W.M.C. Weidemaier, *Sovereign debt after NML v. Argentina*, 8(2) Capital Mkts. L. J. 123 (2013)........8

W.M.C. Weidemaier & Anna Gelpern, *Injunctions in Sovereign Debt Litigation* (draft dated Nov. 15, 2013) ....................................................13

Philip R. Wood, *Law and Practice of International Finance* 186 (1980)....................................9

Philip R. Wood, *Pari Passu Clauses—What Do They Mean?* Butterworths J. Int'l Banking and Fin. L. 371 (2003) ..............................................8

Philip R. Wood QC (Hon), *Sovereign insolvency: the bankruptcy ladder of priorities and the pari passu clause*, Tijdschrift voor Financieel Recht, Nr. 3 maart 2012 .......................................14

The World Bank, *International Debt Statistics 2013* (2013) ..............................................12, 13

The World Bank, *World Development Indicators Data* (2013)............................................19

Alain Zenner & I. Peeters, *L'opposabilité des garanties conventionnelles permettant d'échapper au concours,* [*The enforceability of contractual guarantees to avoid competition among creditors*], J.T. 865 (2004) ..................................9, 10

Jeromin Zettelmeyer et al., *The Greek Debt Exchange: An Autopsy* (Sept. 11, 2012)...............23

## INTEREST OF THE *AMICUS CURIAE*[1]

As an active and prominent participant in the financial community, the Republic of France has a substantial interest in issues surrounding international financial stability and global sovereign lending markets.

The Court of Appeals held that the Republic of Argentina's decision to pay only holders of the exchange bonds it issued but not holders of its old bonds (among which are the plaintiffs) constituted a breach of the *pari passu* clause contained in the Republic's 1994 Fiscal Agency Agreement (the "FAA"). Based on that holding, the Court of Appeals affirmed the issuance of an injunction pursuant to which whenever Argentina pays any amount due under the terms of the exchange bonds, it must concurrently, or in advance, make a "ratable payment" to the plaintiffs in respect of the old bonds. In France's view, the Court of Appeals' ruling is based on an erroneous understanding of the meaning of the *pari passu* clause, and contradicts the well-settled mainstream market understanding that a *pari passu* clause does not covenant that all payments will be made by a borrower ratably with the borrower's other unsubordinated debts, but rather provides protection against legal subordination of claims only.

---

[1]   Pursuant to Rules 37.2 and 37.6, counsel of record for all parties received timely notice of *amicus curiae*'s intention to file this brief. *Amicus curiae* files this brief with the written consent of all parties, and copies of the parties' consent letters have been filed. *Amicus* and its counsel state that none of the parties to this case nor their counsel authored this brief in whole or in part, and that no person other than *amicus* or its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

2

In upholding the injunction, the Court of Appeals rendered a decision threatening international financial stability in various respects:

<u>First</u>, the *pari passu* clause is a market-standard clause that is used in virtually all sovereign bonds, a large proportion of which are governed by the laws of the State of New York. The injunction that the Court of Appeals affirmed to enforce its interpretation of the *pari passu* clause does not conform with the well-settled expectations of the sovereign debt markets, and accordingly threatens substantial uncertainty and harm in those markets.

<u>Second</u>, France wishes to draw the Court's attention to the adverse consequences that the Court of Appeals' decision will have on the ability of sovereign debtors to engage in orderly and negotiated debt restructuring to prevent default when the sovereign's debt has been deemed unsustainable. The decision grants a veto right to holdout creditors over both a sovereign's voluntary restructuring and future payments on restructured obligations. France has extensive experience in sovereign debt-related issues through its participation in the Paris Club, an informal group of sovereign creditors that deals with the restructuring of official—*i.e.*, intergovernmental—debt.[2]

---

[2]  The Paris Club is comprised of nineteen permanent member states, which, in addition to the United States and France, include Australia, Austria, Belgium, Canada, Denmark, Finland, Germany, Ireland, Italy, Japan, The Netherlands, Norway, The Russian Federation, Spain, Sweden, Switzerland, and the United Kingdom. Other official sector creditors may also actively participate in Paris Club negotiations, subject to the agreement of permanent members and of the sovereign debtor. The International Monetary

3

Although it does not speak here on behalf of the Paris Club, France, as a long-standing and active member, has participated in the development and application of the Paris Club's principles guiding orderly sovereign restructurings since 1956.[3]

Third, France has a practical concern with the effects of enforcing a *pari passu* clause as though it were a ratable payment clause—effectively preventing other creditors and their financial intermediaries from recovering due claims. France holds significant exposure to sovereign borrowers, particularly to developing countries, as part of its official development aid. The Court of Appeals' interpretation of the *pari passu* clause and its affirmance of the injunctive remedy crafted to enforce that interpretation will have a deleterious effect on the ability of borrower nations to honor their financial commitments to international lenders, including France.

France strongly supports the fair treatment of creditors by borrowers and it does not intervene in support of Argentina's repayment decisions. Moreover, France considers that Argentina should normalize its relations with all of its creditors, both public and private. Nonetheless, because the Court of Appeals' decision threatens wider societal and economic harm, France supports Argentina's petition for a writ of *certiorari*.

---

Fund ("IMF") and the World Bank are represented at the Paris Club's monthly meetings and attend negotiations as observers.

[3]   Since 1956, the Paris Club has reached 429 agreements with 90 sovereign debtors for a total amount of more than $570 billion of restructured sovereign debt. *See Club de Paris*, http://www.clubdeparis.org (last visited March 24, 2014) (every website cited in this brief was last visited on March 24, 2014).

4

## SUMMARY OF THE ARGUMENT

In its petition, Argentina posits that the Court of Appeals' decision raises issues that are of critical importance to sovereigns and their creditors, including to creditors that hold restructured sovereign debt. *See* Petition for Writ of Certiorari at 18, 32-36. This brief is respectfully submitted to explain why France believes that position to be correct, and to outline for this Court the harmful impact that the Court of Appeals' decision could have on sovereign debt markets.

The Court of Appeals' decision is based on an erroneous interpretation of a market-standard clause that appears in virtually all sovereign bonds. In misinterpreting the *pari passu* clause as entitling any creditor to a ratable payment whenever any other creditor is paid, the Court of Appeals disregarded a well-established market understanding that the clause merely provides protection against legal subordination of claims.

If upheld, the injunctive remedy affirmed by the Court of Appeals on the basis of this ill-founded interpretation threatens significant global harm to various public and private interests. It also would disrupt the established practice of orderly sovereign debt restructurings, in which France has acquired extensive experience as an active participant in the Paris Club. In particular, the injunctive remedy threatens to upset the complex balance of interests between sovereign debtors and their creditors, sovereign lenders, bank lenders and bondholders that is generally achieved in a voluntary and orderly restructuring process.

5

This balance is disturbed by the powerful incentive that the injunctive remedy provides for hold-out creditors to forgo participation in voluntary restructuring and instead to enforce full payment of their debt against an already distressed sovereign debtor. The Court of Appeals' decision will inevitably lead to an increase in the number of hold-out creditors, including so-called "vulture funds," that will seek to leverage the Court of Appeals' decision in future restructurings. Other creditors, including sovereign and private sector lenders that would have otherwise participated in a restructuring may choose not to as long as any payment on the restructured debt could be conditioned on a ratable payment to the hold-out creditors. Consequently, such lenders may also be less willing to extend loans to sovereign debtors in the first place.

Finally, although the Court of Appeals believed that the threat posed by the injunctive remedy would no longer be relevant in light of collective action clauses that are increasingly included in sovereign bond issuances, France respectfully submits that such clauses cannot and will not in fact obviate the significant harms outlined above.

6

# ARGUMENT

## I. THE RATABLE PAYMENT INJUNCTION AFFIRMED BY THE COURT OF APPEALS UPSETS WELL-SETTLED MARKET UNDERSTANDING

The *pari passu* clause appears in virtually all sovereign bonds. The form of the clause included in Argentina's defaulted bonds follows one of the market-standard variants. In relevant part, the *pari passu* clause provides that:

> The Securities will constitute . . . direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank *pari passu* and without any preference amongst themselves. The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness.

App. 198 (FAA at 2).

The clause does not have the unequivocal and straightforward meaning assigned to it by the Court of Appeals, that any payment to a given creditor should be made conditional upon equivalent, *pro rata* payments made to other creditors irrespective of their status or participation in previous agreements. The Court of Appeals' analysis ignored the well-settled market understanding that *pari passu* clauses are not ratable payment clauses. *See* G. Mitu Gulati & Kenneth N. Klee, *Sovereign Piracy*, 56 Bus. Law. 635, 637, 640 (2001) (interpretation of the *pari passu* clause in the sovereign context is subject to disagreement

7

but there is a well-established, "clear" interpretation that is not one of a ratable payments clause).

Indeed, France respectfully submits that particular attention should be paid to the longstanding and well-established practices of public and private actors in the sovereign bond markets with respect to the interpretation of the clause, which is quite different from that articulated by the Court of Appeals. The market understanding of a *pari passu* clause—most of which are drafted as a variant of the clause appearing in Argentina's defaulted bonds—is that it is a legal ranking covenant, intended to ensure that the borrower's obligations will rank equally in right of payment among each other, within a particular series of bonds, and with all of the sovereign borrower's other unsubordinated external indebtedness. *See* Brief of the United States of America as *Amicus Curiae* in Support of Reversal at 5, 13-17, *NML Capital, Ltd., v. Rep. of Argentina*, 699 F.3d 246 (2d Cir. 2012) (No. 12-105), ECF No. 238 (The district court's interpretation of the *pari passu* clause "deviate[d] from decades of settled market expectations."). The international capital markets and the major participants in those markets, including France, do not interpret the *pari passu* clause as a covenant that would condition certain creditors' receipt of payments to which they are entitled on the debtor's willingness and ability to pay other creditors.

Consistent with this well-settled understanding of the meaning of the clause, sovereigns have historically restructured their debt through voluntary, contract-based approaches, without any suggestion that, after entering into a comprehensive restructuring with their creditors, the *pari passu*

8

clause would prohibit them from paying participating creditors unless they made ratable payments to hold-outs.[4] Through its extensive participation in sovereign bond markets, and the periodic restructurings historically inherent in that market, France can attest that this standard process of sovereign debt restructuring has never been understood as a violation of the *pari passu* clause.

Beyond New York and English law,[5] this interpretation of the *pari passu* clause is supported by numerous commentators in the civil law jurisdictions of Europe. French legal authorities insist that a contrary interpretation of the *pari passu* clause, such as that espoused by the Court of Appeals is both "difficult to admit" and "lacking support as much as from the practice of financial credits as from doctrinal thoughts."[6] Likewise, German and Italian legal doctrine sides with the

---

[4]   *See* W.M.C. Weidemaier, *Sovereign debt after NML v Argentina*, 8(2) Capital Mkts. L. J. 123, 127 (2013); Gulati & Klee, *Sovereign Piracy*, at 637.

[5]   Philip R. Wood, *Pari Passu Clauses—What Do They Mean?*, Butterworths J. Int'l Banking and Fin. L. 371 (2003). *See also* Financial Markets Law Committee, *Analysis of the role, use and meaning of pari passu clauses in sovereign loan obligations as a matter of English law* (March 1, 2005) at 22, *available at* http://www.fmlc.org /Pages/papers.aspx ("[A]s a matter of English law the ranking interpretation is the proper interpretation of the *pari passu* clause in sovereign debt obligations."); Weidemaier, *Sovereign debt after NML v Argentina*, at 126-27.

[6]   Georges Affaki, *Du Sens des mots et du bon sens: de la bonne interprétation de la clause pari passu* [*Of the meaning of words: of the proper interpretation of the pari passu clause*], Mélanges Le Tourneau, Dalloz 2008, at 1-24 (the quotation is a translation from French); *see also* Georges Affaki & Jean Stoufflet, *Chronique de Droit Bancaire International*, 101 Banque et droit 81-90 (2005).

9

interpretation of the sovereign *pari passu* clause as a legal ranking clause.[7] When a Belgian court erred in interpreting the *pari passu* clause in the same manner as the Court of Appeals, the Belgian legislature clarified the position in accordance with Belgian legal doctrine and market understanding.[8] In light of these considerations, one

---

[7]   For German doctrine, *see* Prof. Dr. Otto Sandrock, *Griechenland und Zypern in der Finanzkrise: die Rechtsstellung ihrer privaten Finanzinvestoren*, Recht der Internationalen Wirtschaft 16-33 (2014); Alexander Szodruch, *Staateninsolvenz und private Gläubiger* [*State insolvency and private investors*], Rechtsprobleme des Private Sector Involvement bei staatlichen Finanzkrisen im 21. Jahrhundert 181-88 (2008); Dr. Christoph G. Paulus, *Jüngste Entwicklungen im Resolvenzrecht* [*Recent developments in the law of resolvency*], Wertpapiermitteilungen 489 (2013); Christoph Keller, *Umschuldung von Staatsanleihen unter Berücksichtigung der Problematik einer Aggregation aller Anleihegläubiger* [*Restructuring of sovereign bonds in particular in light of aggregation clauses affecting all bondholders*], Die Reform des Schuldverschreibungsrechts [The reform of the German debt securities law] 161-162 (2004); Dr. Otto Palandt & Dr. Christian Grünberg, *Bürgerliches Gesetzbuch (German Civil Code)* § 275, Note 3 (69th ed. 2010); Szodruch, *Staateninsolvenz und private Gläubiger* at 183-85 (citing among others Philip R. Wood, *Law and Practice of International Finance* 186 (1980)); for Italy, *see* Mauro Megliani, *Debitori sovrani e obbligazionisti sovrani* [*Sovereign debt and sovereign bondholders*], 02 Diritto commerciale internazionale 259 (2010).

[8]   S*ee* note from Jean-Pierre Buyle & Martine Delierneux, *Contrats de crédit internationaux: clauses "pari passu" et égalité des créanciers* [International credit agreements: pari passu clauses and equal treatment of creditors] *under Arrêt de la cour d'appel de Bruxelles du 19 mars 2004,* T.B.H.-R.D.C. 99-105 (2006); Alain Zenner & I. Peeters, *L'opposabilité des garanties conventionnelles permettant d'échapper au concours* [The enforceability of

10

must wonder why a rational sovereign debtor would willingly introduce *ex ante* a *pari passu* clause into its sovereign contracts if, as in the Court of Appeals' interpretation, it so significantly constrained the way it services its debt, especially in a distress situation. *See* Gulati & Klee, *Sovereign Piracy*, at 642 (if read as a ratable payment obligation, the *pari passu* clause gives potential hold-outs significant leverage, a power that sovereigns are not likely to have bargained to give away *ex ante*).

The analysis of the Court of Appeals might possibly have been justifiable if, instead of a *pari passu* clause, the Court had been considering a *most favored debt* clause requiring ratable payments between creditors. Such clauses are not unknown to the financial markets, yet did not appear in the Argentinian bonds at issue in this case, and, indeed, are essentially absent from most sovereign bond issuances.

## II. THE DECISION OF THE COURT OF APPEALS THREATENS WIDER PUBLIC AND PRIVATE INTERESTS

As Argentina sets forth in its petition for *certiorari*, this case raises systemically important

---

Contractual guarantees to avoid competition among creditors], J.T. 865-873 (2004). France disagrees with the view expressed by the Court of Appeals of Brussels in the order granted to Elliot Associates, L.P., in 2000 in connection with Peru's debt restructuring. *See Elliott Assocs., L.P.*, General Docket No. 2000/QR/92 (Court of Appeals of Brussels, 8th Chamber, Sept. 26, 2000). In that order, the Court did not reference market understanding of the *pari passu* clause—virtually identical to that at issue in Argentina's bonds—in applying it as a ratable payments clause. Gulati & Klee, *Sovereign Piracy*, at 638.

issues that merit this Court's review. Unlike perhaps any other error of contractual interpretation, the Court of Appeals' error imperils a variety of public and private interests, not least of which are those of sovereign debtors and their creditors, including state lenders and their citizens. By providing strong disincentives to creditors to participate in orderly sovereign debt restructurings, the Court of Appeals' decision impedes the ability of distressed sovereign debtors to restructure their debt when necessary, threatening the stability of the sovereign debt markets themselves. Pet. at 1-3, 6-8, 18, 31-36. In light of the Court of Appeals' apparent disregard of these issues, France respectfully submits this Brief to provide this Court its perspective on these grave concerns.

## A.  The Court Of Appeals' Decision Will Have A Global Impact

This case is not only about the named plaintiffs and Argentina. To the contrary, the Court of Appeals' decision, if upheld, will have a global impact. New York law is so widely utilized in global finance that it is no exaggeration to characterize it as an international public utility. It applies in a large proportion of outstanding stock of foreign law-governed sovereign bonds, followed by English law. For example, as of March 2009, out of a total of $411 billion of emerging market sovereign bonds, New York law governed a total outstanding amount of $272 billion. *See* Udaibir S. Das et al., *Sovereign Debt Restructurings 1950-2010: Literature Survey, Data, and Stylized Facts*, International Monetary Fund Working Paper No. 12/203 (August 2012) at 41, *available at* http://www.un.org/esa/ffd/ecosoc/debt/2013/IMF_wp12_203.pdf.

12

Between 1990 and 2011, almost 500 sovereign bonds were issued under New York law by 55 different countries. *See* Michael Bradley & Mitu Gulati, *Collective Action Clauses for the Eurozone,* Review of Finance (2013), at 13-14.

As a result, the Court of Appeals' decision will constitute a precedent in numerous cases involving alleged breaches of *pari passu* clauses and New York law, possibly making it less appealing to issue sovereign bonds under New York law if the interpretation of what used to be "mutually agreeable terms" faces *ex post* legal challenge. *See NML Capital, Ltd. v. Rep. of Argentina*, 727 F.3d 230, 248 (2d Cir. 2013).

The reach of the Court of Appeals' decision is so wide that it may also impact creditors whose bonds are *not* governed by New York law. If, for example, a sovereign borrower has bonds governed by New York law and also has bonds governed by another foreign law, then, following the Court of Appeals' decision, a court could condition payments of bonds governed by the foreign law upon the making of ratable payments on the New York law-governed bonds. The rights of investors holding bonds governed by a different law would thereby be affected by the injunctive remedy upheld by the Court of Appeals on the basis of a New York law-governed contract to which such investors are not a party.

This decision may also impact official bilateral loans contracted by a sovereign if it has a mix of bond, bank and official bilateral borrowing—as do many sovereigns. *See* The World Bank, *International Debt Statistics 2013* (2013) at 24-29, *available at* https://openknowledge.worldbank.org/bitstream

13

/handle/10986/12226/NonAsciiFileName0.pdf? The mere existence of a New York law-governed bond among a sovereign's borrowing structure may expose payments under its loans to the Court of Appeals' injunctive remedy if the bonds include a common *pari passu* clause that links the ranking of payments on loans and bonds within the scope of the sovereign's external indebtedness.

Further, the unique significance of the injunctive remedy approved by the Court of Appeals is its express impact on private non-parties that form the backbone of the international payments system. The injunction threatens a wide range of private parties with contempt of court if they honor their obligations, whether as agents, participants in the payment chain or custodians. *See NML Capital,* 727 F.3d at 243-45; App. 117 (*NML Capital, Ltd. v. Rep. of Argentina*, Case No. 08-civ-6978 (TPG), Amended February 23, 2012 Order, at 5-6 (S.D.N.Y. Nov. 21, 2012) (ECF No. 425)); *see* W. Mark C. Weidemaier & Anna Gelpern, *Injunctions in Sovereign Debt Litigation* (draft dated Nov. 15, 2013), *available at* http://scholarship.law. georgetown.edu/facpub/1319 (discussing injunctions as a remedy in sovereign debt litigation and their impact on third parties). Many of these entities are outside the United States and certain of them are systemically important entities, central to the global payment and securities clearing systems. It is curious that in seeking to enforce payment rights of a subset of creditors, the Court of Appeals would be willing to risk settlement and payment finality in the global payments and clearing systems, a systemic utility in the global financial system. In an era of global financial system fragility, this seems a heavy burden on a key utility.

14

In light of the reach that its decision will have and the hundreds of billions of U.S. dollars at stake globally, the Court of Appeals did not correctly address the public interest implications of its decision, resulting in a ruling that may exacerbate sovereign debt crises and in turn threaten international financial stability.

**B. The Court Of Appeals' Decision Jeopardizes The Ability Of Sovereign Debtors To Achieve Orderly And Negotiated Restructurings Of Their External Debt**

There is no international bankruptcy law to guide the restructuring of a distressed sovereign, as there is for a corporation. Sovereigns cannot be liquidated, their assets cannot be distributed to creditors in accordance with a bankruptcy ladder of priorities, and restructuring terms cannot be enforced by a court or supranational regulatory authority.[9] Absent any sovereign bankruptcy regime, voluntary contract-based mechanisms have evolved based on accepted practices among participants. *See* Das et al., at 12-30, for an overview of the sovereign debt restructuring process. Broadly, these participants are sovereign lenders (primarily in the context of the Paris Club), bank lenders (often working through organized creditor committees, and referred to as the London Club) and bondholders. Modern sovereign restructuring depends on coordination, close dialogue and fair negotiations among all creditors and the sovereign debtor.

---

[9]    Philip R. Wood QC (Hon), *Sovereign insolvency: the bankruptcy ladder of priorities and the pari passu clause*, Tijdschrift voor Financieel Recht, Nr. 3 maart 2012, at 60.

15

Sovereign debt restructurings remain a traumatic undertaking for the debtor. They are generally used only as a last resort, given their inherent economic and social costs. However, when deemed necessary, they should be carried out quickly and efficiently in order to prevent such costs from escalating further and to restore debt sustainability. *See* International Monetary Fund, *Sovereign Debt Restructuring–Recent Developments and Implications for the Fund's Legal and Policy Framework* (April 26, 2013) at 15-27, *available at* http://www.imf.org/external/np/pp/eng/2013/042613.pdf (hereinafter, the "IMF Report").

The voluntary contract-based mechanism available to a debtor is complex and informed by decades of historical development, its effectiveness driven by a subtle balancing of interests. This mechanism can be rendered ineffective by the slightest shift in incentives to participants.

The Court of Appeals' remedy is a fundamental shift in the incentives to bondholders *not* to participate in a restructuring: if it stands, it will raise significant obstacles to good-faith negotiations and voluntary sovereign debt restructurings precisely because it grants disproportionate power to a small group of hold-out bondholders, to the detriment of the majority of bondholders, in the event of a sovereign debt crisis. In this case, less than eight percent of Argentina's pre-2001 foreign bonds are held by the plaintiffs, while approximately ninety-two percent of Argentina's bondholders participated in its two exchange offers. *See NML Capital, Ltd., v. Rep. of Argentina*, 699 F.3d 246, 253 (2d Cir. 2012).

Often, once a sovereign borrower is known to be in financial difficulty, distressed debt investors

16

purchase bonds from their original holders, either shortly before or after the debt restructuring takes place. In this case, the Court of Appeals noted that plaintiffs had bought their defaulted bonds as recently as June 2010, *i.e.*, almost nine years after Argentina's default. *See id.* at 251.

Some investors, known as "vulture funds," purchase distressed sovereign debt obligations in the secondary markets at deep discount to their face value with the intent of blocking voluntary restructuring of particular classes of debt obligations and also blocking broader debt restructuring carried out through cooperative processes as a means of last resort to restore debt sustainability.[10] They deliberately adopt a non-cooperative stance during the restructuring process by bringing enforcement actions or seeking out-of-court settlements on their claims.

The rights of the majority of creditors would be better protected by eliminating any kind of unfair leverage. Instead, hold-outs' leverage is strengthened by the Court of Appeals' misinterpretation of the *pari passu* clause as imposing a "ratable payment" obligation, where any payment to a restructured creditor made in full (if on a single interest maturity) calls for the full payment of accelerated capital and interest due to hold-outs.

---

[10]   *See generally* Julian Schumacher et al., *Sovereign Defaults in Court: The Rise of Creditor Litigation 1976-2010* (2013) at 3, *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2189997 ("Vulture" funds have accounted for nearly ninety percent of all cases in sovereign debt litigation, and are "particularly likely to initiate legal disputes against Highly Indebted Poor Countries (HIPCs). Of the twenty cases filed against HIPCs, thirteen were filed by 'vultures.'").

17

Prior to the Court of Appeals' decision, the leverage of hold-out creditors over sovereigns' restructuring efforts had indeed been limited. IMF Report at 31. However, the Court of Appeals has granted hold-out creditors a powerful means of extracting full payment on the non-restructured debt of the borrower. Hold-out creditors thus have the leverage of seeking the injunctive remedy affirmed by the Court of Appeals and thereby blocking payments due to other creditors who voluntarily took part in the restructuring, to the detriment of the interests of the sovereign debtor and of those other creditors. *Id*.; *see also* Horatia Muir Watt, *Private International Law Beyond the Schism*, 2(3) Transnational Legal Theory 347-427 (2011) (discussing the disruptive effect on sovereign funding of a private international law framework that empowers vulture fund hold-out creditors to seek enforcement against debtor states on the basis of erroneous interpretations of *pari passu* clauses as ratable payment clauses, without political accountability); Das et al., at 50 (describing vulture funds).

The legal enforcement advantages conferred to creditors who refuse any restructuring effort, no matter how small their holding of un-restructured debt, are potentially enormous. The Court of Appeals' empowerment of hold-out creditors through injunctive relief, if upheld, will represent a strong disincentive to any future sovereign debt restructurings: it will have a chilling effect on creditors' willingness to grant concessions in order to facilitate voluntary and negotiated debt restructurings as a means of last resort.[11] Private creditors in particular, who otherwise would be

---

[11]   The injunctive remedy upheld by the Court of Appeals has already been relied upon by plaintiffs in

18

prepared to accede to a restructuring, may thus be discouraged from participating if they believe that hold-out creditors may block payments on the debtors' restructured obligations and therefore refrain from participating in the restructuring.

Finally, it is also worth recalling that the Paris Club, as a pivotal actor in orderly sovereign debt crisis resolution, provides each sovereign creditor participating in a restructuring with guidelines that form the basis of subsequent legally binding bilateral agreements. Notably, Paris Club agreed minutes include a "comparability of treatment" clause, which aims specifically to ensure balanced treatment of the sovereign's debt and fair burden-sharing among *all* external creditors—sovereign lenders, bank lenders and bondholders. As a general rule, the principle of comparability of treatment incorporated in the Paris Club agreed minutes is a crucial touchstone for catalyzing the effective coordination of private creditors and thereby enabling effective, fair and orderly restructurings that will allow the sovereign to attain its objective of debt sustainability and meet payment obligations to all its cooperating creditors. Furthermore, as a matter of equality of treatment, this clause is designed to ensure that claims of official creditors (and ultimately of taxpayers in the lender countries; for example, U.S. or French taxpayers) are not subordinated to those of other, private-sector creditors. Crucially, it facilitates fair burden-sharing among sovereign creditors.

---

other pending cases. *See, e.g.*, *Export-Import Bank of the Republic of China v. Grenada*, No. 13 Civ. 1450 (HB), 2013 WL 4414875, at *1-3 (S.D.N.Y. Aug. 19, 2013) (denying Grenada's motion to dismiss lender's action for injunctive relief based on breach of *pari passu* clause).

19

If private creditors are incentivized not to participate in sovereign debt restructuring, bilateral official creditors—and, therefore, their taxpayers—will bear an outsized share of the resulting debt relief burden. As a result, sovereign lenders will be less willing to grant debt relief, resulting in adverse consequences on broader official sector participation in aiding low-income countries in economic distress.

## C. The Court Of Appeals' Decision Also Threatens Sovereign Lending, Particularly Development Aid In The Form Of Loans To Developing Countries

Although private funding, notably in the form of bonds, is a growing source of financing for sovereigns, financing *by* sovereigns remains a large component of international financial flows, and is of particular relevance for the most vulnerable countries, notably for the 72 countries eligible to use the concessional financing window of the IMF.[12] Indeed, while private funding for the most vulnerable countries amounted to less than 10% of the total external public and publicly-guaranteed debt stock of these countries as of 2011, bilateral sovereign loans accounted for close to 40%. In addition, sovereign bilateral disbursements represent a steady share of new external financing for these countries, at more than 35% of total disbursements in 2011.[13]

---

[12]    *See* International Monetary Fund, *Eligibility To Use The Fund's Facilities For Concessional Financing* (March 15, 2013), *available at* https://www.imf.org/external/np/pp/eng/2013/031813a.pdf.

[13]    Percentages calculated based on World Bank, World Development Indicators Data, *available at* http://data.worldbank.org/data-catalog/world-development-indicators.

20

France is a major participant in this funding market and ranks among the largest lenders to low-income countries. As of December 31, 2011, France had a total exposure of EUR 7 billion (including outstanding principal, overdue amounts, and penalty interest but excluding guarantees not called) to the 72 countries eligible to use the IMF's concessional financing window. As of the same date, France's total exposure to more than 100 sovereign debtors amounted to EUR 36 billion. *See* Trésor Direction Générale, *Encours des créances de la France sur les États étrangers au 31 décembre 2011*, *available at* https://www.tresor .economie.gouv.fr/5597_Encours-des-créances -de-la-France-sur-les-Etats-etrangers-au-31 -decembre-2011. These lending decisions are made on the assumption that loans will be repaid by the borrower. In line with customary banking practice, France assesses the probability of default and loss given default in connection with these loans. Expectations relating to any restructuring that might arise in the future are based on an assumed orderly sovereign debt restructuring, in the context of an appropriate international forum, including the Paris Club, just as expectations relating to a private borrower would be assessed in light of corporate bankruptcy law.

The injunctive remedy upheld by the Court of Appeals, if it stands, will increase significantly the risk of default on bilateral sovereign loans extended by sovereign lenders. For France, as well as other sovereign lenders, the effects of the Court of Appeals' decision could therefore have a major impact on its policy of development aid in the form of loans. The heightened risk of default on bilateral sovereign loans extended by France, as a

21

result of impediments to orderly sovereign restructuring, would adversely affect the external financing of sovereign borrowers, and of low-income countries in particular. Indeed, the combination of a heightened risk of default with a lower probability of repayment could lead to a reduction in international capital flows and eventually to an increase in the cost for borrowers of external loans driven by a higher cost of risk. *See* Anna Gelpern, Peterson Institute for International Economics, *Sovereign Damage Control*, Policy Brief Number PB13-12, at 12 (2013) ("Until the standards are clear, creditors may attach the same litigation risk premium to both, lending the good apple too little and the bad apple too much.").

**D. Contrary To The Court Of Appeals' View, Collective Action Clauses Do Not Resolve The Problems Created By Its Ruling**

The Court of Appeals mistakenly determined that collective action clauses "effectively eliminate the possibility of 'hold-out' litigation," and that, therefore, the deleterious effects of its decision—thus implicitly acknowledged by the Court itself—would not impact future sovereign restructurings because most sovereign bonds now contain such clauses. *See NML Capital*, 699 F.3d at 264. To the contrary, the Court of Appeals' decision actually empowers hold-out creditors to threaten orderly sovereign debt restructurings, notwithstanding the prevalence of collective action clauses in international bond issues.

Collective action clauses allow a defined majority of holders of a bond series to bind other holders of that series to a restructuring of that series.

22

However, these clauses affect only that one series of bonds, and each series involved in the restructuring will need to be amended individually in the same way.

The Court of Appeals was incorrect to surmise that the problem of hold-out creditors is resolved by collective action clauses, and that, in this respect, "it is highly unlikely that in the future sovereigns will find themselves in Argentina's predicament." *Id.*; *see also NML Capital*, 727 F.3d at 247-48.

<u>First</u>, collective action clauses are not universal in sovereign bonds. Even if the clauses were universal in recently issued bonds, older classes of bonds would still exist without the benefits of such clause. This stock of bonds will remain outstanding for many years.

<u>Second</u>, most collective action clauses in existing bonds or under discussion by market participants do not have aggregation features that would allow super-majorities to fully bind all bondholders across different series of bonds. In essence, aggregation provisions allow the aggregation of creditor claims across *all* bonds issued by a sovereign for voting purposes. Depending on the exact drafting of the provision, a defined majority of holders can thereby bind *all* holders of bonds issued by a sovereign and not just one series. Even if aggregation clauses were present in a large proportion of the stock of outstanding sovereign bonds—which is not the case—many of them would still allow series to be excluded from the restructuring based on legitimate concerns about protection of minority rights. Hold-out creditors can therefore—if undeterred—buy up blocking

23

minorities on small issues in order to stall the resolution of a defined class of instruments, and cause serious problems. IMF Report at 28; *see* Jeromin Zettelmeyer et al., *The Greek Debt Exchange: An Autopsy* (September 11, 2012) at 26, 33-34, *available at* http://scholarship.law.duke.edu/faculty_scholarship /2660/; Das et al., at 45 (noting the cases of Dominica in 2004 and Argentina in 2005).

The largest-ever sovereign debt restructuring, of Greek public debt in 2012, has been cited by respondents as an example where hold-out creditors did not have a detrimental effect on voluntary restructuring.[14] This is not accurate, as free-rider, hold-out creditors actually blocked the restructuring of certain classes of Greece's external debt. Of thirty-six bonds governed by foreign (English) law containing collective action clauses that were eligible to participate in the debt exchange, only seventeen bonds were able to be successfully restructured using collective action clauses. IMF Report at 28. Hold-out creditors prevented the operation of the collective action clauses in the remaining bonds, amounting to approximately EUR 6.5 billion in un-restructured claims, or thirty percent of the total value of bonds governed by foreign law. *Id.*

---

[14]   *See* Joint Response Brief of Plaintiffs-Appellees NML Capital, Ltd. and Olifant Fund, Ltd. at 39, *NML Capital, Ltd. v. Rep. of Argentina*, 727 F.3d 230 (2d Cir. 2013) (No. 12-105), ECF No. 821. *But see* Zettelmeyer et al., at 26 (discussing the limitations of using bond-by-bond collective action clauses, as well as the importance of having a stock of debt governed by domestic law, which can unilaterally be used to change the terms of such bonds).

24

## CONCLUSION

The injunctive remedy affirmed by the Court of Appeals constitutes a strong disincentive for bond-holders to participate in restructuring, if the creditor is holding a New York law-governed bond and can seek full repayment with the aid of an injunction, and the Court of Appeals was incorrect in its view that collective action clauses solve the problem. For the foregoing reasons, the petition for a writ of *certiorari* should be granted and the Court of Appeals' decision should be reversed.

Respectfully submitted,

ANDREW RHYS DAVIES
(*Counsel of Record*)
MICHAEL F. WESTFAL
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399
andrew.rhys.davies@allenovery.com

DIANA BILLIK
ALLEN & OVERY LLP
52 Avenue Hoche
CS90005
75379 Paris Cedex 08
France

*Attorneys for Amicus Curiae*

March 24, 2014

# EXHIBIT E

# 12-105-cv(L)

**12-109-cv(CON),  12-111-cv(CON),  12-157-cv(CON),  12-158-cv(CON),
12-163-cv(CON),  12-164-cv(CON),  12-170-cv(CON),  12-176-cv(CON),
12-185-cv(CON),  12-189-cv(CON),  12-214-cv(CON),  12-909-cv(CON),
12-914-cv(CON),  12-916-cv(CON),  12-919-cv(CON),  12-920-cv(CON),
12-923-cv(CON),  12-924-cv(CON),  12-926-cv(CON),  12-939-cv(CON),
12-943-cv(CON),  12-951-cv(CON),  12-968-cv(CON),  12-971-cv(CON)**

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD., ACP
MASTER, LTD., BLUE ANGEL CAPITAL I LLC, AURELIUS

*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA
## AS *AMICUS CURIAE* IN SUPPORT OF
## THE REPUBLIC OF ARGENTINA'S PETITION FOR
## PANEL REHEARING AND REHEARING *EN BANC*

STUART F. DELERY,
*Principal Deputy Assistant
Attorney General*

MARK B. STERN,
SHARON SWINGLE,
*Attorneys, Appellate Staff
Civil Division,
Department of Justice*

CHRISTOPHER J. MEADE,
*Acting General Counsel,
Department of the Treasury*

HAROLD HONGJU KOH,
*Legal Adviser,
Department of State*

PREET BHARARA,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America as Amicus Curiae*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2716

JOHN D. CLOPPER,
JEANNETTE A. VARGAS,
BENJAMIN H. TORRANCE,
*Assistant United States Attorneys,
Of Counsel*

OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA, MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,

*Plaintiffs-Appellees,*

—v.—

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant,*

THE BANK OF NEW YORK MELLON, as Indenture Trustee,
EXCHANGE BONDHOLDER GROUP,
ICE CANYON LLC, FINTECH ADVISORY INC.,

*Non-Party Appellants,*

EURO BONDHOLDERS,

*Intervenor.*

# TABLE OF CONTENTS

PAGE

Interest of the United States. . . . . . . . . . . . . . . . . .  1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

POINT I—THE PANEL'S INTERPRETATION OF THE
    *PARI PASSU* CLAUSE IS INCORRECT AND
    ADVERSE TO THE UNITED STATES' POLICY
    INTERESTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

POINT II—THE INJUNCTION CONTRAVENES THE
    FSIA AND MAY HARM U.S. FOREIGN
    RELATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

ii

PAGE

## Table of Authorities

*Cases*:

*Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*,
475 F.3d 1080 (9th Cir. 2007) . . . . . . . . . . . . . . . 7

*Af-Cap Inc. v. Republic of Congo*,
383 F.3d 361 (5th Cir. 2004) . . . . . . . . . . . . . . . . 7

*Af-Cap Inc. v. Republic of Congo*,
462 F.3d 417 n.8 (5th Cir. 2006) . . . . . . . . . . . . . 8

*Allied Bank v. Banco Credito Agricola*,
757 F.2d 516 (2d Cir. 1985) . . . . . . . . . . . . . . . . 5

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989) . . . . . . . . . . . . . . . . . . . . . . . 6

*Grupo Mexicano v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) . . . . . . . . . . . . . . . . . . . . . . . 2

*Letelier v. Republic of Chile*,
748 F.2d 790 (2d Cir. 1984) . . . . . . . . . . . . . . . 6, 7

*S&S Mach. Co. v. Masinexportimport*,
706 F.2d 411 (2d Cir. 1983) . . . . . . . . . . . . . . . 6, 7

*Stephens v. Nat'l Distillers & Chem. Corp.*,
69 F.3d 1226 (2d Cir. 1995) . . . . . . . . . . . . . . . . 7

*Walker Int'l Holdings Ltd. v. Republic of Congo*,
395 F.3d 229 (5th Cir. 2004) . . . . . . . . . . . . . . . . 7

*Whiteman v. Dorotheum GmbH & Co.*,
431 F.3d 57 (2d Cir. 2005) . . . . . . . . . . . . . . . . . 8

iii

PAGE

*Statutes*:

28 U.S.C. §§ 1609-1611 . . . . . . . . . . . . . . . . . . . . . . .  5

*Rules*:

Fed. R. App. P. 35(a)  . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Other Authorities*:

Financial Markets Law Comm. (Bank of England),
   *Pari Passu Clauses: Analysis of the Role, Use and
   Meaning of Pari Passu Clauses in Sovereign Debt
   Obligations as a Matter of English Law* (2005) ......2

Allen & Overy Global Law Intelligence Unit, *The Pari
   Passu Clause and the Argentine Case* (Dec. 27,
   2012)................................................................2

Roubini, *From Argentina to Greece: Crisis in the
   Global Architecture of Orderly Sovereign Debt
   Restructurings*, Roubini Global Econ. (Nov. 28,
   2012)..............................................................2, 4

Lubben, *Possible Ripples from the Argentine Bond
   Litigation*, N.Y. Times Dealbook (Dec. 13, 2012) ....3

Schumacher et al., *Sovereign Defaults in Court: The
   Rise of Creditor Litigation 1976-2010* ....................3

Zettlemeyer et al., *The Greek Debt Exchange: An
   Autopsy*, Sept. 2010 draft........................................4

iv

PAGE

Das et al., *Sovereign Debt Restructurings 1950-2010:
  Literature Survey, Data, and Stylized Facts*, IMF
  Working Paper WP/12/203 (Aug. 2012)...................4

**Interest of the United States**

The panel in this case adopted a novel interpretation of a standard *pari passu* clause found in many sovereign debt instruments, in a manner that runs counter to longstanding U.S. efforts to promote orderly restructuring of sovereign debt. The panel further affirmed injunctive relief that constrains a sovereign state's disposition of assets that are not subject to execution under the Foreign Sovereign Immunities Act ("FSIA"). By unduly restricting the immunity afforded to foreign state property, the decision not only contradicts this Court's precedent, but could adversely affect U.S. foreign relations and threaten U.S. government assets. While the United States does not condone Argentina's actions in the international financial arena, Argentina's petition for rehearing en banc presents a "question of exceptional importance," and rehearing is needed to secure the "uniformity of the court's decisions." Fed. R. App. P. 35(a). Accordingly, the petition should be granted.

## A R G U M E N T

### POINT I—THE PANEL'S INTERPRETATION OF THE *PARI PASSU* CLAUSE IS INCORRECT AND ADVERSE TO THE UNITED STATES' POLICY INTERESTS

The panel held Argentina had violated the *pari passu* clause in its bonds and agreement by subordination of non-exchanged bonds through conduct resulting in selective repayment of creditors. That construction contradicts the settled market understanding of *pari passu* clauses and could undermine

2

longstanding U.S. efforts to promote orderly resolutions of sovereign debt crises.

The settled understanding of *pari passu* clauses is that selective repayment does *not* violate the clause, even if it is the result of sovereign policy. This view has been expressed not only by the United States, but by academics, governmental bodies, and market participants—not merely the sources the panel characterized as "arguably biased" (slip op. 17). *See, e.g.*, Financial Markets Law Comm. (Bank of England), *Pari Passu Clauses: Analysis of the Role, Use and Meaning of Pari Passu Clauses in Sovereign Debt Obligations as a Matter of English Law* (2005) ("FMLC Study"); Brief of *Amicus Curiae* Clearing House Ass'n at 4-5. Moreover, the United States' view is reinforced by historical experience, as *pari passu* clauses in sovereign debt instruments were not impediments to restructurings in the 1980s and 1990s.[1]

The reaction to the panel's decision has confirmed that it was contrary to settled understanding. *See* Allen & Overy Global Law Intelligence Unit, *The Pari Passu Clause and the Argentine Case* (Dec. 27, 2012); Roubini, *From Argentina to Greece: Crisis in the Global Architecture of Orderly Sovereign Debt Restructurings*, Roubini Global Econ. (Nov. 28, 2012);

---

[1]  In general, an insolvent debtor "may prefer one creditor to another, in discharging his debts." *Grupo Mexicano v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 321 (1999). There is no reason to believe that the *pari passu* clause here was intended to alter that rule.

3

Lubben, *Possible Ripples from the Argentine Bond Litigation*, N.Y. Times Dealbook (Dec. 13, 2012).

The panel believed that the first sentence of the *pari passu* clause prohibits "the issuance of other superior debt" and the second prohibits "the giving of priority to other payment obligations." Slip op. 18-19. The better reading, however, is that the two sentences separately address changes in rank *within* a particular bond issuance and changes in rank *across* all external indebtedness, not a debtor's obligations as issuer and as payor, *see* FMLC Study at 4, as the panel believed. Thus, the first sentence bars changes in legal rank in bonds "among themselves" and the second sentence—which requires only that payment "*obligations*" (as opposed to the payments themselves) rank equally—prohibits changes in legal rank among all "External Indebtedness." *See id.*

The panel's reasoning that preferential payment can breach a *pari passu* clause threatens core U.S. policy regarding international debt restructuring. The effect could extend well beyond Argentina: creditor litigation has increased significantly in the past decade, adversely affecting even low-income countries such as Liberia and Zambia. *See* Schumacher et al., *Sovereign Defaults in Court: The Rise of Creditor Litigation 1976-2010* (http://dx.doi.org/10.2139/ssrn.2189997). As the government explained in its prior *amicus* brief, voluntary sovereign debt restructuring will become far more difficult if holdout creditors can use novel interpretations of boilerplate bond provisions to interfere with the performance of a restructuring plan accepted by most creditors, and to greatly

4

tilt incentives away from voluntary debt exchanges and negotiated restructuring in the first place.

A sovereign's potential resistance to paying non-exchanged debt is a critical tool in its efforts to negotiate broad creditor support for restructuring. This leverage will be lost if creditors believe that a holdout strategy will eventually result in substantial or full payment. If enough creditors adopt this strategy, foreign sovereign debt restructuring will become impossible. While holdouts retain the right to assert legal claims in court and enforce resultant judgments in appropriate circumstances and in a manner consistent with the FSIA, the creation of new rights and new vehicles for enforcement alters and destabilizes the landscape of sovereign debt restructuring.

The panel suggested that the prevalence since 2005 of collective action clauses in bonds governed by New York law will eliminate any threat to orderly sovereign debt restructuring. Slip op. 27. But most bonds issued under New York law before 2005 lack collective action clauses, and the United States expects many to be in the market for the foreseeable future. Moreover, as demonstrated in the recent Greek debt exchange, holdouts can block amendment of bond issues despite collective action clauses. *See* Zettlemeyer et al., *The Greek Debt Exchange: An Autopsy*, Sept. 2010 draft (http://ssrn.com/abstract= 2144932); Das et al., *Sovereign Debt Restructurings 1950-2010: Literature Survey, Data, and Stylized Facts*, IMF Working Paper WP/12/203 (Aug. 2012) at 43-45; Roubini, *supra*, at 5.

5

The Court also erroneously suggested that its opinion would be of limited reach because it was applicable only to bonds governed by New York law. Most bonds issued by emerging-market countries are governed by New York or English law, *see* Das et al., *supra*, at 41, making the decision highly significant to the worldwide bond market. In addition, the decision could harm U.S. interests in promoting issuers' use of New York law and preserving New York as a global financial jurisdiction. *See Allied Bank v. Banco Credito Agricola*, 757 F.2d 516, 521 (2d Cir. 1985) ("The United States has an interest in maintaining New York's status as one of the foremost commercial centers in the world."). The decision could encourage issuers to issue debt in non-U.S. currencies in order to avoid the U.S. payments system, causing a detrimental effect on the systemic role of the U.S. dollar.

Finally, the panel's construction was unnecessary for its legal conclusion. Had the panel stopped at its determination that "even under Argentina's interpretation of the [*pari passu* clause] as preventing only 'legal subordination' . . . , the Republic breached the Provision" through enactment of legislation such as the Lock Law, slip. op. 20, a measure that seems largely unique to Argentina, the far-reaching consequences of the ruling could have been avoided—and could to this extent be easily corrected upon panel rehearing or en banc review.[2]

_____

[2]  While the United States has taken no position on whether the unique Lock Law itself violates the

6

## POINT II—THE INJUNCTION CONTRAVENES THE FSIA AND MAY HARM U.S. FOREIGN RELATIONS

The panel further erred in affirming the extraordinary injunctive relief entered by the district court. That relief contravenes the FSIA, which sets out the exclusive means of obtaining jurisdiction over a foreign state and enforcing judgments against it in U.S. courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-35 (1989). Even when a court has jurisdiction to enter a judgment against a foreign state, injunctive relief can be enforced only if consistent with the FSIA provisions governing immunity from attachment, execution, or arrest, 28 U.S.C. §§ 1609-1611. *S&S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 418 (2d Cir. 1983). Here, although the district court has properly exercised jurisdiction over Argentina, the injunction affirmed by the panel constrains Argentina's use and disposition of sovereign property that is immune from execution. That result improperly circumvents the careful limits on execution established by Congress. *See Letelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir. 1984).

This ruling conflicts with *S&S*, 706 F.2d at 418, which held that courts may not grant, "by injunction, relief which they may not provide by attachment" under the FSIA. The panel reasoned that the injunction did not implicate § 1609 because it did not "transfer . . . dominion or control over sovereign prop-

_____

*pari passu* clause, it appears that such a ruling would not harm sovereign debt restructuring generally.

erty to the court." Slip op. 25. But that formalistic interpretation would permit courts to "eviscerate [the FSIA's] protections merely by denominating their restraints as injunctions against the . . . use of property rather than as attachments of that property." *S&S*, 706 F.2d at 418. "[T]he principle behind the prohibition against attachments should apply broadly," *Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1230 (2d Cir. 1996), particularly as Congress enacted the FSIA against a background practice in which sovereign property was absolutely immune, *Letelier*, 748 F.2d at 799. When judicial action constrains a foreign state's use of its property, § 1609's protections apply. *See Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080 (9th Cir. 2007) (garnishment action); *Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229 (5th Cir. 2004) (same); *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361 (5th Cir. 2004) (same).

That Argentina's dominion over its property was constrained is demonstrated by the panel's own logic. The Court stated that Argentina could comply with the injunction by paying "all amounts owed to its exchange bondholders" and all to the holdouts, or by making partial payments to both, slip op. 25; but in each case Argentina would be compelled to use sovereign funds in a particular way. Similarly, if Argentina decides not to pay the holdouts, it is constrained in its use of funds with which it would pay the exchange bondholders. Either way, Argentina is compelled to do something in particular with its immune property.

Finally, U.S. foreign relations may be harmed by a holding constraining a foreign state's use of its prop-

8

erty outside the United States, particularly such property inside the foreign state's territory. As explained more fully in the government's prior *amicus* brief, such an order could have adverse consequences for the treatment of U.S. property under principles of reciprocity. The laws of many foreign nations do not permit a court to enter an injunction against a foreign state; those foreign states may expect the United States to extend them the same consideration. Although the United States' position regarding foreign policy implications of particular exercises of jurisdiction should be accorded deference by the courts, *see, e.g.*, *Whiteman v. Dorotheum GmbH & Co.*, 431 F.3d 57, 69-74 (2d Cir. 2005); *Af-Cap Inc. v. Republic of Congo*, 462 F.3d 417, 428 n.8 (5th Cir. 2006), especially with respect to the extraordinary equitable relief of an injunction against a foreign sovereign, the panel here did not even address the government's position.

9

Dated:    New York, New York
          December 28, 2012

                    Respectfully submitted,

                    PREET BHARARA,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States as*
                         *Amicus Curiae.*

                    JOHN D. CLOPPER,
                    JEANNETTE A. VARGAS,
                    BENJAMIN H. TORRANCE,
                    *Assistant United States Attorneys,*
                         *Of Counsel.*

STUART F. DELERY,
*Principal Deputy Assistant Attorney General,*
MARK B. STERN,
SHARON SWINGLE,
*Attorneys, Appellate Staff*
*Civil Division, Department of Justice*

CHRISTOPHER J. MEADE,
*Acting General Counsel, Department of the Treasury*

HAROLD HONGJU KOH,
*Legal Adviser, Department of State*

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------x
                               :
NML CAPITAL, LTD.,             :
                               :        **ORDER**
                   Plaintiff,    :
                               :    08 Civ. 6978 (TPG)
        – against –        :    09 Civ. 1707 (TPG)
                               :    09 Civ. 1708 (TPG)
REPUBLIC OF ARGENTINA,  :
                               :
                Defendants.  :
                               :
---------------------------------------------x

## AMENDED FEBRUARY 23, 2012 ORDER

      WHEREAS, in an Order dated December 7, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic is "required . . . at all times to rank its payment obligations pursuant to NML's Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

      WHEREAS, in its December 7, 2011 Order, this Court granted partial summary judgment to NML on its claim that the Republic repeatedly has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds."

1

And WHEREAS NML Capital, Ltd. ("NML") has filed a renewed motion for equitable relief as a remedy for such violations pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

Upon consideration of NML's renewed motion, the response of the Republic of Argentina (the "Republic") thereto, NML's reply, and all other arguments submitted to the Court in the parties' papers and at oral argument, it is HEREBY ORDERED that:

1.    It is DECLARED, ADJUDGED, and DECREED that NML is irreparably harmed by and has no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA, and that the equities and public interest strongly support issuance of equitable relief to prevent the Republic from further violating Paragraph 1(c) of the FAA, in that:

   a.  Absent equitable relief, NML would suffer irreparable harm because the Republic's payment obligations to NML would remain debased of their contractually-guaranteed status, and NML would never be restored to the position it was promised that it would hold relative to other creditors in the event of default.

   b.  There is no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA because the Republic has made clear – indeed, it has codified in Law 26,017 and Law

2

26,547 – its intention to defy any money judgment issued by
this Court.

c. The balance of the equities strongly supports this Order in light
of the clear text of Paragraph 1(c) of the FAA and the Republic's
repeated failures to make required payments to NML.  In the
absence of the equitable relief provided by this Order, the
Republic will continue to violate Paragraph 1(c) with impunity,
thus subjecting NML to harm.  On the other hand, the Order
requires of the Republic only that which it promised NML and
similarly situated creditors to induce those creditors to
purchase the Republic's bonds.  Because the Republic has the
financial wherewithal to meet its commitment of providing equal
treatment to both NML (and similarly situated creditors) and
those owed under the terms of the Exchange Bonds, it is
equitable to require it to do so.  Indeed, equitable relief is
particularly appropriate here, given that the Republic has
engaged in an unprecedented, systematic scheme of making
payments on other external indebtedness, after repudiating its
payment obligations to NML, in direct violation of its
contractual commitment set forth in Paragraph 1(c) of the FAA.

d. The public interest of enforcing contracts and upholding the
rule of law will be served by the issuance of this Order,
particularly here, where creditors of the Republic have no

3

recourse to bankruptcy regimes to protect their interests and must rely upon courts to enforce contractual promises. No less than any other entity entering into a commercial transaction, there is a strong public interest in holding the Republic to its contractual obligations.

2.    The Republic accordingly is permanently ORDERED to specifically perform its obligations to NML under Paragraph 1(c) of the FAA as follows:

a.    Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" to NML (as defined below and as further defined in the Court's Opinion of November 21, 2012).

b.    Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

c.    Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which the Republic

4

intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

d. The Republic is ENJOINED from violating Paragraph 1(c) of the FAA, including by making any payment under the terms of the Exchange Bonds without complying with its obligation pursuant to Paragraph 1(c) of the FAA by concurrently or in advance making a Ratable Payment to NML.

e. Within three (3) days of the issuance of this ORDER, the Republic shall provide copies of this ORDER to all participants in the payment process of the Exchange Bonds ("Participants"). Such Participants shall be bound by the terms of this ORDER as provided by Rule 65(d)(2) and prohibited from aiding and abetting any violation of this ORDER, including any further violation by the Republic of its obligations under Paragraph 1(c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to NML.

f. "Participants" refer to those persons and entities who act in active concert or participation with the Republic, to assist the Republic in fulfilling its payment obligations under the Exchange Bonds, including: (1) the indenture trustees and/or registrars under the Exchange Bonds (including but not limited to The Bank of New York Mellon f/k/a/ The Bank of New York);

(2) the registered owners of the Exchange Bonds and nominees of the depositaries for the Exchange Bonds (including but not limited to Cede & Co. and The Bank of New York Depositary (Nominees) Limited) and any institutions which act as nominees;  (3) the clearing corporations and systems, depositaries, operators of clearing systems, and settlement agents for the Exchange Bonds (including but not limited to the Depository Trust Company, Clearstream Banking S.A., Euroclear Bank S.A./N.V. and the Euroclear System);  (4) trustee paying agents and transfer agents for the Exchange Bonds (including but not limited to The Bank of New York (Luxembourg) S.A. and The Bank of New York Mellon (including but not limited to the Bank of New York Mellon (London));  and (5) attorneys and other agents engaged by any of the foregoing or the Republic in connection with their obligations under the Exchange Bonds.

g. Nothing in this ORDER shall be construed to extend to the conduct or actions of a third party acting solely in its capacity as an "intermediary bank," under Article 4A of the U.C.C. and N.Y.C.L.S. U.C.C. § 4-A-104, implementing a funds transfer in connection with the Exchange Bonds.

h. Any non-party that has received proper notice of this ORDER, pursuant to Rule 65(d)(2), and that requires clarification as to

its duties, if any, under this ORDR may make an application to this Court, with notice to the Republic and NML.  Such clarification will be promptly provided.

i.  Concurrently or in advance of making a payment on the Exchange Bonds, the Republic shall certify to the Court and give notice of this certification to its Participants, and to counsel for NML, that the Republic has satisfied its obligations under this ORDER to make a Ratable Payment to NML.

3.  NML shall be entitled to discovery to confirm the timing and amounts of the Republic's payments under the terms of the Exchange Bonds; the amounts the Republic owes on these and other obligations; and such other information as appropriate to confirm compliance with this ORDER;

4.  The Republic is permanently PROHIBITED from taking action to evade the directives of this ORDER, render it ineffective, or to take any steps to diminish the Court's ability to supervise compliance with the ORDER, including, but not limited to, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval by the Court;

5.  This Court shall retain jurisdiction to monitor and enforce this ORDER, and to modify and amend it as justice requires to achieve its equitable purposes and to account for changing circumstances.

Dated: New York, New York
November, 21 2012



     Thomas P. Griesa
     U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/21/12

# EXHIBIT G

# 12-105-cv(L)

**12-109-cv(CON), 12-111-cv(CON), 12-157-cv(CON), 12-158-cv(CON), 12-163-cv(CON), 12-164-cv(CON), 12-170-cv(CON), 12-176-cv(CON), 12-185-cv(CON), 12-189-cv(CON), 12-214-cv(CON), 12-909-cv(CON), 12-914-cv(CON), 12-916-cv(CON), 12-919-cv(CON), 12-920-cv(CON), 12-923-cv(CON), 12-924-cv(CON), 12-926-cv(CON), 12-939-cv(CON), 12-943-cv(CON), 12-951-cv(CON), 12-968-cv(CON), 12-971-cv(CON)**

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

◄─◄◄◄►►─►

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC, AURELIUS

*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF REVERSAL

STUART F. DELERY,
*Acting Assistant
Attorney General*
MARK B. STERN,
SHARON SWINGLE,
*Attorneys, Appellate Staff
Civil Division,
Department of Justice*

GEORGE W. MADISON,
*General Counsel,
Department of the Treasury*

HAROLD HONGJU KOH,
*Legal Adviser,
Department of State*

PREET BHARARA,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America as Amicus Curiae*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2678

JEANNETTE A. VARGAS,
JOHN D. CLOPPER,
SARAH S. NORMAND,
*Assistant United States Attorneys,
Of Counsel*

OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA
INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA
CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA,
MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA
ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN
VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA VAZQUEZ,
OLIFANT FUND, LTD.,

*Plaintiffs-Appellees*,

—v.—

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant.*

# TABLE OF CONTENTS

PAGE

Interest of the United States . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

POINT I—THIS COURT SHOULD REJECT THE DISTRICT
   COURT'S INTERPRETATION OF THE *PARI PASSU*
   CLAUSE IN SOVEREIGN DEBT INSTRUMENTS . . . . . 6

  A.  The United States Has Long Promoted
     Consensual, Orderly Sovereign Debt
     Restructuring Efforts Within a Framework of
     Contractual Certainty . . . . . . . . . . . . . . . . 6

  B.  The District Court's Interpretation of the
     *Pari Passu* Clause Disrupts Settled
     Expectations, and Is Incorrect as a Matter of
     Law and Adverse to the United States' Policy
     Interests. . . . . . . . . . . . . . . . . . . . . . . . . . 10

     1.  The Ratable Payment Interpretation of
       the *Pari Passu* Clause Is Incorrect and
       Creates Uncertainty in Sovereign
       Contractual Relationships . . . . . . . . . . 10

       a.  Longstanding Market Practice
          Supports a Narrow Reading of the
          *Pari Passu* Clause . . . . . . . . . . . . 11

       b.  The Ratable Payment Interpretation
          of the *Pari Passu* Clause Deviates
          From This Settled Market
          Understanding . . . . . . . . . . . . . . . 13

ii

PAGE

2. The Ratable Payment Interpretation of the *Pari Passu* Clause Would Disrupt the Orderly Resolution of Sovereign Debt Crises . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3. The Ratable Payment Interpretation of the *Pari Passu* Clause Could Prevent Sovereign Debtors From Servicing Debts to International Financial Institutions . . . . . . . . . . . . . . . . . . . . . . . 19

POINT II—THE DISTRICT COURT'S ORDERS ARE IMPERMISSIBLY BROAD . . . . . . . . . . . . . . . . . . . . 21

A. The Orders Contravene the Purpose and Structure of the FSIA . . . . . . . . . . . . . . . . . 22

B. The Orders Are Harmful to the United States' Foreign Relations . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

iii

TABLE OF AUTHORITIES

*Cases*:

*Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*,
    475 F.3d 1080 (9th Cir. 2007) . . . . . . . . . . . . . .  24

*Af-Cap, Inc. v. Republic of Congo*,
    462 F.3d 417 (5th Cir. 2006) . . . . . . . . . . .  22, 28

*Argentine Republic v. Amerada Hess Shipping
    Corp.*, 488 U.S. 428 (1989) . . . . . . . . . . . . . . . .  22

*Autotech Technologies LP v. Integral Research
    & Dev. Corp.*, 499 F.3d 737 (7th Cir. 2007) .  22, 23

*Elliot Assocs., L.P. v. Banco de la Nacion*,
    General Docket No. 2000/QR/92 (Court of
    Appeals of Brussels, 8th Chamber,
    Sept. 26, 2000) . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Kensington Int'l Ltd. v. Republic of the Congo*,
    2002 No. 1088, [2003] .  . . . . . . . . . . . . . . . . . .  16

*Mangattu v. M/V Ibn Hayyan*,
    35 F.3d 205 (5th Cir. 1994) . . . . . . . . . . . . . . .  27

*NML Capital, Ltd. v. Banco Central de la
    Republica Argentina*, 652 F.3d 172
    (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*Persinger v. Islamic Republic of Iran*,
    729 F.2d 835 (D.C. Cir. 1984) . . . . . . . . . . . . .  29

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) . . . . . . . . . . . . .  26

iv

PAGE

*Philippine Export and Foreign Loan Guarantee
Corp. v. Chuidian*, 218 Cal. App. 3d 1058
(Cal. Ct. App. 1990) . . . . . . . . . . . . . . . . . . . . . . 26

*Red Mountain Finance, Inc. v. Democratic
Republic of Congo*, No. CV-00-0164 R
(C.D. Cal.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Republic of Nicaragua v. LNC Investments and
Euroclear Bank S.A.*,Docket No. 240/03
(Brussels Commercial Ct. Sept. 11, 2003) . . . . . 15

*Republic of Philippines v. Pimentel*,
128 S. Ct. 2180 (2008) . . . . . . . . . . . . . . . . . . . . 24

*Rubin v. Islamic Republic of Iran*,
637 F.3d 783 (7th Cir. 2011) . . . . . . . . . . . . . . 27

*S&S Machinery Co. v. Masinexportimport*,
706 F.2d 411 (2d Cir. 1983) . . . . . . . . . . . . 25, 26

*Sharon Steel Corp. v. Chase Manhattan
Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982) . . . . . 10

*In re Southeast Banking Corp.*,
93 N.Y.2d 178 (1999) . . . . . . . . . . . . . . . . . . . . . 10

*Walters v. Industrial and Comm. Bank of
China, Ltd.*, 651 F.3d 280 (2d Cir. 2011) . . 23, 26

*Walters v. People's Republic of China*,
672 F. Supp. 2d 573 (S.D.N.Y. 2009) . . . . . . . . 23

*Weston Compagnie de Finance et D'Investissement,
S.A. v. Republic del Ecuador*,
823 F. Supp. 1106 (S.D.N.Y. 1993) . . . . . . . . . . 26

v

PAGE

*Whiteman v. Dorotheum GmbH & Co.*,
 431 F.3d 57 (2d Cir. 2005) . . . . . . . . . . . . . . . . .  28

*Statutes*:

22 U.S.C. § 5324 . . . . . . . . . . . . . . . . . . . . . . . . . .  8

28 U.S.C. § 517 . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

28 U.S.C. § 1604 . . . . . . . . . . . . . . . . . . . . . . . . .  23

28 U.S.C. § 1606 . . . . . . . . . . . . . . . . . . . . . . . . .  27

28 U.S.C. § 1609 . . . . . . . . . . . . . . . . . . . . . . . . .  23

28 U.S.C. § 1610 . . . . . . . . . . . . . . . . . . . . . . . . .  23

Department of State, Foreign Operations, and
 Related Programs Appropriations Act, 2012,
 div. I, Pub. L. No. 112-74, § 7071(b), 125 Stat.
 786.1254 (2011) . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Legislative History*:

Foreign Sovereign Immunities Act of 1976,
 House Report No. 94-1487, 5 U.S.C.A.A.N.
 6604 (Sept. 9, 1976) . . . . . . . . . . . . . . . . . . .  22, 24

*Miscellaneous*:

Edwin Borchard, 1 *State Insolvency and Foreign
 Bondholders* (1951) . . . . . . . . . . . . . . . . . . . . . . .  13

vi

PAGE

Michael H. Bradley, James D. Cox & Mitu Gulati,
*The Market Reaction to Legal Shocks and Their
Antidotes: Lessons from the Sovereign Debt
Market*, 39 J. Legal Studies 289 (2010) . . .  14, 15

Lee C. Buchheit & Jeremiah S. Pam, *The Pari
Passu Clause in Sovereign Debt Instruments*,
53 Emory L.J. 869 (2004) . . . . . . . . . . .  11, 12, 14

Lee C. Buchheit & Ralph Reisner, *The Effect of the
Sovereign Debt Restructuring Process on Inter-
Creditor Relationships*,
1988 U. Ill. L. Rev. 493 (1988) . . . . . . . . . . . . . .  12

Financial Markets Law Committee, *Pari Passu
Clauses: Analysis of the Role, Use and Meaning
of Pari Passu Clauses in Sovereign Debt
Obligations as a Matter of English Law*
(2005) . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 18, 19

H. Fox, "International Law and the Restraints on
the Exercise of Jurisdiction by National Courts
of States," in M. Evans, ed., *International Law*,
364 (2003) . . . . . . . . . . . . . . . . . . . . . . . . .  28, 29

G. Mitu Gulati & Kenneth N. Klee, *Sovereign
Piracy,* 56 Bus. Law. 635 (2001) . . . . . . . .  15, 16

John W. Head, *Suspension of Debtor Countries'
Voting Rights in the IMF: An Assessment of the
Third Amendment to the IMF Charter*,
33 Va. J. of Int'l Law 591 (1993) . . . . . . . . . . .  20

Matthew H. Hurlock, *New Approaches to
Economic Development: The World Bank, the
EBRD, and the Negative Pledge Clause*,
35 Harv. Int'l L. J. 345 (1994) . . . . . . . . . . . . . .  21

vii

PAGE

Rodrigo Olivares-Caminal, *To Rank Pari Passu or
Not to Rank Pari Passu: That is the Question in
Sovereign Bonds After the Latest Episode of the
Argentine Saga*, 15 Law and Business Review of
the Americas 745 (2009) . . . . . . . . . . . . . . . . . . 14

Rodrigo Olivares-Caminal, *Understanding the Pari
Passu Clause in Sovereign Debt Instruments:
A Complex Quest*,
43 Int'l Law. 1217 (Fall 2009) . . . . . . 11, 13, 18

Mark Weidemaier, Robert Scott & G. Mitu Gulati,
*Origin Myths, Contracts and the Hunt for Pari
Passu*, UNC Legal Studies Research
Paper No. 1633439 (2011).. . . . . . . . . . . . . . . . 14

Philip R. Wood, Pari Passu *Clauses—What Do They
Mean?*, 18 Butterworths J. of Int'l Banking and
Financial L. 371 (2003) . . . . . . . . . . . . . . . . . . 11

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

**Docket Nos. 12-105(L), 12-109-cv (CON),
12-111-cv (CON), 12-157-cv (CON),
12-158-cv (CON), 12-163-cv (CON),
12-164-cv (CON), 12-170-cv (CON),
12-176-cv (CON), 12-185-cv (CON),
12-189-cv (CON), 12-214-cv (CON),
12-909-cv (CON), 12-914-cv (CON),
12-916-cv (CON), 12-919-cv (CON),
12-920-cv (CON), 12-923-cv (CON),
12-924-cv (CON), 12-926-cv (CON),
12-939-cv (CON), 12-943-cv (CON),
12-951-cv (CON), 12-968-cv (CON),
12-971-cv (CON)**

———————

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD.,
ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC,
AURELIUS OPPORTUNITIES FUND II, LLC, PABLO
ALBERTO VARELA, LILA INES BURGUENO, MIRTA
SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO,
LEANDRO DANIEL POMILIO, SUSANA AQUERRETA,
MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL,
NORMA ELSA LAVORATO, CARMEN IRMA LAVORATO,
CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES,
MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,

*Plaintiffs-Appellees,*

—v.—

2

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant.*

―――――――――――

**BRIEF FOR THE UNITED STATES OF AMERICA AS
AMICUS CURIAE IN SUPPORT OF REVERSAL**

―――――――――――

**Interest of the United States**

Pursuant to 28 U.S.C. § 517 and Rule 29(a) of the Federal Rules of Appellate Procedure, the United States respectfully submits this brief as amicus curiae supporting reversal of orders entered by the United States District Court for the Southern District of New York (Griesa, *J.*), on December 7 and December 13, 2011 (the "December Orders") (SPA 10-25), and February 23, 2012 (the "February 23 Orders") (SPA 28-54) (collectively, the "Orders").

This litigation involves efforts by so-called "holdout creditors" to collect on defaulted bonds from the Republic of Argentina ("Argentina"). In 2001, the Argentine government announced a moratorium on its repayment of approximately $80 billion in public foreign debt. *See NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 175 (2d Cir. 2011). Since 2001, Argentina has not made any payments on the defaulted bonds. *Id.* Instead, Argentina restructured approximately 92 percent of its debt by launching global exchange offers in 2005 and 2010, pursuant to which creditors holding the defaulted bonds could exchange them for new securities with modified terms. *Id.* at 176 & n.4. Plaintiffs-appellees

3

did not accept the exchange offers and instead sought recourse from the courts.

In the December Orders, the district court adopted a broad and novel interpretation of the standard *pari passu* provision found in many sovereign debt instruments. The district court concluded that Argentina breaches the *pari passu* provision whenever it makes payments to those bondholders who accepted the exchange offers without fsimultaneously paying the full amount of principal and interest owed to plaintiffs-appellees. (SPA 13).

The February 23 Orders in turn require that Argentina pay the full amount due to plaintiffs-appellees whenever Argentina makes a payment under the terms of the exchange bonds. (*See, e.g.*, SPA 33). The court further prohibited third parties from assisting Argentina in servicing payments on the exchange bonds without ensuring that full payment to plaintiffs-appellees are also made. (*See, e.g.*, SPA 34). Finally, the court prohibited Argentina from altering the process by which Argentina makes payments on the exchange bonds without obtaining approval from the court. (*See, e.g.*, SPA 34-35).

In supporting reversal of the Orders, the United States does not condone or excuse a foreign state's failure to comply with the judgment of a U.S. court imposing liability on the state. The United States consistently has maintained, and continues strongly to maintain, that Argentina immediately should normalize relations with all of its creditors, both public and private.

4

In addition to Argentina's unwillingness to resolve remaining issues with all of its bondholders, the United States has several concerns regarding Argentina's failure to honor its international obligations. We encourage Argentina to continue to work with the International Monetary Fund ("IMF") and to participate in IMF surveillance as required under its Articles of Agreement, to improve its statistical reporting, clear its arrears to the United States and other Paris Club members, and honor final awards of arbitration panels convened under the auspices of the International Centre for Settlement of Investment Disputes ("ICSID"). Argentina's failure to honor its obligations or to engage with international institutions remains a concern, given that Argentina is a member of the G-20, the IMF, the World Bank, and other international fora, and is a middle-income country with great potential to generate prosperity for its citizens. It is for these reasons that the United States has opposed lending to Argentina through multilateral development banks such as the World Bank and the Inter-American Development Bank. In addition, on March 26, 2012, President Obama suspended Argentina's eligibility under the Generalized System of Preferences program because of Argentina's failure to pay two longstanding ICSID arbitral awards in favor of U.S. companies.

Notwithstanding these concerns regarding Argentina's continued failure to abide by its obligations, and our strong insistence that it do so promptly, the United States respectfully submits this brief because these consolidated appeals raise two issues of vital

5

public policy and legal importance to the United States that extend beyond the particular facts of this case.*

First, the district court's interpretation of the *pari passu* clause, a boilerplate provision contained in a number of sovereign debt instruments, in a manner that deviates from decades of settled market expectations is contrary to United States economic policy. Notwithstanding recent developments in sovereign debt contracts that promote collective action by creditors, the district court's interpretation of the *pari passu* provision could enable a single creditor to thwart the implementation of an internationally supported restructuring plan, and thereby undermine the decades of effort the United States has expended to encourage a system of cooperative resolution of sovereign debt crises. Allowing creditors recourse to such an enforcement mechanism would have adverse consequences on the prospects for voluntary sovereign debt restructuring, on the stability of international financial markets, and on the repayment of loans extended by international financial institutions ("IFIs"). Accordingly, the United States opposes the adoption of the district court's ratable payment interpretation of the *pari passu* clause as contrary to United States policy interests.

Second, the United States has a significant interest in ensuring that courts correctly construe the laws

---

\* In 2004, the United States filed a Statement of Interest in related litigation addressing the proper interpretation of the *pari passu* clause and the permissible scope of relief against a foreign sovereign. (*See* A-1760–A-1785).

6

relating to foreign sovereign immunity, including immunity from enforcement of judgments against the property of foreign states. The issues raised in this appeal regarding the appropriate scope of an injunction issued against a foreign sovereign could affect all foreign sovereigns in U.S. courts, and have a significant, detrimental impact on our foreign relations, as well as on the reciprocal treatment of the United States and its extensive property holdings.

## A R G U M E N T

### POINT I

### THIS COURT SHOULD REJECT THE DISTRICT COURT'S INTERPRETATION OF THE *PARI PASSU* CLAUSE IN SOVEREIGN DEBT INSTRUMENTS*

**A. The United States Has Long Promoted Consensual, Orderly Sovereign Debt Restructuring Efforts Within a Framework of Contractual Certainty**

Recognizing the serious difficulties that sovereign solvency crises present for both sovereign borrowers

---

\* In addition to holding that the *pari passu* clause was violated when Argentina made payments to the holders of exchange bonds without also satisfying its payment obligations under the bonds held by the appellees (SPA-32 at ¶ 5), the district court found that the *pari passu* clause was violated by the enactment of Argentina's Lock Law (SPA-32 at ¶¶ 6-7). The parties here dispute the proper characterization of the Lock Laws. Argentina argues that the Lock Law does not

7

and the international financial system, the United States has adopted, as a cornerstone of its foreign economic policy, the position that emerging markets should embrace strong macroeconomic policies that will produce economic growth, allow them to fully satisfy their external debt obligations, and strengthen the international financial system. In those rare cases where a sovereign cannot meet its external obligations, however, the policy of the United States is that the orderly and consensual restructuring of sovereign debt, in conjunction with needed macroeconomic adjustments, is the most appropriate response. This policy promotes international economic and financial stability by allowing a debtor nation to move expeditiously past a balance of payment crisis, while at the same time minimizing potentially devastating "ripple effects" that

---

legally subordinate debt, but merely requires legislative approval to authorize new settlements with bondholders. Brief of Defendant-Appellant the Republic of Argentina ("Arg. Br.") at 45. Plaintiffs-appellees contend, in contrast, that the Lock Law is a legislative enactment that prohibits payments with respect to their bonds and accords a higher legal preference to the exchange bonds. (A-2122). The United States does not have particular expertise on the application of Argentine law in the context of its 2005 and 2010 debt restructuring. Moreover, legal mechanisms to effectuate a default or a restructuring of debt are likely to vary from country to country, and may not exist in all cases. Accordingly, the United States takes no position as to whether the district court correctly concluded that the enactment of the Lock Law constituted a breach of the *pari passu* clause.

8

sovereign defaults could otherwise have on the global economy.

In response to the sovereign debt crises of the 1980s, the United States urged sovereign debtors to adopt economic policy reforms in conjunction with increased lending from the IFIs. In a subsequent initiative known as the Brady Plan, the United States explicitly recognized the role restructuring must play in resolving sovereign debt crises. The Brady Plan encouraged commercial banks to find alternatives to new lending in dealing with the sovereign debt problem, and called for debt and debt service reduction by banks. This policy was codified in the International Debt Management Act, 22 U.S.C. § 5324.

Over the past decade, the United States has recognized that the shift of the emerging market creditor base from commercial banks to bondholders has increased uncertainty surrounding the sovereign debt restructuring process and complicated decision-making for private creditors, the public sector, and sovereign debtors alike. Accordingly, the United States has been engaged in a concerted effort to promote greater orderliness and predictability in the restructuring process. The United States has advocated the incorporation of a package of new clauses into sovereign debt contracts that would provide for a more orderly restructuring process and facilitate countries' efforts to restructure their debt in order to reach more rapidly sustainable debt positions.

For example, the United States has encouraged the inclusion of collective action clauses in sovereign debt contracts, which would permit a super-majority of bondholders to amend a debt instrument even when a

9

minority creditor refuses to agree to the amendment. The United States considers the progress made in this initiative a demonstration that sovereign debt restructuring can be achieved within the existing framework of contractual relations and consensual negotiation.

Despite these actions to promote voluntary restructuring as the solution to sovereign debt crises, the growth of the secondary market for sovereign debt means that creditors have a wide range of financial interests. The disparate nature of creditor interests complicates the orderly resolution of sovereign debt crises, which depends on the voluntary actions of individual debtholders and the affected sovereign state in developing jointly negotiated solutions to balance of payment crises.

In this context, ensuring the certainty and predict-ability of sovereign contractual relations becomes essential. Indeed, U.S. sovereign debt policy implicitly recognizes the critical role of the contract in resolving a debt crisis. Restructuring negotiations must take place within a framework where creditors can seek recourse to the courts to enforce contractual obligations. Moreover, creditors must be assured that the terms of any new debt instruments issued pursuant to a restructuring plan will be legally enforceable. It would, however, harm the process that has evolved to address sovereign debt problems if creditors, in negotiating with debtors, also retained the option to litigate to obtain incorrect interpretations of standard terms than are not supported by commercial market practice. Because it is the United States' policy that neither party should be allowed to alter through litigation the terms of a

10

sovereign debt instrument, it is vital that such terms be interpreted according to settled market understanding.

Settled market understanding most clearly reflects the *ex ante* understanding of the parties at the time they entered their contractual relationship. In contrast, altering settled market understanding of existing debt instruments renders contractual relations less certain. International markets are adversely affected by uncertainty regarding provisions in sovereign debt instruments, particularly where, as here, it injects further unpredictability and disorder into the already complex problems posed by sovereign defaults. Such a lack of certainty could also discourage international lending to distressed sovereigns.

**B. The District Court's Interpretation of the *Pari Passu* Clause Disrupts Settled Expectations, and Is Incorrect as a Matter of Law and Adverse to the United States' Policy Interests**

The district court's construction of the *pari passu* clause in the December Orders is both contrary to the settled understanding of this standard contractual provision and at odds with the established framework for resolving sovereign payment crises through consensual restructuring of debt.

**1. The Ratable Payment Interpretation of the *Pari Passu* Clause Is Incorrect and Creates Uncertainty in Sovereign Contractual Relationships**

As an initial matter, by failing to analyze, let alone defer to, the market understanding of boilerplate language in a commercial instrument, the district

11

court's decision was contrary to New York law, which governs the interpretation of the loan documents at issue. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982) ("[T]he creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets."); *In re Southeast Banking Corp.*, 93 N.Y.2d 178, 183-84 (1999) (noting importance of settled marking understanding in construing terms of indenture instruments). Moreover, because *pari passu* clauses substantially similar to those at issue here have been common in sovereign debt instruments since the 1970s, adoption of the district court's novel interpretation is likely to disrupt financial markets for a considerable period.

### a. Longstanding Market Practice Supports a Narrow Reading of the *Pari Passu* Clause

The United States accepts the established market understanding of *pari passu* clauses in sovereign debt instruments. "The international financial markets have long understood the [*pari passu*] clause to protect a lender against the risk of legal subordination in favor of another creditor . . . ." Lee C. Buchheit & Jeremiah S. Pam, *The Pari Passu Clause in Sovereign Debt Instruments*, 53 Emory L.J. 869, 870 (2004); *see also id.* at 872 n.3; Rodrigo Olivares-Caminal, *Understanding the Pari Passu Clause in Sovereign Debt Instruments: A Complex Quest*, 43 Int'l Law. 1217, 1227 (Fall 2009) [hereinafter, "*Understanding the Pari Passu Clause*"]; Philip R. Wood, *Pari Passu Clauses—What Do They*

12

*Mean?*, 18 Butterworths J. of Int'l Banking and Financial L. 371, 372 (2003).

It is clear that the market does not understand the *de facto* actions or policies of a sovereign regarding payment of its debt obligations to affect the "rank" of debt within the meaning of the *pari passu* clause. To the contrary, market understanding has consistently reflected that a "borrower does not violate [the *pari passu*] clause by electing as a matter of practice to pay certain indebtedness in preference to the obligations outstanding under the agreement in which this clause appears." Lee C. Bucheit & Ralph Reisner, *The Effect of the Sovereign Debt Restructuring Process on Inter-Creditor Relationships*, 1988 U. Ill. L. Rev. 493, 497 (1988). The customary inclusion of *pari passu* provisions in sovereign debt instruments throughout the 1980s and 1990s was never viewed as a barrier to the resolution of sovereign defaults on foreign loans through the negotiation of consensual rescheduling and restructuring agreements. In fact, it was common practice throughout this period for sovereigns to exclude some debt from restructuring—such as debt owed to trade creditors or multilateral lending institutions—while restructuring other public debt. *See* Buchheit & Pam, *supra*, at 883.\*

----------

\* This was consistent with historical sovereign lending practice. In his treatise, former Yale law professor Edwin Borchard described how the principle of equal treatment of sovereign debt was understood in the early twentieth century, before the term "*pari passu*" had entered the sovereign debt lexicon:

### b. The Ratable Payment Interpretation of the *Pari Passu* Clause Deviates From This Settled Market Understanding

Notwithstanding this settled commercial understanding, in September 2000, a Belgian court in an *ex parte* proceeding relied upon the *pari passu* clause to enjoin payments by Peru through Euroclear to the holders of bonds issued under a restructuring

> The principle of equality . . . does not signify uniformity of treatment. . . . While the private law of bankruptcy is governed by the principle of equality of claims in the distribution of the debtor's assets, differential treatment of the holders of foreign government bonds in case of default is the ordinary rule. The reason therein lies in the semipolitical nature of government loans and in the great variety of forms and purposes for which such loans are issued.

Edwin Borchard, 1 *State Insolvency and Foreign Bondholders* 337-38 (1951). Professor Borchard went on to note the variety of ways in which discrimination among classes of state obligations had been tolerated in the past. For example, creditors tolerated preferences in favor of certain other creditors in order for the state to maintain its basic functions (*e.g.,* salaries for public employees) and to conduct trade (*e.g.,* preferred payment of short-term trade credits over longer term external loan contracts). *Id.*

14

agreement. *See Elliot Assocs., L.P. v. Banco de la Nacion*, General Docket No. 2000/QR/92 (Court of Appeals of Brussels, 8th Chamber, Sept. 26, 2000). The Belgian Court of Appeals held, without citation to any authority, that "the various creditors benefit from a *pari passu* clause that in effect provides that the debt be repaid *pro rata* among all creditors." *Id.* at 3. The Peruvian government was ultimately forced to pay substantially all of the holdout creditor's debt to avoid defaulting on its Brady Bonds. *See Understanding the Pari Passu Clause*, *supra*, at 1225.

The Belgian court's construction of the *pari passu* clause deviated from well-established market practice and was viewed with almost universal consternation by international financial markets. *See, e.g.*, Mark Weidemaier, Robert Scott & G. Mitu Gulati, *Origin Myths, Contracts and the Hunt for Pari Passu*, UNC Legal Studies Research Paper No. 1633439, at 5 (2011), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1633439 ("The decision sent shockwaves through the sovereign debt world . . . ."); Rodrigo Olivares-Caminal, *To Rank Pari Passu or Not to Rank Pari Passu: That is the Question in Sovereign Bonds After the Latest Episode of the Argentine Saga*, 15 Law and Business Review of the Americas 745, 746 (2009) [hereinafter "*To Rank Pari Passu*"]; Michael H. Bradley, James D. Cox & Mitu Gulati, *The Market Reaction to Legal Shocks and Their Antidotes: Lessons from the Sovereign Debt Market*, 39 J. Legal Studies 289, 303 (2010) ("[T]he [Belgian] court's decision came as a shock to the market and was clearly unanticipated.").

15

Most commentators concluded that the Belgian court had misconstrued the *pari passu* clause in a way that would cause problems in the sovereign debt markets. *See, e.g.*, Financial Markets Law Committee, *Pari Passu Clauses: Analysis of the Role, Use and Meaning of Pari Passu Clauses in Sovereign Debt Obligations as a Matter of English Law*, at 9-22 (2005) (A-1823–A-1849) (noting that the Belgian court's interpretation would be unworkable and contrary to market practice); *To Rank Pari Passu*, *supra*, at 746; Weidemaier, Scott & Gulati, *supra*, at 2; Buchheit & Pam, *supra*, at 917; G. Mitu Gulati & Kenneth N. Klee, *Sovereign Piracy*, 56 Bus. Law. 635, 640 (2001).

The Belgian government itself effectively overruled the *Elliot* decision in November 2004, by enacting legislation that precludes holdout creditors from obtaining orders blocking payments through Euroclear in future cases. *See* Belgium Law 4765 [C-2004/03482]; Bradley, Cox & Gulati, *supra*, at 9, 15 & n.33.*

---

    * Although two other lower level courts have issued orders requiring a sovereign to make *pro rata* payments to holders of defaulted sovereign debt instruments, neither court engaged in any substantive consideration of the *pari passu* clause, and both orders were later vacated. A Belgian court enjoined Euroclear from making payments to holders of debt instruments issued by the Republic of Nicaragua, but this decision merely adhered to the precedent set by the *Elliot* decision. *Republic of Nicaragua v. LNC Investments and Euroclear Bank S.A.*, Docket No. 240/03 (Brussels Commercial Ct. Sept. 11, 2003). This decision was reversed on appeal on grounds unrelated to the

16

The one court to examine the *pari passu* clause in depth since the *Elliot* decision was issued expressed skepticism regarding its conclusion. In *Kensington Int'l Ltd. v. Republic of the Congo*, 2002 No. 1088, [2003] EWHC 2331 (Comm) (Commercial Ct. Apr. 16, 2003), the court denied an application for an injunction requiring Congo to make *pro rata* payments to its creditors. The court ultimately based its decision upon, *inter alia*, the excessive and intrusive nature of the injunction that was sought. *Id.* at ¶¶ 93-94. The court nonetheless observed that it gave "little weight" to the *Elliot* decision, which "was made upon an *ex parte* application," *id.* at ¶ 63, and which was contrary to language in the Encyclopaedia of Banking Law stating that the *pari passu* clause is not violated "merely because one creditor is, in fact, paid before another," *id.* at ¶ 67.

————

interpretation of the *pari passu* clause. In another case, a district court in California denied a judgment creditor's motion for specific performance of the *pari passu* clause. Despite denying that motion, the court nonetheless enjoined the Democratic Republic of Congo from making payments on any debts unless proportionate payments were made to the plaintiff in that case. Order dated May 21, 2001, *Red Mountain Finance, Inc. v. Democratic Republic of Congo*, No. CV-00-0164 R (C.D. Cal.) (A-1369–A-1372). The district court's order contained no reasoning and so it is unclear on what basis the court entered the injunction. In any event, the injunction was vacated after the parties arrived at a settlement while the case was on appeal. (A-2216–A-2225).

17

Like the *Elliot* decision, the district court's decision here failed to analyze market practices or commercial understanding of the *pari passu* clause, much less consider how its interpretation of the *pari passu* clause might affect the financial markets. Because the district court's interpretation of the *pari passu* clause disrupts settled expectations concerning the scope and effect of boilerplate language contained in many sovereign debt instruments, it is contrary to U.S. policy interests. *See* Gulati & Klee, *supra*, at 649-50.

## 2. The Ratable Payment Interpretation of the *Pari Passu* Clause Would Disrupt the Orderly Resolution of Sovereign Debt Crises

The district court's broad interpretation of the *pari passu* clause also imperils the United States' efforts to promote voluntary debt restructuring, along with macroeconomic reform and support as necessary from the IFIs, as the most effective way to resolve sovereign balance of payment crises while minimizing economic damage. Voluntary sovereign debt restructuring will become substantially more difficult, if not impossible, if holdout creditors are allowed to use novel interpretations of boilerplate bond provisions to interfere with the performance of a restructuring plan accepted by most creditors and to dramatically tilt the incentives away from consensual, negotiated restructuring in the first place.

Reinterpreting standard *pari passu* clauses after decades of settled market practice could change the balance of interests that, to date, has induced the majority of creditors and debtors to recognize a

18

mutuality of interest in finding jointly negotiated solutions to balance of payment crises. The ratable payment interpretation of the *pari passu* clause presents a classic collective action problem: no creditor will be willing to accept the reductions in debt necessary for a consensual restructuring plan if creditors are contractually guaranteed to receive the full amount of their outstanding loan obligation at some point in the future, when the sovereign inevitably makes payment on other external indebtedness. Moreover, if, as happened in *Elliot*, creditors can interfere with payments by sovereign debtors to those creditors who have already accepted a reduction in the sovereign's debt obligation, this will reduce the incentives of such creditors to agree to a restructuring.

At the same time, the knowledge that creditors might be able to rely upon the *pari passu* clause to leverage greater recoveries from sovereign debtors would encourage more creditors to pursue holdout litigation strategies. *See Understanding the Pari Passu Clause*, *supra*, at 1219. The threat of increased litigation by holdout creditors relying upon the *pari passu* clause to target the implementation of a debt restructuring plan undermines the orderly consensual restructuring process the United States has been at pains to foster for the past several decades.

Indeed, a broad construction of the *pari passu* clause could ultimately involve the federal courts in rendering determinations concerning payments on Argentina's debts of all kinds and in many countries, including in Argentina itself. This may force the district court to assume the role of a sovereign bankruptcy court, issuing stays on all outflow of Argentina's assets and

19

supervising the timing and amount of payments made by Argentina to its creditors.

Finally, the ratable payment interpretation could have the cascading effect of turning short-term and limited balance of payment problems into full-fledged sovereign defaults. It was partly for this reason that the Financial Markets Law Committee ("FMLC"), an independent committee of private sector English lawyers sponsored by the Bank of England, rejected the ratable payment construction of the *pari passu* clause as unworkable and contrary to market practice. FMLC, *supra*, at 13-15. The FMLC observed that, following the ratable payment theory to its natural conclusion could have dramatic consequences: Because the ratable payment construction of the *pari passu* clause prohibits the creation of preferences among creditors, as soon as a sovereign became unable to pay all of its external indebtedness, even temporarily, the sovereign's only options would be to default on all of its outstanding obligations or violate the *pari passu* clause by prioritizing payments. *Id.* at 14. The *pari passu* clause should not be read to have such drastic implications.

### 3. The Ratable Payment Interpretation of the *Pari Passu* Clause Could Prevent Sovereign Debtors From Servicing Debts to International Financial Institutions

The ratable payment interpretation of the *pari passu* clause adopted by the district court could also impede the repayment of loans extended by IFIs to sovereigns experiencing unserviceable debt burdens. Although the district court's holding that Argentina breached the *pari passu* clause by its terms is limited to

20

Argentina's payments to holders of exchange bonds, the logical implication of its decision is that any selective payment of external indebtedness by a sovereign debtor, including to IFIs, constitutes a violation of the *pari passu* clause.

The United States relies upon the IFIs to play a critical role in resolving sovereign debt crises. The IFIs were established by the international community to advance shared public policy interests in promoting global economic growth and stability. For example, the IMF—with U.S. urging—played a central role in the international financial community's efforts to tackle the Latin debt crises of the 1980s, to promote the transition of Eastern European and former Soviet Union economies to market-based systems, and to address the Asian financial crisis in the second half of the 1990s.

Most recently, the IMF has worked with private bondholders and European leaders to restructure Greece's sovereign debt, thereby preventing a disorderly Greek default. The IMF has provided critical support for economic reform programs in Greece, Ireland, and Portugal in partnership with Europe, actions that have helped limit the damage from the European financial crisis to the United States and to economies around the world.

The IFIs—with the encouragement of the United States and other members—provide financial support to reforming countries at times when private capital is unavailable. Continued financial support for nations facing balance of payment difficulties and undertaking needed reforms is vital to maintaining the stability of the international financial system. *See, e.g.*, International Monetary Fund, Policy on Lending into

21

Arrears to Private Creditors, available at http://www.imf.org/external/pubs/ft/ privcred/ (1999).

The IFIs would be hampered in their ability to serve this function were they no longer able to expect timely and complete payments from their borrowers. *See* John W. Head, *Suspension of Debtor Countries' Voting Rights in the IMF: An Assessment of the Third Amendment to the IMF Charter*, 33 Va. J. of Int'l Law 591, 603-04 (1993). Therefore, as a matter of established custom, sovereign debtors routinely service debts owed to IFIs—even though those debtors may lack the resources to pay their other obligations. This custom is well understood by the international financial community. *See, e.g.*, Matthew H. Hurlock, *New Approaches to Economic Development: The World Bank, the EBRD, and the Negative Pledge Clause*, 35 Harv. Int'l L. J. 345, 365-66 (1994); Testimony of Deputy Assistant Secretary Mark Sobel Before the House Oversight Committee on TARP, Financial Services, and Bailouts of Public and Private Programs (Dec. 16, 2011), available at http://www.hftreview.com/pg/newsfeeds/hftreview/item/30378/written-testimony-of-deputy-assistant-secretary-mark-sobel-before-the-house-oversight-and-government-reform-subcommittee-on-tarp-financial-services-and-bailouts-of-public-and-private-programs-what-the-euro-crisis-means-for-taxpayers-and-the-us-economy ("The Fund is regarded as the world's preferred creditor, meaning that the IMF's member countries acknowledge and agree that it gets repaid first."); Department of State, Foreign Operations, and Related Programs Appropriations Act, 2012, div. I, Pub. L. No. 112-74, § 7071(b), 125 Stat. 786.1254 (2011) (directing the Secretary of the Treasury to "instruct the United States Executive Director of the [IMF] to seek to ensure that

22

any loan will be repaid to the IMF before other private creditors"). Any interpretation of the *pari passu* clause that would potentially prevent states from continuing to service their IFI debt during, or as they emerge from, financial crisis is contrary to U.S. interests.

## POINT II

## THE DISTRICT COURT'S ORDERS ARE IMPERMISSIBLY BROAD

The district court exceeded the permissible scope of its jurisdiction when it directed a sovereign state to marshal assets that are immune from the court's exercise of its execution powers under the Foreign Sovereign Immunities Act of 1976 ("FSIA") restrained the sovereign's use of such immune property, and commanded the sovereign to refrain from altering its processes for servicing its debt obligations to third parties not before the court. In the context of the FSIA, such an injunction constitutes a "breathtaking assertion of extraterritorial jurisdiction," *Autotech Technologies LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007), and, as discussed in further detail below, is inconsistent with directly relevant Second Circuit precedent. Furthermore, the extraordinary intrusiveness of the Orders could have adverse effects on our foreign relations and pose reciprocal concerns with respect to U.S. government assets.

### A. The Orders Contravene the Purpose and Structure of the FSIA

The injunctive relief ordered by the district court must be considered against the backdrop of the

23

statutory scheme established in the FSIA. The FSIA sets out the "sole, comprehensive scheme" for obtaining and enforcing a judgment against a foreign state in a civil case in the U.S. courts. *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 428 (5th Cir. 2006); *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433 (1989); Foreign Sovereign Immunities Act of 1976, House Report No. 94-1487, 5 U.S.C.A.A.N. 6604, 6610 (Sept. 9, 1976) [hereinafter H.R. 94-1487] (the FSIA "prescribes . . . [the] circumstances under which attachment and execution may be obtained against the property of foreign states to satisfy a judgment"). Under the FSIA, a foreign state is immune from jurisdiction except as immunity is removed by statute, 28 U.S.C. § 1604, and foreign state-owned property is "immune from attachment arrest and execution except as provided in" 28 U.S.C. §§ 1610 and 1611, 28 U.S.C. § 1609. Accordingly, the FSIA does not provide for plenary enforcement of the orders of U.S. courts, but instead cabins courts' enforcement authority to those mechanisms set forth in the statute. *Id.* §§ 1609-1611.

The FSIA's presumption of enforcement immunity contains exceptions for foreign state property located "in the United States" that is "used for a commercial activity in the United States" and that meets one of seven other requirements, 28 U.S.C. § 1610(a). Sovereign property located outside of the United States plainly falls outside the court's enforcement authority. *See, e.g.*, *Walters v. Industrial and Comm. Bank of China, Ltd.*, 651 F.3d 280, 288-89 (2d Cir. 2011) (noting that "special protection [is] afforded to the property of a foreign sovereign" under the FSIA because the judicial seizure of sovereign property is viewed as a

24

greater affront to sovereignty than the exercise of jurisdiction over a state by itself); *Walters v. People's Republic of China*, 672 F. Supp. 2d 573, 574 (S.D.N.Y. 2009) (citing cases). "The FSIA did not purport to authorize execution against a foreign state's property . . . wherever that property is located around the world." *Autotech*, 499 F.3d at 750.

The FSIA's carefully circumscribed limits on the judiciary's exercise of jurisdiction over sovereigns and foreign state property reflect a deliberate policy choice on the part of Congress. As Congress recognized at the time it enacted the FSIA, "enforcement [of] judgments against foreign state property remains a somewhat controversial subject in international law." H.R. 94-1487, 5 U.S.C.A.A.N. at 6626. The judicial seizure of the property of a foreign state may well "be regarded as 'an affront to its dignity and may . . . affect our relations with it.'" *Republic of Philippines v. Pimentel*, 128 S. Ct. 2180, 2190 (2008). Accordingly, the provisions of the FSIA allowing execution against foreign state property impose limits on the extraterritorial exercise of jurisdiction by U.S. courts. *See, e.g.*, *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1088-89 (9th Cir. 2007).

According to Argentina, "the Republic makes its payments on the restructured debt *outside the United States* when it transfers the necessary funds to a trustee." Arg. Br. at 50. If plaintiffs were to reduce their claims to money judgment, they would be prevented from seeking to attach the funds utilized to pay the exchange bonds under the FSIA's strictures on enforcement of judgments, as the funds at issue are located outside the United States. Presumably in an

25

effort to avoid these restrictions, plaintiffs-appellees chose instead to move for equitable relief that purports to constrain Argentina's use of such property.

A court may issue an injunction against a sovereign only if it is "clearly appropriate." H.R. 94-1487, 5 U.S.C.A.A.N. at 6621. An injunction restraining a sovereign's use of property that the FSIA expressly provides is immune from execution is inconsistent with the structure of the FSIA and thus not "clearly appropriate."

Although the injunctions at issue here do not formally effectuate a transfer of property interests, the February 23 Orders have the practical effect of requiring Argentina to transfer funds amounting to the balance of principal and interest owed to plaintiffs-appellees on the next occasion that it makes a payment on the exchange bonds. Courts are not permitted to achieve by injunction what they are prohibited from doing in the exercise of their limited execution authority under the FSIA. *See S&S Machinery Co. v. Masinexportimport*, 706 F.2d 411, 418 (2d Cir. 1983).

In *S&S Machinery Co.*, this Court considered the propriety of an injunction that restrained the use of assets that were immune from attachment under the FSIA. The Court squarely rejected the notion that a district court's jurisdiction over a foreign state permitted it to restrain the use of sovereign property that was not itself subject to the court's jurisdiction:

> [S]uch [an injunction] could only have resulted in the disingenuous flouting of the FSIA ban on prejudgment attachment of assets belonging to a

26

> 'foreign state'. . . . The FSIA would
> become meaningless if courts could
> eviscerate its protections merely by
> denominating their restraints as
> injunctions against the negotiation or
> use of property rather than as
> attachments of that property. We hold
> that courts in this context may not
> grant, by injunction, relief which they
> may not provide by attachment.

*Id.* at 418; *see also Weston Compagnie de Finance et D'Investissement, S.A. v. Republic del Ecuador*, 823 F. Supp. 1106, 1115-16 (S.D.N.Y. 1993) (denying injunction that directed sovereign to return funds that had passed through New York but were now located abroad).

Courts have repeatedly resisted creditors' attempts to evade the restrictions on enforcement set forth in the FSIA, even if creditors frame the collection method as an exercise of jurisdiction over the sovereign, rather than the sovereign's property. For example, in *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117 (9th Cir. 2010), the Ninth Circuit rejected a creditor's argument that the court's exercise of *in personam* jurisdiction over a sovereign provided it with authority to enter an order requiring the sovereign to assign foreign state assets located outside the United States, and hence immune from execution under the FSIA, to the creditor. *Id.* at 1130-32 ("The FSIA does not provide methods for the enforcement of judgments against foreign states, only that those judgments may not be enforced by resort to immune property."); *see also Philippine Export and Foreign Loan Guarantee Corp. v. Chuidian*, 218 Cal.

27

App. 3d 1058, 1094, 1099-100 (Cal. Ct. App. 1990) (rejecting argument that assignment order applying to assets worldwide would be "a valid exercise of the court's personal jurisdiction" over state instrument-ality, because such an order would "ignore a long-standing immunity under international law and under the FSIA," and give the creditor what he could not achieve "through ordinary creditors' remedies, namely, execution upon foreign property"); *cf. Walters*, 651 F.3d at 288-89 ("[T]he FSIA's provisions governing jurisdic-tional immunity, on the one hand, and execution immunity, on the other, operate independently.").

To the extent that plaintiffs-appellees rely upon section 1606 as the basis for the district court's authority to enter the injunctions, this argument is unavailing. Section 1606 establishes that, with respect to a claim for which a state is not entitled to immunity, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Yet section 1606 concerns "the scope of *liability*, [not] the scope of *execution*. Although [a state] may be found liable in the same manner as any other private defendant, the options for executing a judgment remain limited." *Rubin v. Islamic Republic of Iran*, 637 F.3d 783 (7th Cir. 2011) (rejecting argument that section 1606 provides authority to subject sovereign to broad discovery orders in aid of execution of judgment). Accordingly, section 1606 does not expand upon the enforcement remedies that are available against a sovereign defendant. *See Mangattu v. M/V Ibn Hayyan*, 35 F.3d 205, 209 (5th Cir. 1994). Nor is it even clear that a U.S. court would have the authority to issue such

28

a broad injunction—which also purports to bind non-parties in Argentina—against a private party.

In sum, parties cannot avoid the limitations deliberately imposed by Congress on judicial execution authority and expand the scope of remedies available to them in an action against a sovereign simply by refraining from asking the court to reduce their claims to judgment. There is no indication in the statutory text or history that Congress intended for litigants to be able to sidestep sections 1609-1611 by seeking an injunction that restrains the sovereign's use of immune assets until a judgment is satisfied, rather than an order of execution against those same assets.

## B. The Orders Are Harmful to the United States' Foreign Relations

In addition to being contrary to the purpose and structure of the FSIA, the February 23 Orders could cause heightened tensions in our foreign relations. The United States' views regarding the foreign policy implications of particular exercises of a court's jurisdiction under the FSIA are accorded deference by the courts. *See, e.g.*, *Af-Cap*, 462 F.3d at 428 n.8; *Whiteman v. Dorotheum GmbH & Co.*, 431 F.3d 57, 69-74 (2d Cir. 2005).

As an initial matter, the same foreign relations concerns that animate the FSIA's restrictions on execution of judgments with respect to sovereign property located abroad exist whether the order is denominated an order of attachment or an injunction restricting the use of sovereign funds. Although there is a widespread acceptance in modern international law that foreign states' immunity from adjudication may be

29

restricted, "immunity from enforcement jurisdiction remains largely absolute," and "a foreign State continues largely immune from forcible measures of execution against its person or property." H. Fox, "International Law and the Restraints on the Exercise of Jurisdiction by National Courts of States," in M. Evans, ed., *International Law*, 364, 366, 371 (2003).

Moreover, the laws of many foreign nations do not even permit a court to enter an injunction against a foreign state, and the foreign state may expect the United States to extend to it the same respect and courtesy. It is important to recognize in this regard the strongly held view of many foreign states that they are not subject to coercive orders of U.S. courts. *See* Fox, *supra*, at 371 ("Nor may an injunction or order for specific performance be directed by a national court against a foreign State on pain of penalty if not obeyed."). The potential for affront is particularly heightened where, as here, the U.S. court purports to control the foreign state's conduct within its own borders. The breadth of the injunctions at issue here, which not only purport to exercise jurisdiction over foreign state property, but also have the effect of dictating to a sovereign state the implementation of its sovereign debt policy within its own territory, is particularly likely to raise foreign relations tensions.

The February 23 Orders are also problematic in their application to third parties. An order by a U.S. court directing third parties' actions with respect to foreign property could lead to friction in our foreign relations by imposing obligations on foreign persons or entities with possession of foreign state assets. Such third parties might have inconsistent obligations with

30

regard to those assets as a matter of domestic law or by contract.

Finally, an order by a U.S. court authorizing execution against foreign state property could have adverse consequences for the treatment of the United States and its property abroad under principles of reciprocity. As the D.C. Circuit recognized in *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 841 (D.C. Cir. 1984), because "some foreign states base their sovereign immunity decisions on reciprocity," a U.S. court's decision to exercise jurisdiction over a foreign state can "subject the United States to suits abroad" in like circumstances. The district court's Orders restraining the use of foreign state property and purporting to direct the conduct of a sovereign state could encourage foreign courts to issue like orders against the United States and its property abroad.

31

**CONCLUSION**

**For the foregoing reasons, the Orders should be reversed.**

Dated:     New York, New York
           April 4, 2012

                          Respectfully submitted,

                          PREET BHARARA,
                          *United States Attorney for the*
                          *Southern District of New York,*
                          *Attorney for the United States as*
                          *Amicus Curiae*

                          JEANNETTE A. VARGAS,
                          JOHN D. CLOPPER,
                          SARAH S. NORMAND,
                          *Assistant United States Attorneys,*
                          *Of Counsel.*

STUART F. DELERY,
*Acting Assistant Attorney General*
MARK B. STERN,
SHARON SWINGLE,
*Attorneys, Appellate Staff*
*Civil Division, Department of Justice*

GEORGE W. MADISON,
*General Counsel, Department of the Treasury*

HAROLD HONGJU KOH,
*Legal Adviser, Department of State*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B). As measured by the word processing system used to prepare this brief, there are 6924 words in this brief.

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York*

By: JEANNETTE A. VARGAS,
*Assistant United States Attorney*

# EXHIBIT H

# 12-105-cv(L)

**12-109-cv(CON), 12-111-cv(CON), 12-157-cv(CON), 12-158-cv(CON),
12-163-cv(CON), 12-164-cv(CON), 12-170-cv(CON), 12-176-cv(CON),
12-185-cv(CON), 12-189-cv(CON), 12-214-cv(CON), 12-909-cv(CON),
12-914-cv(CON), 12-916-cv(CON), 12-919-cv(CON), 12-920-cv(CON),
12-923-cv(CON), 12-924-cv(CON), 12-926-cv(CON), 12-939-cv(CON),
12-943-cv(CON), 12-951-cv(CON), 12-968-cv(CON), 12-971-cv(CON)**

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖❖

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD.,
BLUE ANGEL CAPITAL I LLC, AURELIUS OPPORTUNITIES FUND II, LLC, PABLO
ALBERTO VARELA, LILA INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA
EVANGELINA CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA,
MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA LAVORATO,
CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES,
MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,

*Plaintiffs-Appellees,*

—against—

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICUS CURIAE*
## THE CLEARING HOUSE ASSOCIATION L.L.C.
## IN SUPPORT OF REVERSAL

PAUL SALTZMAN
JOSEPH R. ALEXANDER
THE CLEARING HOUSE
  ASSOCIATION L.L.C.
450 West 33rd Street
New York, New York 10001
(212) 613-0100

H. RODGIN COHEN
MICHAEL M. WISEMAN
  *Of Counsel*

SERGIO J. GALVIS
JOSEPH E. NEUHAUS
MICHAEL J. USHKOW
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for Amicus Curiae
  The Clearing House Association L.L.C.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for The Clearing House Association L.L.C. ("The Clearing House") hereby certifies that The Clearing House is not a subsidiary of any other corporation. The Clearing House is a limited liability company and as such has no shareholders. Rather, each member holds a limited liability company interest in The Clearing House that is equal to each other member's interest, none of which is more than a 10% interest in The Clearing House.

Dated:      New York, New York
            April 4, 2012

By:  /s/ Michael J. Ushkow
Michael J. Ushkow
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

*Attorneys for Amicus Curiae*
*The Clearing House Association L.L.C.*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

STATEMENT OF INTEREST OF *AMICUS CURIAE* .............................................6

ARGUMENT ......................................................................................................9

    I.     INTERPRETING THE *PARI PASSU* CLAUSE TO REQUIRE RATABLE PAYMENTS TO UNSECURED CREDITORS IS INCONSISTENT WITH THE LANGUAGE OF THE CLAUSE, OTHER PROVISIONS OF THE CONTRACT, AND MARKET PRACTICE AND UNDERSTANDING...............................................................9

          A.    Interpreting and Understanding *Pari Passu* Clauses.................9

          B.    Reading the *Pari Passu* Clause in the Context of the Entire FAA Confirms That the Lower Court's Interpretation is Erroneous........................................................11

    II.    INTERPRETING THE *PARI PASSU* CLAUSE TO REQUIRE RATABLE PAYMENT TO UNSECURED CREDITORS, AND THE INJUNCTION BASED UPON THAT INTERPRETATION, THREATENS THE ORDERLY FUNCTIONING OF THE PAYMENT SYSTEMS AND CREDIT MARKETS...........................................17

          A.    The Injunction Would Place Undue Burdens on the Payment Systems That Are Inconsistent with New York Law and This Court's Precedents. ...........................................17

          B.    The Orders Threaten the Proper Functioning of Credit Markets and the Certainty of Necessary Negotiated Workouts and Debt Restructurings...........................................24

CONCLUSION ................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Brown* v. *J.P. Morgan & Co.*,
 40 N.Y.S. 2d 229 (1st Dep't 1943), *aff'd*, 295 N.Y. 867 (1946)........................18

*Cala Rosa Marine Co., Ltd.* v. *Sucres et Deneres Group*,
 613 F. Supp. 2d 426 (S.D.N.Y. 2009) ................................................................24

*Grain Traders, Inc.* v. *Citibank, N.A.*,
 160 F.3d 97 (2d Cir. 1998) ................................................................................23

*Nacional Financiera, S.N.C.* v. *Chase Manhattan Bank, N.A.*,
 No. 00 Civ. 1571 (JSM), 2003 WL 1878415 (S.D.N.Y. Apr. 14, 2003) ...........11

*Shipping Corp. of India, Ltd.* v. *Jaldhi Overseas Pte, Ltd.*,
 585 F.3d 58 (2d Cir. 2009)  ...............................................................19, 23–24

*Winter Storm Shipping Ltd.* v. *Thai Petrochemical Industry PCL*,
 310 F.3d 263 (2d Cir. 2002)  .....................................................................23–24

*In re Yale Express System, Inc.*,
 370 F.2d 433 (2d Cir. 1966) ............................................................................23

### STATUTES AND RULES

11 U.S.C. § 507 .........................................................................................................9

12 U.S.C. § 1821 .......................................................................................................9

N.Y. U.C.C. § 4-A-104 ...........................................................................................19

N.Y. U.C.C. § 4-A-503 and comment ....................................................................23

### OTHER AUTHORITIES

2 PHILIP R. WOOD, LAW AND PRACTICE OF INTERNATIONAL FINANCE § 6.03
 (1990)..................................................................................................................10

3 COLLIER BANKRUPTCY PRACTICE GUIDE ¶ 55.07 (Alan Resnick & Henry J.
Sommer ed. 2011) ...............................................................................10

Ad Hoc Comm. For Revision of the 1983 Model Simplified Indenture, Am.
Bar Ass'n, *Revised Model Simplified Indenture*, 55 BUS. LAW. 1115
(2000) ................................................................................................14

Debra J. Schnebel, *Intercreditor and Subordination Agreements – A
Practical Guide*, 118 BANKING L.J. 48 (2001) .....................................10

Edward Luce, *Pakistan a warning for bondholders*, FIN. TIMES, Feb. 18,
1999, at 6 ..........................................................................................15

*Elliott Assocs., L.P.* v. *Banco de la Nacion*, Hof van Beroep [HvB]
[Court of Appeal] Brussel, 8e Kamer, Sept. 26, 2000, A.R. Nr.
2000/QR/92 (Belg.) .........................................................................5, 11

Financial Markets Law Committee, Issue 79 – Pari Passu Clauses
(Mar. 2005) .......................................................................................13

G. Mitu Gulati & Kenneth N. Klee, *Sovereign Piracy*,
56 BUS. LAW. 635 (2001) ...................................................................11

International Bank for Reconstruction and Development, GENERAL
CONDITIONS APPLICABLE TO LOAN AND GUARANTEE AGREEMENTS FOR
SINGLE CURRENCY LOANS § 9.03 (1995) .............................................15

*Kensington International Ltd.* v. *Republic of the Congo*,
2002 No. 1088 (Eng. Commercial Ct. Apr. 16, 2003) ...........................11

Lee C. Buchheit, HOW TO NEGOTIATE EUROCURRENCY LOAN AGREEMENTS
(2d ed. 2004) .....................................................................................12

Lee C. Buchheit & Jeremiah S. Pam, *The Pari Passu Clause in Sovereign
Debt Instruments*, 53 EMORY L.J. 869 (2004) ......................................10

*LNC Inv. LLC* v. *Republic of Nicaragua*, Rechtbanken van Koophandel
[Kh.] [Commercial Court] Brussel, Sept. 11, 2003, R.K. 240/03 (Belg.) ............5

Memorandum of *Amicus Curiae* The New York Clearing House Ass'n
L.L.C., *Macrotecnic Int'l Corp.* v. *Republic of Argentina*, No. 02 Civ.
5932 (TPG) (S.D.N.Y. Jan. 12, 2004) ....................................................8

Memorandum of Law of *Amicus Curiae* Federal Reserve Bank of New
 York, *Macrotecnic International Corp.* v. *Republic of Argentina*,
 No. 02 Civ. 5932 (TPG) (S.D.N.Y. Jan. 12, 2004) ................................. 8, 22-23

Permanent Editorial Bd. for the Uniform Commercial Code, PEB
 Commentary No. 16: Sections 4A-502(d) and 4A-503 (July 1, 2009) ..............24

Philip R. Wood, *Pari Passu Clauses – What Do They Mean?*,
 Butterworths J. Int'l Banking & Fin. L. 371 (2003) ...................................11

Statement of Interest of the United States, *Macrotecnic International Corp.*
 v. *Republic of Argentina*,
 No. 02 Civ. 5932 (TPG) (S.D.N.Y. Jan. 12, 2004) ..............................................8

William Tudor John, *Sovereign Risk and Immunity Under English Law and
 Practice*, 1 International Financial Law 79 (2d ed. R. Rendell ed.
 1983) ................................................................................................................10

Working Group on International Financial Crises, Report of the Working
 Group on International Financial Crises (1998) .......................................14

## INTRODUCTION

The Clearing House Association L.L.C. ("The Clearing House") submits this brief, with consent of all parties, as *amicus curiae* in the appeal by defendant the Republic of Argentina ("Argentina") from orders entered by the United States District Court for the Southern District of New York (Griesa, J.) on February 23, 2012 (the "Injunction" (A-3382–89)[1]) and underlying orders entered on December 7 and 13, 2011 (the "December 2011 Orders" and together with the Injunction, the "Orders") (A-2164–68, A-3047–53). The Clearing House supports Argentina's position that the Court should reverse the Orders.[2]

This brief addresses an issue of vital importance to the U.S. and international credit markets for trillions of dollars of debt obligations governed by New York law. The critical question posed is the effect, as a matter of New York law, of the *pari passu* covenant included in Section 1(c) of Argentina's Fiscal

---

[1] Citations to "A-" refer to the Joint Appendix. Pursuant to Federal Rule of Appellate Procedure 29(c)(5) and Local Rule 29.1(b), The Clearing House states that this brief was authored by The Clearing House and its counsel; was neither authored nor funded by any party to this action; and no person other than the *amicus curiae*, its members, or counsel contributed money that was intended to fund preparing or submitting this brief.

[2] On March 30, 2012, the Court granted The Clearing House's unopposed emergency motion for an extension of time to file this brief. *NML Capital, Ltd.* v. *Republic of Argentina*, No. 12-105-cv(L) (2d Cir. Mar. 30, 2012) (Dkt No. 176).

Agency Agreement dated as of October 19, 1994 (the "FAA"), A-157, and in the bonds issued thereunder and held by plaintiffs. Our member banks and other participants in the credit markets have long understood such a clause—which is standard language included in substantially the same form in numerous credit documents—to prohibit a debtor from creating unsecured debt that ranks senior in legal right of payment to the payment obligations the debtor has to creditors for whose benefit the covenant is made.

On December 7 and 13, 2011, the district court entered orders that adopted a markedly different, broader interpretation of this clause: that it also serves to prevent a debtor from paying certain of its unsecured, unsubordinated creditors without making a "Ratable Payment" to each of its other unsecured, unsubordinated creditors, and to permit an unpaid creditor to interfere with payments to other creditors. The district court ruled that the enactment of a 2005 (and 2009) Argentine statute, known as the "Lock Law," that prohibited the Argentine government from re-opening the then-pending exchange offer without approval of the Argentine Congress, and from settling later with non-tendering bondholders, constituted a violation of the *pari passu* clause. A-3053. The district court separately ruled that Argentina, apparently irrespective of the Lock Law, would violate the clause if it "fail[ed] to pay the obligations currently due under [plaintiffs'] Bonds while at the same time making payments currently due to

-2-

holders of other unsecured and unsubordinated External Indebtedness."  A-3052. The court postponed the question of remedy for later consideration.

On February 23, 2012, the district court granted plaintiffs' motions for injunctive relief.  The Injunction requires that Argentina make "Ratable Payments" to plaintiffs when Argentina "pays any amount due under the terms of the bonds or other obligations issued pursuant to [Argentina's] 2005 or 2010 Exchange Offers" (the "Exchange Bonds").  A-3387 (Injunction ¶ 2.a).  The Injunction defines Ratable Payment to mean the portion of the total amount owed to plaintiffs that corresponds to the *percentage* of the amount then due and owing on the Exchange Bonds that is being paid (not the actual dollar amount being paid).  A-3387 (Injunction ¶ 2.b & c).  (That is, if Argentina pays 100% of an installment owed on the Exchange Bonds it must pay 100% of the accelerated amounts of principal and interest due on the plaintiffs' bonds (a much larger sum).  A-3387 (Injunction ¶ 2.b & c).)  More generally, and vaguely, Argentina is enjoined from "violating [the *pari passu* clause in the FAA], *including* by making any payment under the terms of the Exchange Bonds without . . . concurrently or in advance making a Ratable Payment to" plaintiffs.  A-3387 (Injunction ¶ 2.d) (emphasis added).  Thus, apparently any payment to any unsecured creditor could be said to trigger the prohibition.  Moreover, the Injunction purports to bind "all parties involved, directly or indirectly, in advising upon, preparing, processing, or facilitating any

-3-

payment on the Exchange Bonds." A-3388 (Injunction ¶ 2.e). It prohibits such "Participants" from processing payments made pursuant to the Exchange Bonds unless Argentina certifies to the district court that Argentina has made or concurrently is making a Ratable Payment to plaintiffs and provides notice of the certification to the Participants. A-3388 (Injunction ¶ 2.e-f).[3]

The Clearing House respectfully submits that its interpretation—not the unique interpretation of the court below—reflects the view of how credit markets have negotiated and understood these clauses to operate for many decades, and is the correct reading of New York law. The Orders, on the other hand, are based upon an interpretation that constitutes a dramatic and disruptive departure

---

[3] Plaintiffs and the district court in the hearing at which the Injunction was signed indicated that the Injunction was intended to reach both entities with a designated role in the payment to bondholders—such as The Bank of New York (the trustee for the Exchange Bondholders) and Cede & Company (the registered Exchange Bondholder)—and unspecified "banks" and "intermediaries" who might participate in making payments to Exchange Bondholders. *E.g.*, A-2296–97 (Feb. 23, 2012 Tr. 7:22-8:2 ("THE COURT: The banks wouldn't be aiding and abetting [a violation of an order directed only at Argentina]. The banks only pay the exchange offer people. That's what they do. Now, if I entered this order, this would impose an obligation on the banks and it might impose an impediment upon the banks with respect to the exchange offer people which does not exist now."); *see also* A-2293, 2295-97, 2329 (*id.* at 4:12-19, 4:23, 6:13-15, 7:10, 8:17-24, 40:15-17) (referring to effect of order on "banks" and "intermediaries").

from how New York law-based credit markets have functioned in this area.[4]  We do not address in this brief whether Argentina's Lock Law in itself constitutes a breach of the *pari passu* clause,[5] but we submit that the district court's holding that paying the Exchange Bondholders without also paying other unsecured creditors was by itself a breach of the *pari passu* clause was clearly wrong.  This Court should reverse the Orders and reaffirm the long-understood meaning of these clauses in the market.

The Clearing House wishes to highlight for the Court two independent reasons for vacating the Orders of particular importance to The Clearing House

---

[4]  On two occasions, courts in Brussels, Belgium, have interpreted New York law to give *pari passu* clauses the second, broader meaning—that is, barring payments to some unsecured creditors if other unsecured creditors are not paid pro rata.  In each case, however, the Belgian court ruled without citing any New York authority.  *See Elliott Assocs., L.P.* v. *Banco de la Nacion*, Hof van Beroep [HvB] [Court of Appeal] Brussel, 8e Kamer, Sept. 26, 2000, A.R. Nr. 2000/QR/92 (Belg.) (A-1356–67); *LNC Inv. LLC* v. *Republic of Nicaragua*, Rechtbanken van Koophandel [Kh.] [Commercial Court] Brussel, Sept. 11, 2003, R.K. 240/03 (Belg.) (A-1333–55).

[5]  It is important, however, to distinguish between changes in *ranking* of subordinated debt and decisions by a debtor to pay one creditor over another.  On its face, Argentina's Lock Law appears to be nothing more than an expression of a sovereign's intent in the context of a restructuring not to give a better deal to bondholders who do not accept the restructured terms being offered.  Such statements are common, necessary in any sovereign restructuring and not ordinarily understood as changing the legal right to enforce the right to be paid.  In any event, enjoining payment to certain bondholders would not appear to be a proper remedy for a breach of a *pari passu* clause in unsecured debt held by other creditors.

and its members.  *First*, the district court's interpretation of the standard *pari passu* clause conflicts with longstanding market practice and understanding and, significantly, is inconsistent with the existence of other clauses that specifically provide for sharing and other allocation of payments by debtors and that are widely used in domestic and international credit agreements.   *Second*, if applied in accordance with its terms, the Injunction would impose undue burdens on the bank Participants, risk unacceptable delays to the clearing and settlement of unrelated payments, and threaten the orderly functioning of the U.S. and international credit markets and payment systems.

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

Established in 1853, The Clearing House is the United States' oldest banking association and payments company.  It is owned by the world's largest commercial banks, which collectively employ 1.4 million people in the United States and hold more than half of all U.S. deposits.[6]  The Clearing House is a nonpartisan advocacy organization representing, through regulatory comment

---

[6]   The members of The Clearing House are:  Banco Santander, S.A.; Bank of America, N.A.; The Bank of New York Mellon; The Bank of Tokyo-Mitsubishi UFJ Ltd.; Branch Banking and Trust Company; Capital One, N.A.; Citibank, N.A.; Comerica Bank; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; PNC Bank, N.A.; Regions Bank; The Royal Bank of Scotland N.V.; UBS AG; U.S. Bank N.A.; and Wells Fargo Bank, N.A.

letters, *amicus* briefs and white papers, the interests of its member banks on a variety of systemically important banking issues.  Its affiliate, The Clearing House Payments Company L.L.C. ("PaymentsCo"), provides payment, clearing, and settlement services to its member banks and other financial institutions, clearing almost $2 trillion daily and representing nearly half of the automated clearing-house, funds-transfer, and check-image payments made in the U.S.[7]

PaymentsCo operates the Clearing House Interbank Payments System ("CHIPS"), a real time, final payment funds transfer system that serves 53 U.S. and foreign banks and that each day processes, on average, over 377,967 payment orders, with an aggregate daily value of $1.522 trillion as of February 29, 2012.[8] CHIPS and Fedwire, which is operated by the Federal Reserve Banks, are the principal payment systems for international funds transfers in the United States.[9]

The Clearing House has a substantial interest in the outcome of this action because the lower court's broader interpretation of the *pari passu* clause so as to prevent the payment of one debtor in preference to another is not only wrong but also dangerous.  This is the first New York court to reach that conclusion.

---

[7]  *See* http://www.theclearinghouse.org.

[8]  *See* http://www.chips.org/docs/000652.pdf.

[9]  Average daily funds transfers using Fedwire amounted to $2.513 trillion in the fourth quarter of 2011.  *See* http://federalreserve.gov/paymentsystems/fedfunds_qtr.htm.

Unless and until reversed, it may be looked to by foreign courts as the only statement of New York law on the issue. Maintaining the correct interpretation of this widely used clause is important to Clearing House members not only as parties to the debt instruments that include the clause. An interpretation of the standard *pari passu* clause in debt instruments to permit some of a debtor's creditors to interdict payments to other creditors, as the Injunction does, would impose undue costs on intermediary banks and almost certainly delay some payments beyond those targeted by the court's order, incrementally degrading the reliability of the worldwide payment systems.[10] Moreover, an erroneous interpretation of that clause in debt instruments threatens the proper functioning of U.S. and international credit markets and, especially, the negotiation of orderly workouts and restructuring of debt where necessary and appropriate.

---

[10] For these reasons, in 2004 The Clearing House, the United States and the Federal Reserve Bank of New York all submitted *amicus* briefs to the district court opposing the proposed new interpretation. Mem. of *Amicus Curiae* The New York Clearing House Ass'n L.L.C., *Macrotecnic Int'l Corp.* v. *Republic of Argentina*, No. 02 Civ. 5932 (TPG) (S.D.N.Y. Jan. 12, 2004) (A-1805–22); Statement of Interest of the United States, *Macrotecnic Int'l Corp.* v. *Republic of Argentina*, No. 02 Civ. 5932 (TPG) (S.D.N.Y. Jan. 12, 2004) (A-1760–85); Mem. of Law of *Amicus Curiae* Federal Reserve Bank of New York, *Macrotecnic Int'l Corp.* v. *Republic of Argentina*, No. 02 Civ. 5932 (TPG) (S.D.N.Y. Jan. 12, 2004) ("FRBNY Mem.") (A-1786–1804). At that time, the district court resolved this issue without reaching the merits because plaintiffs represented to the court that they were not asserting a claim under the *pari passu* clause. A-2016–17. Each of these briefs was placed before the district court anew in connection with the motions that resulted in the Orders.

# ARGUMENT

**I.** **INTERPRETING THE *PARI PASSU* CLAUSE TO REQUIRE RATABLE PAYMENTS TO UNSECURED CREDITORS IS INCONSISTENT WITH THE LANGUAGE OF THE CLAUSE, OTHER PROVISIONS OF THE CONTRACT, AND MARKET PRACTICE AND UNDERSTANDING.**

## A. Interpreting and Understanding *Pari Passu* Clauses.

Trillions of dollars of outstanding unsecured debt obligations governed under New York law benefit from *pari passu* clauses. Like all contractual provisions, the *pari passu* clause must be interpreted to reflect the intent of the parties, as such intent is expressed in the language of the clause read in the context of the entire contract. The function of the clause, as its language provides, is to affirm that the obligations to which it relates will be unsecured and unsubordinated obligations, ranking *pari passu* and without preference among defined categories of unsecured debt. The *pari passu* clause contrasts directly with a subordination clause in which holders of debt agree to be subordinate in right of payment to certain specified debt obligations.

*Pari passu* clauses are usually not included in domestic U.S. debt instruments because the general parity of unsecured debt obligations, absent statutory priorities[11] or the exercise of a court's equitable powers of

---

[11] *See*, *e.g.*, 12 U.S.C. § 1821(d)(11); 11 U.S.C. § 507(a).

subordination,[12] is well established by law.[13]  Indeed, it is so established that the prospectuses pursuant to which U.S. domestic corporate debt is sold typically refer to the *pari passu* status of the debtor's obligation even without inclusion of a specific contractual *pari passu* clause.

In contrast, for non-U.S. debt, it is the practice to include such clauses in the debt contracts because there is not always the same certainty that the legal regimes generally applicable to such debtors will necessarily protect creditors from involuntary subordination.[14]  The clause is not intended, however, to do more than what it says—to provide certainty on the issue of involuntary subordination.  The *pari passu* clauses in both the FAA and the bonds held by plaintiffs reflect this standard approach.

There is no basis for concluding that a *pari passu* clause serves the broader function of prohibiting a debtor from choosing to pay some unsecured creditors without simultaneously paying others, or, if a debtor attempts to make

---

[12]  *See* 3 COLLIER BANKRUPTCY PRACTICE GUIDE ¶ 55.07 (Alan Resnick & Henry J. Sommer ed. 2011).

[13]  *See* Debra J. Schnebel, *Intercreditor and Subordination Agreements – A Practical Guide*, 118 BANKING L.J. 48, 53 (2001).

[14]  *See* 2 PHILIP R. WOOD, LAW AND PRACTICE OF INTERNATIONAL FINANCE § 6.03 (1990); William Tudor John, *Sovereign Risk and Immunity Under English Law and Practice*, 1 INTERNATIONAL FINANCIAL LAW 79, 95 (2d ed. R. Rendell ed. 1983); Lee C. Buchheit & Jeremiah S. Pam, *The Pari Passu Clause in Sovereign Debt Instruments*, 53 EMORY L.J. 869, 902–04 (2004).

-10-

such payments, permitting an unpaid unsecured creditor to enlist the aid of a court to interfere with payments to other creditors. Before the December 2011 Orders, no New York or other U.S. court had interpreted the *pari passu* clause in such a way.[15] There is, however, significant legal commentary criticizing such a broad interpretation of New York law-governed *pari passu* clauses.[16]

### B. Reading the *Pari Passu* Clause in the Context of the Entire FAA Confirms That the Lower Court's Interpretation is Erroneous.

Our conclusion about the limited purposes of the *pari passu* clause and the error in the analysis of the court below is confirmed when the clause is read in the context of the provisions included in and absent from the remainder of the FAA. Most telling is the absence of a "sharing clause."

---

[15] To date no court in New York has adopted either the *Elliott* or *Nicaragua* interpretation of the *pari passu* clause. The *Elliott* case was cited but not followed in *Nacional Financiera, S.N.C.* v. *Chase Manhattan Bank, N.A.*, No. 00 Civ. 1571 (JSM), 2003 WL 1878415 (S.D.N.Y. Apr. 14, 2003), which noted only that the presence of an injunction such as was entered in *Elliott* would present a different case. Similarly, the English courts have not addressed the merits of the issue with respect to *pari passu* clauses in English-law debt instruments. *See Kensington Int'l Ltd.* v. *Republic of the Congo*, 2002 No. 1088, transcript at 27 (Eng. Commercial Ct. Apr. 16, 2003) (noting absence of English authority and denying injunction on equitable grounds) (A-1991–97).

[16] *See*, *e.g.*, Buchheit & Pam, *supra* note 14, at 10–15; Philip R. Wood, *Pari Passu Clauses – What Do They Mean?*, BUTTERWORTHS J. INT'L BANKING & FIN. L. 371, 374 (2003); G. Mitu Gulati & Kenneth N. Klee, *Sovereign Piracy*, 56 BUS. LAW. 635, 637-39 (2001).

A "sharing clause" is the vehicle for lenders or other creditors to agree among themselves on a contractual basis—typically in syndicated loan agreements—that, if any one of them receives a payment from a debtor that is disproportionate to any amounts received by all of the creditors who are party to the agreement, the excess payment will be shared with the others. These "sharing clauses" generally provide either that a lender is to pay over any disproportionate payment it receives to the other lenders as though it had been received from the debtor or that the lender receiving the disproportionate payment is to purchase participations in the loans held by the other banks. *See* Lee C. Buchheit, How to Negotiate Eurocurrency Loan Agreements 76–81 (2d ed. 2004). The FAA and Argentine bonds at issue do not have such a clause.

There are three important points to note in relation to sharing clauses. First, these clauses are often found in loan agreements under which the creditors separately are protected against involuntary subordination through a *pari passu* clause, because these two types of clauses serve different purposes. It is, in fact, standard practice in syndicated loan agreements with non-U.S. debtors to include both sharing clauses, to protect against disproportionate payments to lenders in the

-12-

group, and *pari passu* clauses, to protect against involuntary subordination to new or existing classes of debt.[17]

        Second, sharing clauses protect a narrowly defined set of creditors: the lenders who agree among themselves in the inter-creditor agreement in which they appear. In contrast, *pari passu* clauses relate to unilateral action by the debtor with respect to an extremely broad set of creditors: the holders of all sorts of unsecured debt. That could be trade debt, such as the bill owed to the electric company, short-term bank borrowings, or multi-billion dollar bond issuances.[18] Moreover, sharing clauses contain complex "payover" provisions that are necessary to reallocate disproportionate payments among creditors. That is not necessary for *pari passu* clauses, which address only the ranking of legal right to, as opposed to the fact of, payment. Thus, given the specificity and restrictions on

---

[17] *See* Financial Markets Law Committee, Issue 79 – Pari Passu Clauses, at 4, 17–18 (Mar. 2005) (A-1830, 1843–44).

[18] Although the Injunction limits its certification requirement to payments from Argentina to Exchange Bondholders, it expressly enjoins Argentina from making any payments that would breach the *pari passu* clause as interpreted by the district court. A-3387 (Injunction ¶ 2.d). The Injunction provides no basis to limit payments that would trigger the requirement to pay the plaintiff bondholders. It is utterly implausible that the parties to a *pari passu* clause intended it to prevent any timely payment to any other creditor (including trade creditors) without Ratable Payment to plaintiffs, as that would prevent the Argentine national government from operating in the event of a default, yet that is the inevitable result of the district court's interpretation.

standard sharing clauses, it is implausible to contend that the market intends *pari passu* clauses to accomplish the same thing in a much vaguer and open-ended way.[19]

Third, sharing clauses are generally not included in New York law-governed fiscal agency agreements, such as Argentina's FAA, or, for that matter, in bond issuances generally.[20] This practice as it relates to sovereign debt securities, and the effect of not having them in that context, has been the subject of considerable debate and commentary in the market. In the 1990s, official sector participants (the G-10 governments and the International Monetary Fund) proposed that emerging market sovereign bonds begin to incorporate sharing clauses modeled on those typically found in syndicated commercial bank loans. *See*, *e.g.*, Working Group on International Financial Crises, REPORT OF THE WORKING GROUP ON INTERNATIONAL FINANCIAL CRISES 19–20 (1998). Prominent trade associations representing bond market investors argued strongly against the

---

[19] Similarly, when lenders agree to be subordinated to other debt, they do so through subordination clauses that, as typically drafted, (a) apply strictly for the benefit of a specified group of senior creditors (and, in most cases, not generally to the debtors' unsecured obligations) and (b) expressly provide that any subordinated creditor who receives a payment otherwise prohibited by the subordination provisions must pay it over to the beneficiaries of the clause.

[20] *See*, *e.g.*, Ad Hoc Comm. For Revision of the 1983 Model Simplified Indenture, Am. Bar Ass'n, *Revised Model Simplified Indenture*, 55 BUS. LAW. 1115 (2000).

-14-

inclusion of such clauses. *See*, *e.g.*, Edward Luce, *Pakistan a warning for bondholders*, FIN. TIMES, Feb. 18, 1999, at 6, *cited in* Buchheit & Pam, *supra* note 14, at 12 n.35. Ultimately, the market did not adopt the proposal. This debate clearly demonstrates that market participants and governments around the world did not consider *pari passu* clauses, which had been in use for decades, to impose a Ratable Payment obligation on debtors or to give rights to unpaid creditors to interfere with payments to other creditors.[21]

The FAA's lack of a sharing clause shows that plaintiffs (or the investors from whom plaintiffs purchased the bonds issued under the FAA) had not bargained for the right to Ratable Payments. Moreover, the FAA contains another provision, the inclusion of which is wholly inconsistent with the lower court's broad reading of the *pari passu* clause. Section 9(c) of the FAA (A-169) provides:

> The Republic may at any time purchase Securities at any
> price in the open market or otherwise, provided that in

---

[21] Although *pari passu* clauses apply to protect creditors against legal subordination to other *unsecured* obligations of the debtor, they do not address the terms under which the debtor may create *secured* obligations. That task is left for "negative pledge" clauses, which customarily are included in debt instruments—including the FAA at Section 11 (A-170–72) and agreements with the World Bank. Such clauses, for example, preclude the debtor from preferring other creditors by granting them security interests or liens over the debtor's assets or revenues without equally and ratably securing the creditors benefiting from the clause. *See*, *e.g.*, International Bank for Reconstruction and Development, GENERAL CONDITIONS APPLICABLE TO LOAN AND GUARANTEE AGREEMENTS FOR SINGLE CURRENCY LOANS § 9.03 (1995).

any such case such purchase or purchases are in compliance with all relevant laws, regulations and directives. Securities so purchased by the Republic, may, at the Republic's discretion, be held, resold or surrendered to the Fiscal Agent for cancellation. The Securities so purchased, while held by or on behalf or for the benefit of the Republic shall not entitle the registered holder thereof to vote at any meetings of registered holders of Securities and shall not be deemed to be outstanding for the purposes of calculating quorums at meetings of the registered holders of the Securities. Notwithstanding the foregoing, the Republic will not acquire any beneficial interest in any Securities unless it gives prior written notice of each acquisition to the Fiscal Agent. The Fiscal Agent will be entitled to rely without further investigation on any such notification (or lack thereof).

Pursuant to this clause, the issuer may purchase bonds (i) at any time, (ii) at any price, and (iii) in the open market or otherwise (*e.g.*, in privately negotiated transactions). The only conditions imposed upon the issuer are that purchases be made in accordance with applicable law and regulations, the issuer not vote securities held by it at bondholders' meetings, and the issuer give the fiscal agent prior notice of each purchase. There is nothing in this provision (or in its companion provision that sets out procedures for the issuer to cancel purchased bonds (FAA § 9(d) (A-169))) that contractually imposes upon the debtor any obligation to make ratable purchases at equal prices among holders of the securities, or to make payments to any bondholders upon cancellation of other outstanding bonds. Because, from the perspective of the recipient of the funds,

-16-

issuer repurchases are the functional equivalent of repayments, it would be irrational for bondholders to provide issuers with this broad flexibility to make repurchases if the intention of the *pari passu* clause were to prohibit payments to bondholders absent Ratable Payments to other creditors.

## II. INTERPRETING THE *PARI PASSU* CLAUSE TO REQUIRE RATABLE PAYMENT TO UNSECURED CREDITORS, AND THE INJUNCTION BASED UPON THAT INTERPRETATION, THREATENS THE ORDERLY FUNCTIONING OF THE PAYMENT SYSTEMS AND CREDIT MARKETS.

The district court's conclusion that a *pari passu* clause requires a debtor to make Ratable Payments to its unsecured unsubordinated creditors, and the Injunction permitting unpaid creditors to interfere with payments that a debtor makes to other unsecured creditors, would impose undue burdens on banks and risk delay of unrelated payments. Further, because of the prevalence of New York law-governed debt instruments, the Injunction threatens the orderly functioning of the credit markets, particularly in cases of sovereign debt in or perceived to be near default.

### A. The Injunction Would Place Undue Burdens on the Payment Systems That Are Inconsistent with New York Law and This Court's Precedents.

The Clearing House members act as intermediary banks for electronic funds transfer ("EFT") payments hundreds of thousands of times each day. *See supra* p. 7. The Injunction and its confirmation regime (A-3388 (Injunction ¶ 2.f))

would place significant burdens on intermediary banks that are inconsistent with New York law and this Court's precedents. The Injunction evidently depends on Participants—defined in the Injunction to include intermediary banks—to verify that no payment is made by Argentina to Exchange Bondholders unless and until the Participants have received notice that Argentina has filed a certification with the district court demonstrating that a Ratable Payment has been made to plaintiffs. This system, or any system that seeks to force intermediary banks to stop payments by a particular entity for a particular purpose, imposes significant costs on intermediary banks and risks delays in payments unrelated to the targeted Exchange Bond payments.[22]

---

[22] Plaintiffs have suggested in conversations prior to filing this brief that the Injunction was not intended to reach intermediary banks that might process payments made to the Exchange Bondholders. Such a limitation would be welcome but should have been included in the Injunction itself, which the district court directed be served on all "Participants" "involved, directly or indirectly, in . . . processing . . . any payment on the Exchange Bonds." A-3388. Moreover, that limitation apparently would not extend to the trustee for the Exchange Bondholders, a Clearing House member, which would be faced with a court order purporting to direct it not to carry out its fiduciary obligations to those Bondholders if it receives a payment of principal and interest for distribution to them. This attempt to interdict such payments could not be achieved by the ordinary means of attachment. *Brown* v. *J.P. Morgan & Co.*, 40 N.Y.S. 2d 229, 233 (1st Dep't 1943) (bondholder cannot attach money in the hands of trustee for other bondholders because the money "belongs to the [other] bondholders"), *aff'd*, 295 N.Y. 867 (1946).

Under the 2005 and 2010 Exchange Bonds, Argentina makes principal and interest payments not to Exchange Bondholders directly but to a trustee for the Bondholders in Argentina. A-2207; A-2288. Pursuant to a trust indenture, dated June 2, 2005, The Bank of New York (now The Bank of New York Mellon, a Clearing House member) was appointed trustee (the "Trustee"). A-2281.

Payment from the Trustee to the U.S.-registered Exchange Bondholder takes the form of an EFT from the Trustee's bank outside the United States to the registered holder's bank in the United States, with the funds transfer often routed through one or more intermediary banks. An EFT is "a series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." N.Y. U.C.C. § 4-A-104(1). Only the originator's bank and the beneficiary's bank in an EFT have a contractual relationship with the ultimate originator and beneficiary, respectively; the remaining transactions in a typical EFT are with, or between, intermediary banks. *See Shipping Corp. of India Ltd.* v. *Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 60 n.1 (2d Cir. 2009) (explaining the operation of EFTs). As a consequence, while information about the ultimate originator and beneficiary is included in payment processing information to ensure that the payment is ultimately credited properly, from the perspective of intermediary banks, the critical information to know in

-19-

executing EFTs is the identity of the banks before and after them in the payment chain.

Payment order forms provide for the identification of the originator and ultimate beneficiary in "free text" fields, so that the identification may be abbreviated or appear with other variations.[23]  For example, the originator or beneficiary could be identified by account number, or by an identifying code assigned by a funds-transfer network, with or without a name.  If the name were included, the name could be abbreviated or otherwise shortened.  In any case, under the procedures described in the trust indenture, the originator of any funds transfer to pay the U.S.-registered Exchange Bondholder would not be Argentina, but the Trustee, a large commercial bank that makes tens of thousands of payments every day, so one could not simply flag all payments from that bank.  Moreover, even if a Participant could properly identify the originator, payment orders do not need to indicate the purpose of the payment and there is no uniform method for doing so.  If the purpose of the funds transfer as a payment on the Exchange Bonds

---

[23] Cross-border funds transfer systems use computer-readable structured payment-order formats that require information to be placed in limited fields.  The most common funds-transfer system used for cross-border payments is the Society for Worldwide Interbank Financial Telecommunication ("SWIFT"), and SWIFT payments coming into the United States are frequently routed through Fedwire or CHIPS.

is mentioned in any way in the payment orders, it would be in a free-form reference field.

In connection with counter-terrorism initiatives and economic-sanctions programs administered by the Treasury Department's Office of Foreign Assets Control ("OFAC"),[24] banks electronically screen all of their EFTs to identify payments that must be blocked or rejected under OFAC rules. This process frequently generates false positives. The process of eliminating those false positives is extremely labor-intensive, involving both iterative refinement of search terms and manual review of numerous "hits." This process is not only very costly to the banks, but sometimes results in delays in payments. This is because the process of eliminating false positives is not always completed in the course of a single payment day, resulting in some delay to payments having no connection to the target payment. The extent of that impact is impossible to predict, as it depends entirely on the specificity of the information provided with respect to the target payment.

The only way that banks would be able to comply with the Injunction as written would be to search for the enjoined payments using the screening procedures used to comply with OFAC sanctions, yet the Injunction provides very

---

[24] OFAC programs include sanctions against Iran, North Korea, and global terrorists. *See*, *e.g.*, 31 C.F.R. parts 500, 510, 535, and 594.

little information that could be used to identify the enjoined payments or reduce the costs to the banks or the risk of delayed payments. The Exchange Bond payment apparently would be originated by the Trustee—which, as noted earlier, is one of the largest participants in automated electronic payment systems—and be directed to one or more custodians in the United States or elsewhere who might or might not be known. There might or might not be an indication on the payment order that it was related to the Exchange Bonds. As a consequence, any attempt to identify a particular payment to Exchange Bondholders would generate numerous false hits. The banks' operations staff would need to review the entire message for the originator's and ultimate beneficiary's name, abbreviations or variations thereof, account or identifying numbers, or information concerning the purpose of the payment. Such an effort would raise significant problems with the speed of payment processing and, because it would require the use of the same personnel and procedures that the banks use for OFAC compliance, complicate the banks' ability to effectively identify and block payments that are subject to OFAC sanctions.

As the FRBNY noted in its 2004 *amicus* brief filed in the court below, this kind of manual review of transfers would increase costs for banks and the payment system. The FRBNY noted that it would have "a wholly unacceptable impact both on the speed of the system and the certainty of the payments it

-22-

handles." FRBNY Mem. at 8 (this issue is not "unique to Fedwire or to the Reserve Banks. If dollar settlements can be restrained while they are being made in the Fedwire system, which is the model for payment systems globally, then all payments are at risk for such restraints") (A-1798).

New York law has long recognized the critical need to protect the payment systems from interference of this kind. Under Article 4-A of the Uniform Commercial Code, intermediary banks are not subject to attachment or injunctions relating to payment orders. *See*, *e.g.*, N.Y. U.C.C. § 4-A-503 cmt. ("No other injunction is permitted. In particular, intermediary banks are protected . . . .");[25] *Grain Traders, Inc.* v. *Citibank, N.A.*, 160 F.3d 97, 102 (2d Cir. 1998) ("[T]hese are matters as to which an intermediary bank ordinarily should not have to be concerned."). As this Court has observed, permitting EFTs to be interdicted at intermediary banks "would impede the use of rapid electronic funds transfers in commerce by causing delays and driving up costs." *Id.*

Similarly, this Court in *Jaldhi* explained that, during a period in which this Circuit's law permitted restraint of EFTs by means of maritime attachments

---

[25] The "Official Comments" of the Uniform Commercial Code "are powerful dicta for the Code is 'well on its way to becoming a truly national law of commerce,' and is, therefore, as we have noted, a most appropriate source of federal law." *In re Yale Express Sys., Inc.*, 370 F.2d 433, 437 (2d Cir. 1966) (citation omitted).

under *Winter Storm Shipping Ltd.* v. *Thai Petrochemical Industry PCL*, 310 F.3d 263, 278 (2d Cir. 2002), the resulting volume of restraints served on New York banks "led to strains on federal courts and international banks operating within" the Second Circuit to such an extent that "some ha[d] even suggested that *Winter Storm* ha[d] threatened the usefulness of the dollar in international transactions." *Jaldhi*, 585 F.3d at 61 (citing Permanent Editorial Bd. for the Uniform Commercial Code, PEB Commentary No. 16: Sections 4A-502(d) and 4A-503 (July 1, 2009)).[26]

### B. The Orders Threaten the Proper Functioning of Credit Markets and the Certainty of Necessary Negotiated Workouts and Debt Restructurings.

Leaving to one side the logistical difficulty of requiring Participants to administer the Injunction in real time, as a more general matter, the payment regime envisioned by the Orders will increase litigation both in the United States and elsewhere and make orderly restructuring of much of the world's New York law-governed sovereign debt impossible.

---

[26] As the Court in *Jaldhi* reported, ultimately the impact that maritime attachments had on banks and international funds transfers post-*Winter Storm* was limited in part because a district court denied a plaintiff's request for a "continuous service" provision. 585 F.3d at 63 (discussing *Cala Rosa Marine Co., Ltd.* v. *Sucres et Deneres Grp.*, 613 F. Supp. 2d 426, 432 (S.D.N.Y. 2009)). Because an attachment is void unless the bank holds an attachable interest of the debtor at time of service, that district court decision rendered "many maritime attachments effectively unenforceable." *Jaldhi*, 585 F.3d at 63. In contrast, the Injunction at issue in this proceeding purports to impose a continuing obligation on bank Participants.

-24-

First, as a practical matter, the lower court's interpretation of the *pari passu* clause and the Injunction would spur further litigation, rather than provide an effective remedy to plaintiffs. Using the case of the Argentine debt crisis as an example, suppose that when plaintiffs commenced litigation, the Republic had paid them in full in accordance with its obligations under the bonds. Under the lower court's reading of the *pari passu* clause, other bondholders (and, for that matter, any other creditors under instruments containing a *pari passu* clause), could have sought to interfere with the payment to plaintiffs. And if those other creditors succeeded in receiving a Ratable Payment (assuming *arguendo* proration in the context of Argentina's billions of dollars of unsecured and unsubordinated debt entitled to *pari passu* treatment could have sensibly been made), then Argentina and such other creditors (and for that matter these plaintiffs) in turn would be at risk that yet another set of unpaid bondholders would bring a similar action. The resulting web of claims, counterclaims, and cross-claims against Argentina and among creditors would place an enormous burden on courts and make virtually impossible an orderly restructuring of Argentina's indebtedness.

Second, such a broad reading of the *pari passu* clause poses additional threats to the reliable functioning of international payment systems. By stimulating a proliferation of injunctions aimed at payment intermediaries—along the lines of the *Nicaragua* case with respect to Euroclear Bank S.A.—such an

-25-

interpretation would inhibit the free flow of funds among financial institutions, create uncertainty as to rights and liabilities, and place intermediary banks in the middle of civil disputes. In this particular instance, it also exposes banks to burdensome discovery. A-3388 (Injunction ¶ 3). Given the prevalence of New York law as the law governing international debt obligations, the Court should not allow a New York court ruling that adopts an interpretation of standard contractual language that is contrary to settled market understanding and expectations and would have such global disruptive implications to stand.

Moreover, if this improbable and unexpected interpretation is affirmed, it will raise questions for market participants about the stability of New York contract law. In the already close competition between New York and other law—particularly English law—when drafters choose a governing law, the outcome of this case is likely to tip the balance, in some instances, away from New York law and New York courts, which will have a deleterious long-term impact on New York's financial institutions and its preeminence as a financial center.

Finally, such a reading would be highly disruptive to the credit markets that support trillions of dollars of existing non-U.S. unsecured debt issued under New York law with *pari passu* clauses. It is a common and long-established practice for troubled debtors to seek to manage their liabilities by satisfying the obligations of certain creditors (such as short-term trade creditors and holders of

short-term sovereign debt) in order to maintain ongoing operations or, in the case of a foreign sovereign, to cover potential budget deficits relating to necessary domestic programs, while holding off on satisfying obligations to other creditors. These liability management activities in which many debtors engage in the ordinary course with respect to their general, unsecured, unsubordinated obligations would become susceptible to challenge. Any obligor in financial distress and engaged in an effort to manage and negotiate its liabilities could find those efforts frustrated and be driven to insolvency even if insolvency, with its enormously disruptive impact, could otherwise have been avoided. Taken to its logical conclusion, a financially troubled debtor could never pay any unsecured obligation without making a Ratable Payment (which under the Injunction is the full payment of principal and interest) on all other unsecured claims (both financial obligations and trade claims), an absurd and counterproductive proposition.

## CONCLUSION

The Clearing House respectfully urges the Court to reverse and vacate the Orders and reaffirm the long-understood meaning of *pari passu* clauses of the type included in Argentina's external debt offerings. Such clauses reflect standard practice and, under New York law, are not properly interpreted to prevent a debtor from paying certain of its unsecured unsubordinated creditors without making Ratable Payment to its other creditors. Allowing courts to convert a bargained-for

*pari passu* clause into universal sharing clauses would be inconsistent with expectations of credit market participants. Further, the Injunction would impose undue burdens on banks, risk delaying the timely settlement of unrelated payments, and disrupt the stability of these markets.

Dated: April 4, 2012
    New York, New York

Respectfully submitted,

/s/ Joseph E. Neuhaus

Paul Saltzman                               Sergio J. Galvis
Joseph R. Alexander                         Joseph E. Neuhaus
THE CLEARING HOUSE                          Michael J. Ushkow
  ASSOCIATION L.L.C.                        SULLIVAN & CROMWELL LLP
450 West 33rd Street                        125 Broad Street
New York, New York  10001                   New York, New York  10004
(212) 613-0100                              (212) 558-4000

H. Rodgin Cohen                             *Attorneys for Amicus Curiae*
Michael M. Wiseman                          *The Clearing House Association*
    *Of Counsel*                            *L.L.C.*

-28-

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(B)

I certify that the length of this brief, as measured by the "Word Count" function of Microsoft Word software, is 6,988 words, exclusive of this certificate and other permissible exclusions contained in Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

Dated:  April 4, 2012
        New York, New York

/s/ Michael J. Ushkow
Michael J. Ushkow
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

*Attorneys for Amicus Curiae*
*The Clearing House Association L.L.C.*

## CERTIFICATE OF SERVICE & CM/ECF FILING

12-105-cv(L)　　　NML Capital, Ltd. v. The Republic of Argentina

I hereby certify that I caused the foregoing Brief for *Amicus Curiae* The Clearing House Association L.L.C. in Support of Reversal to be served on counsel for Plaintiffs-Appellees, Defendant-Appellant and Amicus Curiae United States of America via Electronic Mail generated by the Court's electronic filing system (CM/ECF) with a Notice of Docket Activity pursuant to Local Appellate Rule 25.1:

Carmine D. Boccuzzi, Jr.
Christopher P. Moore
Cleary Gottlieb Steen & Hamilton LLP
1 Liberty Plaza
New York, NY 10006
212-225-2000

Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
City Place House
55 Basinghall Street
London, EC2V 5EH
England
+442076142200

*Attorneys for Defendant-Appellant*
*The Republic of Argentina*

Theodore B. Olson
Matthew McGill
Jason J. Mendro
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
202-887-3680

Robert A. Cohen
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
212-698-3501

*Attorneys for Plaintiff-Appellee*
*NML Capital, Ltd.*

Barry Robert Ostrager
Kimberly A. Hamm
Tyler B. Robinson
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
212-455-2000

Melissa Kelly Driscoll
Menz Bonner & Komar LLP
444 Madison Avenue, 39th Floor
New York, NY 10022
212-223-2100

Edward A. Friedman
Andrew W. Goldwater
Jessica Murzyn
Daniel B. Rapport
Emily A. Stubbs
Friedman Kaplan Seiler & Adelman LLP
7 Times Square
New York, NY 10036
212-833-1100

Jeffrey A. Lamken
MoloLamken LLP
600 New Hampshire Avenue
Washington, DC 20037
202-556-2010

Walter Rieman
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3260

*Attorneys for Plaintiffs-Appellees*
*Aurelius Capital Master , Ltd., ACP Master ,*
*Ltd., Blue Angel Capital I LLC, Aurelius*
*Opportunities Fund II, LLC*

Jeannette Anne Vargas
Assistant U.S. Attorney
United States Attorney's Office
 for the Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
212-637-2678

*Attorneys for Amicus Curiae
United States of America*

Gary Steven Sintow
Michael Champlin Spencer
Milberg LLP
1 Pennsylvania Plaza, 48th Floor
New York, NY 10119
212-594-5300

*Attorneys for Plaintiffs-Appellees
Pablo Alberto Varela, Lila Ines Burgueno,
Mirta Susana Dieguez, Maria Evangelina
Carballo, Leandro Daniel Pomilio, Susana
Aquerreta, Maria Elena Corral, Teresa Munoz
De Corral, Norma Elsa Lavorato, Carmen Irma
Lavorato, Cesar Ruben Vazquez, Norma
Haydee Gines,
Marta Azucena Vazquez*

Stephen D. Poss
Robert D. Carroll
Goodwin Procter LLP
53 State Street
Boston, MA 02109
617-570-1000

*Attorneys for Plaintiff-Appellee
 Olifant Fund, Ltd.*

I certify that an electronic copy was uploaded to the Court's electronic filing system. Six hard copies of the foregoing Brief for *Amicus Curiae* The Clearing House Association L.L.C. in Support of Reversal were sent to the Clerk's Office By Hand Delivery to:

Clerk of Court
United States Court of Appeals, Second Circuit
United States Courthouse
500 Pearl Street, 3rd floor
New York, New York 10007
(212) 857-8576

on this 4th day of April 2012.

Notary Public:

/s/ Ramiro A. Honeywell

**Sworn to me this**

April 4, 2012

RAMIRO A. HONEYWELL
Notary Public, State of New York
No. 01HO6118731
Qualified in Kings County
Commission Expires November 15, 2012

/s/ Samantha Collins

SAMANTHA COLLINS
Record Press, Inc.
229 West 36th Street, 8th Floor
New York, New York 10018
(212) 619-4949

2

# EXHIBIT I

```
                                    ┌─────────────────────────────┐
                                    │ USDC SDNY                   │
                                    │ DOCUMENT                    │
                                    │ ELECTRONICALLY FILED        │
                                    │ DOC #: _____        │
                                    │ DATE FILED: 2/23/12         │
                                    └─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

NML CAPITAL, LTD.                          08 Civ. 6978 (TPG)
                                           09 Civ. 1707 (TPG)
                        Plaintiff,         09 Civ. 1708 (TPG)

        v.

REPUBLIC OF ARGENTINA,

                        Defendant.
--------------------------------------------------------x

## [PROPOSED] ORDER

WHEREAS, in an Order dated December 7, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic is "required . . . at all times to rank its payment obligations pursuant to NML's Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 Order, this Court granted partial summary judgment to NML on its claim that the Republic repeatedly has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds."

And WHEREAS NML Capital, Ltd. ("NML") has filed a renewed motion for equitable relief as a remedy for such violations pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

14293534

Upon consideration of NML's renewed motion, the response of the Republic of Argentina (the "Republic") thereto, NML's reply, and all other arguments submitted to the Court in the parties' papers and at oral argument, it is HEREBY ORDERED that:

1. It is DECLARED, ADJUDGED, and DECREED that NML is irreparably harmed by and has no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA, and that the equities and public interest strongly support issuance of equitable relief to prevent the Republic from further violating Paragraph 1(c) of the FAA, in that:

> a. Absent equitable relief, NML would suffer irreparable harm because the Republic's payment obligations to NML would remain debased of their contractually-guaranteed status, and NML would never be restored to the position it was promised that it would hold relative to other creditors in the event of default.

> b. There is no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA because the Republic has made clear— indeed, it has codified in Law 26,017 and Law 26,547—its intention to defy any money judgment issued by this Court.

> c. The balance of the equities strongly supports this Order in light of the clear text of Paragraph 1(c) of the FAA and the Republic's repeated failures to make required payments to NML. In the absence of the equitable relief provided by this Order, the Republic will continue to violate Paragraph 1(c) with impunity, thus subjecting NML to harm. On the other hand, the Order requires of the Republic only that which it

promised NML and similarly situated creditors to induce those creditors to purchase the Republic's bonds. Because the Republic has the financial wherewithal to meet its commitment of providing equal treatment to both NML (and similarly situated creditors) and those owed under the terms of the Exchange Bonds, it is equitable to require it to do so. Indeed, equitable relief is particularly appropriate here, given that the Republic has engaged in an unprecedented, systematic scheme of making payments on other external indebtedness, after repudiating its payment obligations to NML, in direct violation of its contractual commitment set forth in Paragraph 1(c) of the FAA.

d. The public interest of enforcing contracts and upholding the rule of law will be served by the issuance of this Order, particularly here, where creditors of the Republic have no recourse to bankruptcy regimes to protect their interests and must rely upon courts to enforce contractual promises. No less than any other entity entering into a commercial transaction, there is a strong public interest in holding the Republic to its contractual obligations.

2.     The Republic accordingly is permanently ORDERED to specifically perform its obligations to NML under Paragraph 1(c) of the FAA as follows:

a.     Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the

3

        2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" (as defined below) to NML.

b.      Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

c.      Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which the Republic intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

d.      The Republic is ENJOINED from violating Paragraph 1(c) of the FAA, including by making any payment under the terms of the Exchange Bonds without complying with its obligation pursuant to Paragraph 1(c) of the FAA by concurrently or in advance making a Ratable Payment to NML.

e.      Within three (3) days of the issuance of this ORDER, the Republic shall provide copies of this ORDER to all parties involved, directly or indirectly, in advising upon, preparing, processing, or facilitating any payment on the Exchange Bonds (collectively, "Agents and Participants"), with a copy to counsel for NML. Such Agents and Participants shall be bound by the terms of this ORDER as provided by Rule 65(d)(2) and

prohibited from aiding and abetting any violation of this ORDER, including any further violation by the Republic of its obligations under Paragraph 1(c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to NML.

f.   Concurrently or in advance of making a payment on the Exchange Bonds, the Republic shall certify to the Court and give notice of this certification to its Agents and Participants, and to counsel for NML, that the Republic has satisfied its obligations under this ORDER to make a Ratable Payment to NML.

3.   NML shall be entitled to discovery to confirm the timing and amounts of the Republic's payments under the terms of the Exchange Bonds; the amounts the Republic owes on these and other obligations; and such other information as appropriate to confirm compliance with this ORDER;

4.   The Republic is permanently PROHIBITED from taking action to evade the directives of this ORDER, render it ineffective, or to take any steps to diminish the Court's ability to supervise compliance with the ORDER, including, but not limited to, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval of the Court;

5

5.    This Court shall retain jurisdiction to monitor and enforce this ORDER, and to modify and amend it as justice requires to achieve its equitable purposes and to account for changing circumstances.

Dated: _Feb. 23, 2012_

_Thomas P. Griesa_

Thomas P. Griesa

# EXHIBIT J

1

```
       C2N4NMLC
  1    UNITED STATES DISTRICT COURT
  1    SOUTHERN DISTRICT OF NEW YORK
  2    ------------------------------x
  2    NML CAPITAL LTD,
  3                  Plaintiff,
  3            v.
  4                                      03CV8845(TPG)
  4    THE REPUBLIC OF ARGENTINA,
  5                  Defendant.
  5    ------------------------------x
  6                                      New York, N.Y.
  6                                      February 23, 2012
  7                                      11:15 a.m.
  7    Before:
  8                      HON. THOMAS P. GRIESA
  8                                      District Judge
  9
  9                      APPEARANCES
 10
 10    GIBSON, DUNN & CRUTCHER
 11         Attorneys for Plaintiff NML
 11    THEODORE B. OLSON
 12    MATTHEW D. McGILL
 12    JASON J. MENDRO
 13    MISHA TSEYTLIN
 13
 14    DECHERT
 14        Attorneys for Plaintiff NML
 15    ROBERT A. COHEN
 15
 16    FRIEDMAN KAPLAN SEILER & ADELMAN
 16         Attorneys for Plaintiff Olifant Fund (10CV9587)
 17    EDWARD A. FRIEDMAN
 17    DANIEL B. RAPPORT
 18    ROBERT CARROLL
 18
 19    MILBERG
 19         Attorneys for Plaintiff Varela (10CV5338)
 20    MICHAEL C. SPENCER
 20
 21    CLEARY GOTTLIEB STEEN & HAMILTON
 21         Attorneys for Defendant Republic of Argentina
 22    CARMINE D. BOCCUZZI
 22    MICHAEL M. BRENNAN
 23    EZEQUIEL SANCHEZ-HERRERA
 23    MONA WILLIAMS
 24
 25
```

C2N4NMLC

1     $650 million.  That is one/third of the amount that Argentina
2     paid to the exchange bondholders in connection with payments
3     they made in December of last year, just two months ago.  They
4     paid over $2 billion to the exchange bondholders two months ago
5     after your December 7 order.  The amount owed to NML is $650
6     million.  The amount owed to the other bondholders who are here
7     represented in court today, if my calculations are correct, is
8     another $670-some million.
9                 Both of those added together are less than two/thirds
10    of what Argentina paid out in December to the exchange
11    bondholders.
12                THE COURT:  Just a minute.
13                Give me the figure for NML again.
14                MR. OLSON:  NML, the figure I have in front of me, I
15    could give it to the penny, but it's approximately $650
16    million.
17                THE COURT:  How is that arrived at?
18                MR. OLSON:  That is the principal plus prejudgment
19    interest as of a few days ago.
20                THE COURT:  What happened when the default occurred?
21    The principal was accelerated, right.
22                MR. OLSON:  Yes.
23                THE COURT:  And so the judgments would have been for
24    that accelerated principal, right.
25                MR. OLSON:  Yes.  These are prejudgment interests; the

27

C2N4NMLC

 1    three cases before you today are prejudgment cases.
 2              THE COURT:  But have judgments been entered?
 3              MR. OLSON:  Judgments have been entered in other cases
 4    on behalf of other bondholders and there are also judgments in
 5    NML cases.  We brought the interpretation of the pari passu
 6    clause provision with respect to cases in which you have not
 7    yet entered judgment.
 8              THE COURT:  Why did you decide to do that?
 9              MR. OLSON:  Because those cases were still open.  We
10    thought, Argentina made the point, there might be issues with
11    respect to the interpretation of the pari passu clause with
12    respect to cases where there have already been judgments.
13    These are cases where, the cases are still pending, there have
14    not been judgments.
15              THE COURT:  If you win on this, are we going to have
16    motion as to the others.
17              MR. OLSON:  Possibly.  But that would raise this other
18    issue because of having entered the judgment.  We determined
19    that it would be more straightforward to deal with this issue
20    without having to deal with that separate issue at this time.
21              THE COURT:  650 million for NML and the other people.
22              MR. OLSON:  The other bondholders represented today,
23    if the information in my possession is correct and I believe it
24    is, is 677 million.
25              THE COURT:  OK.  Let's take a short break then I will
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------x
                                              :
NML CAPITAL, LTD.,                            :
                                              :
                        Plaintiff,            :        08 Civ. 6978 (TPG)
                                              :        09 Civ. 1707 (TPG)
              – against –                     :        09 Civ. 1708 (TPG)
                                              :
REPUBLIC OF ARGENTINA,                        :            **ORDER**
                                              :
                        Defendant.            :
                                              :
----------------------------------------------x

Upon consideration of the motion by NML Capital, Ltd. ("NML") for partial summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure ("FRCP") and for injunctive relief and/or specific performance pursuant to FRCP 65(d) and the court's inherent equitable powers, the response of the Republic of Argentina (the "Republic") thereto, NML's reply, and all other arguments submitted to the court in the parties' papers and at the hearing held on September 28, 2011;

WHEREAS the uncontested facts establish that:

1.     The Republic issued bonds pursuant to a 1994 Fiscal Agency Agreement ("FAA").

2.     Paragraph 1(c) of the FAA provides, among other things, that:

The Securities [i.e., the bonds] will constitute . . . direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank <u>pari passu</u> and without any preference among themselves. The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and

unsubordinated External Indebtedness (as defined in this Agreement).

3.      The bonds issued pursuant to the FAA contain the following clause, as quoted in <u>EM Ltd. v. The Republic of Argentina</u>, 720 F.Supp.2d 273, 278 (S.D.N.Y. 2010):

> The Republic has in the Fiscal Agency Agreement irrevocably submitted to the jurisdiction of any New York state or federal court sitting in the Borough of Manhattan, The City of New York and the courts of the Republic of Argentina (the "Specified Courts") over any suit, action, or proceeding against it or its properties, assets or revenues with respect to the Securities of this Series or the Fiscal Agency Agreement (a "Related Proceeding") except with respect to any actions brought under the United States federal securities laws.  The Republic has in the Fiscal Agency Agreement waived any objection to Related Proceedings in such courts whether on the grounds of venue, residence or domicile or on the ground that the Related Proceedings have been brought in an inconvenient forum. The Republic agrees that a final nonappealable judgment in any such Related Proceeding (the "Related Judgment") shall be conclusive and binding upon it and may be enforced in any Specified Court or in any other courts to the jurisdiction of which the Republic is or may be subject (the "Other Courts"), by a suit upon such judgment.

4.      NML owns bonds issued pursuant to the FAA ("NML's Bonds").

5.      The Republic issued other bonds in its 2005 and 2010 Exchange Offers ("Exchange Bonds"), thereby creating new unsecured and unsubordinated External Indebtedness.

6.      The Republic has satisfied the payment obligations that have come due to date under the Exchange Bonds.

7.      The Republic has not paid principal or interest on NML's Bonds since December, 2001.

8.     NML has brought the captioned actions to recover on the defaulted bonds, pursuant to its legal rights, and also pursuant to the express undertakings in the bonds.

9.     On February 10, 2005, Argentina enacted Law 26,017, providing that the "national State shall be prohibited from conducting any type of in-court, out-of-court or private settlement with respect to bonds" that were eligible to participate in the 2005 Exchange Offer.

10.     On December 9, 2009, Argentina enacted Law 26,547, which, *inter alia*, suspended the effect of Law 26,017 for a period of time during which the 2010 Exchange Offer was launched, closed, and consummated.  Law 26,547 also provides that the "Republic of Argentina . . . is prohibited to offer holders of government bonds [including those issued pursuant to the FAA] who may have initiated judicial, administrative, arbitration or any other type of action [to enforce their rights], more favorable treatment than what is offered to those who have not done so."

WHEREAS NML claims that the Republic breached (and continues to breach) its contractual duty to rank its payment obligations under NML's Bonds at least equally with all its other present and future unsecured and unsubordinated External Indebtedness, NML seeks summary judgment on the Republic's liability for that breach, and NML seeks an injunction that would restore it to its bargained-for position among other creditors;

It is HEREBY ORDERED that:

- 3 -

1.     The motion for partial summary judgment pursuant to Rule 56(a) is GRANTED.

2.     It is DECLARED, ADJUDGED, and DECREED that the Republic is required under Paragraph 1(c) of the FAA at all times to rank its payment obligations pursuant to NML's Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness.

3.     It is DECLARED, ADJUDGED, and DECREED that the Republic's payment obligations on the bonds include its payment obligations to bondholders who have brought actions to recover on their defaulted bonds, and on judgments entered pursuant to judicial action brought by bondholders.

4.     It is DECLARED, ADJUDGED, and DECREED that the Republic violates Paragraph 1(c) of the FAA whenever it lowers the rank of its payment obligations under NML's Bonds below that of any other present or future unsecured and unsubordinated External Indebtedness, including (and without limitation) by relegating NML's bonds to a non-paying class by failing to pay the obligations currently due under NML's Bonds while at the same time making payments currently due to holders of other unsecured and unsubordinated External Indebtedness or by legislative enactment.

5.     It is DECLARED, ADJUDGED, and DECREED that the Republic lowered the rank of NML's bonds in violation of Paragraph 1(c) of the FAA when it made payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds.

- 4 -

6.    It is DECLARED, ADJUDGED, and DECREED that the Republic lowered the rank of NML's bonds in violation of Paragraph 1(c) of the FAA when it enacted Law 26,017 and Law 26,547.

7.    It is DECLARED, ADJUDGED, and DECREED that the aforesaid laws were in direct violation of the right of NML under the FAA and the bond agreements to bring a legal action in court to recover on the defaulted bonds.

8.    The motion for injunctive relief and/or specific performance pursuant to FRCP 65(d) and the court's inherent equitable powers is DENIED at the present time to permit further consideration by the court regarding the means of enforcement of the present ORDER.

SO ORDERED.

Dated:  New York, New York
        December 7, 2011

_Thomas P. Griesa_
Thomas P. Griesa
U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/7/11

- 5 -